**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LOGAN MILLS,** | * | **CIVIL ACTION** |
| | * | **NO. 18-847** |
| **VERSUS** | * | |
| | * | **DIVISION "F"(2)** |
| **ROBERT TANNER, WARDEN** | * | |
| | * | |

**************************************************************************

---

**EXHIBIT B**

**MILLS' ORIGINAL EXHIBITS ACCOMPANYING HIS APPLICATION FOR POST CONVICTION RELIEF**

---

IN THE TWENTY-SECOND JUDICIAL DISTRICT COURT
FOR THE PARISH OF WASHINGTON
IN THE STATE OF LOUISIANA

---

No. 11-CR5-113331

---

**LOGAN NESTOR MILLS**
*Petitioner*

v.

**DARREL VANNOY, WARDEN**
*Respondent*

---

# EXHIBITS

Respectfully submitted by:

**JANE HOGAN,** Bar Roll No. 35172
Hogan Attorneys
309 East Church Street
Hammond, Louisiana 70401
(985) 542-7730
(985) 542-7756 fax
jane@hoganandhogan.com

*Counsel for Logan Mills, Petitioner*

**EXHIBITS:**

| | |
|---|---|
| **A** | Federal Complaint for Damages and Injunctive Relief |
| **B** | Letter to Appellate Counsel |
| **C** | Appellate Counsel's Original Brief |
| **D** | State's Original Brief |
| **E** | Appellate Counsel's Reply Brief |
| **F** | *Pro se* Reply Brief |
| **G** | *Pro se* Supplemental Brief |
| **H** | *Pro se* Application for Rehearing |
| **I** | Declaration of Philip J. Kaplan |
| **J** | Declaration of Logan N. Mills |
| **K** | "Charges crumble after cell phone video uncovered" |
| **L** | "Louisiana police and prosecutors conspire to send an innocent man to prison for serving a summons on a fellow police officer." |
| **M** | "Seven cops and lawyers apparently 'lied' to put this man in jail. He was only saved by the video you're about to see." |
| **N** | "Police contrived conspiracy against Douglas Dendinger" |
| **O** | "But for the video…." |
| **P** | "Video exonerates man set up by Louisiana cops and prosecutors" |
| **Q** | "Police misconduct: the worst case in March" |
| **R** | Voluntary statement of Chad Cassard |
| **S** | Voluntary statement of Scott Seals |
| **T** | Voluntary statement of Julie Knight |
| **U** | Voluntary statement of Leigh Anne Wall |
| **V** | Voluntary statement of Pamela Jean Legendre |
| **W** | Voluntary statement of Joe Culpepper |
| **X** | Voluntary statement of Kendal Bullen |
| **Y** | Arrest report of Deputy Steven Galloway |
| **Z** | Felony Bill of Information |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LOGAN N. MILLS** | **CIVIL ACTION NO.** |
| **Versus** | **SECTION:** |
| | **MAGISTRATE** |
| **CITY OF BOGALUSA, JOE CULPEPPER, KENDALL BULLEN PATRICK LYONS, SCOTT SEALS, CHAD CASSARD, JOHN DOE DEFENDANTS** | **JURY DEMANDED** |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

NOW INTO COURT, through undersigned counsel, comes Logan N. Mills ("Plaintiff"), and for his Complaint, alleges as follows:

**THE PARTIES**

1.

The defendants herein are:

a. City of Bogalusa (hereinafter sometimes "City"), a body corporate and political subdivision of the State of Louisiana. City operates the Bogalusa Police Department. It is able to sue and be sued in its own name and is a "person" within the meaning of 42 U.S.C. § 1983.

EXHIBIT
A

b.      Joe Culpepper (hereinafter sometimes "Culpepper"), a person of the full age of majority and the duly appointed Chief of the Bogalusa Police Department, who resides in the Eastern District of Louisiana, sued in both his individual and official capacities. Plaintiff is informed and believes and thereon alleges that Defendant Culpepper is, and at all relevant times was, a policy-making official of City and the Bogalusa Police Department. Defendant Culpepper is, and at all material times was, the individual charged with the duty and granted the authority to render final decisions regarding use-of-force policies and practices of the Bogalusa Police Department, including without limitation the protocol used herein in the apprehension and arrest of criminal suspects.

c.      Kendall Bullen (hereinafter sometimes "Bullen") is a person of the full age of majority, employed by the Bogalusa Police Department holding the rank and title of "Captain" and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana. Plaintiff alleges that Defendant Bullen is, and at all relevant times was, a policy-making official of the City and Bogalusa Police Department, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant City. Defendant Bullen is sued herein in both his individual and official capacities.

d.      Patrick Lyons (hereinafter sometimes "Lyons") is a person of the full age of majority, employed by the Bogalusa Police Department holding the rank and title of "Lieutenant" and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana. Plaintiff alleges that Defendant Lyons is, and at all relevant times was, a policy-making official of the City and Bogalusa Police Department, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant City. Defendant Lyons is sued herein in both his individual and official capacities.

e.      Scott Seals (hereinafter sometimes "Seals") is a person of the full age of majority, who, at all relevant times, was employed by the Bogalusa Police Department holding the rank and title of "Patrolman First Class" ("PFC") and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana.  Plaintiff alleges that Defendant Seals was, at all relevant times, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant City.  Defendant Seals is sued herein in his individual capacity.

f.      Chad Cassard (hereinafter sometimes "Cassard") is a person of the full age of majority, who, at all relevant times, was employed by the Bogalusa Police Department holding the rank and title of "Patrolman First Class" ("PFC") and who on information and belief resides in Washington Parish and within the Eastern District of Louisiana.  Plaintiff alleges that Defendant Cassard was, at all relevant times, acting under the color of law and within his capacity as an employee, agent, representative, and servant of Defendant City.  Defendant Cassard is sued herein in his individual capacity.

g.      John Doe 1, a person of the full age of majority employed by the Bogalusa Police Department, who on information and belief resides in the Eastern District of Louisiana, and whose proper name Plaintiff has been unable to ascertain.  Plaintiff is informed and believes and thereon alleges that John Doe 1 is and was a policy-making official with respect to policies and practices involving the facts herein, including without limitation the protocol used herein in the apprehension and arrest of criminal suspects. John Doe 1 is sued herein in both his/her official and individual capacity

h. John Doe 2, a person of the full age of majority employed by the Bogalusa Police Department, who on information and belief resides in the Eastern District of Louisiana, and whose proper name Plaintiff has been unable to ascertain. Plaintiff is informed and believes and thereon alleges that John Doe 2 is and was a policy-making official with respect to policies and practices involving the facts herein, including without limitation the protocol used herein in the apprehension and arrest of criminal suspects. John Doe 2 is sued herein in both his/her official and individual capacity.

i. John Doe 3, a person of the full age of majority employed by the Bogalusa Police Department, who on information and belief resides in the Eastern District of Louisiana, and whose proper name Plaintiff has been unable to ascertain. Plaintiff is informed and believes and thereon alleges that John Doe 3 is and was a policy-making official with respect to policies and practices involving the facts herein, including without limitation the protocol used herein in the apprehension and arrest of criminal suspects. John Doe 3 is sued herein in both his/her official and individual capacity.

**JURISDICTION AND VENUE**

2.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983, while this Court has pendent jurisdiction over the State Claims herein.

3.

Venue is proper in this district and division under 28 U.S.C.A. § 1391(b), because the underlying acts and conduct violating applicable laws and constitutional rights occurred in this district; and/or each defendant conducts its/his/her affairs in, or is an inhabitant of, resides in, or has an agent in this district.

**ALLEGATIONS COMMON TO ALL COUNTS**

4.

On April 20, 2011, it is alleged that Plaintiff was involved with an armed robbery of Capital One Bank, located in Bogalusa, Louisiana.

5.

After the above-alleged act, the above-defendants, including without limitation Lieutenant Lyons, PFC Scott Seals and PFC Cassard, were involved in the pursuit of a vehicle, in which Plaintiff was a passenger.

6.

Eventually, the vehicle that contained Plaintiff arrived at a location within Pearl River County, Mississippi.

7.

At this location, Plaintiff alleges that he left the vehicle on foot and was pursued by the above-named defendants, with the exception of Defendants Chief Culpepper and Captain Bullen.

8.

Plaintiff alleges that, after his apprehension and at a point where Plaintiff, clearly, posed no danger to the above-defendants, to any officer at the scene or to anyone else, and where there was no chance of escape, Plaintiff was the subject of excessive force, including without limitation being shot, beaten, and kicked by Defendants Lyons, Seals, and Cassard.

**COUNT I – VIOLATIONS OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (UNDER THE FOURTH AND FOURTEENTH AMENDMENTS)**

9.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

10.

The conduct of defendants deprived Plaintiff of his rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, Plaintiff's right to be free from unreasonable seizures, false arrests, and excessive force by police officers, under the Fourth and Fourteenth Amendments to the United States Constitution.

11.

In performing these acts, defendants acted under color of state law. The acts of the Bogalusa

Police Department and Defendant City were the result of official policy, carried out and ratified by

its officers, including Defendants Lieutenant Lyons, Captain Bullen, and Chief Culpepper, as more

fully set forth below. Specifically, Plaintiff alleges that Lieutenant Lyons was a policy-maker with

respect to the use of force employed by him and by others, including PFC Seals and PFC Cassard,

upon Plaintiff.

12.

Plaintiff is informed and believes and thereon alleges that Defendant Lieutenant Lyons both

directly participated in excessive use of force upon Plaintiff and failed to stop excessive uses of force

by Defendants Seals and Cassard. Plaintiff is further informed and believes and thereon alleges that,

while Captain Bullen was not, directly, involved in the apprehension and seizure of Plaintiff, Captain

Bullen was informed of the truth about the deadly force used by defendants and ratified their actions.

**No Qualified Immunity**

13.

At the time of the above uses of force, the contours of the law concerning reasonable uses of

force were clearly established.

14.

Plaintiff further alleges that, at the time defendants and John Does 1 through 3, which

conduct Plaintiff is informed and believes was either willful or done with deliberate indifference to

Plaintiff's rights, such conduct was not objectively reasonable, and a reasonable official in those

circumstances would understand that what he/she was doing violated the law.

15.

As a direct and result of defendants' conduct as alleged above, Plaintiff has suffered physical

injuries and special and general damages.

16.

Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 1988.

Case 2:12-cv-009 HGB-DEK Document 1 Filed 04/. 12 Page 7 of 12

17.

Plaintiff is further informed and believes and thereon alleges that the above-described acts of defendants depriving Plaintiff of his constitutionally protected rights, privileges and immunities were done with evil motive or intent, or with reckless or callous indifference to Plaintiff's rights. Accordingly, Plaintiff seeks an award of punitive damages against the individual defendants in an amount according to proof.

**COUNT II – MONELL MUNICIPAL VIOLATONS UNDER 42 U.S.C. § 1983**

18.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

19.

Plaintiff is informed and believes and thereon alleges that City of Bogalusa manifests a deliberate indifference to the violation of constitutional rights of their residents, including Plaintiff herein. This deliberate indifference is manifested by the failure to change, correct, revoke, or rescind policies, procedures, and customs, in light of prior knowledge by said defendants, and its policymakers, of indistinguishably similar incidents to residents of these defendants. Plaintiff alleges that it is the policy, practice, and custom of defendants to ignore civil rights, including without limitation the right to be free from unlawful seizure and the right to be free from excessive uses of force that cause serious bodily harm.

20.

As a direct and proximate result of the aforementioned acts, systematic deficiencies, policies, procedures, customs and practices of the above defendants, including Defendant City of Bogalusa, Plaintiff was wrongfully shot and beaten, causing serious, permanent injuries.

21.

Plaintiff alleges that Defendants City of Bogalusa and Chief Culpepper have policies, procedures, customs, and practices which violate the constitutional rights of residents and which manifest a deliberate indifference to the civil rights of members of the public by, among other things:

a.   Failing to adequately train officers on matters regarding the proper use of force, the constitutional limits of their authority and proper arrest procedures, including, without limitation, the use of handcuffs, clubs, and guns;

b.   Failing to discipline officers known to have a propensity for violence, the use of unnecessary and unreasonable force, false arrest and/or dishonesty;

c.   Failing to adequately train officers and Commanders in the proper supervision, command and control of police officers, and failing to train in proper police procedures within the Fourth Amendment of the United States Constitution;

d.   Failing to adequately train officers and Commanders in proper police tactics to prevent false arrests, fabrication of probable cause, and in making false affidavits;

e.   Failing to adequately train officers and Commanders in proper police practices and procedures for detentions and arrest;

f.   Failing to adequately train officers and Commanders in proper police tactics to avoid using excessive force;

g.   Failing to adequately train officers and Commanders in the proper police tactics and procedures in avoiding the use of force against persons who are compliant or who have complied with officers;

h.   Failing to train police officers and Commanders to prevent false arrests and falsification of charges against persons who have not committed any crime or public offense;

i.      Covering up acts of misconduct, including, but not limited to, the abuse of unnecessary force, false arrest and/or dishonesty by its officers and thereby conveying to them its approval and/or lack of concern about police misconduct;

j.      Covering up acts of misconduct, including, but not limited to, the abuse of unnecessary force, false arrest and/or dishonesty by its officers and thereby conveying to them its approval and/or lack of concern about police misconduct;

k.      Refusing to discipline adequately individual officers and employees found to have committed similar acts of abuse and misconduct;

l.      Refusing to investigate competently and impartially allegations of abuse and misconduct alleged to have been committed by officers, including the allegations made by Plaintiff in this case;

m.      Reprimanding, threatening, intimidating, demoting, firing and otherwise retaliating against officers who reported acts of abuse by other officers;

n.      Rewarding police officers that displayed aggressive and abusive behavior toward detainees, arrestees and members of the public;

o.      Condoning and participating in the practice of reducing or dismissing criminal charges against individuals in return for releasing defendants and employees of same from civil liability.

p.      Promoting and/or acquiescing in the policy of stopping, detaining, questioning and arresting members of the public without probable cause or reasonable suspicion;

q.      Sanctioning, condoning and approving a department-wide "code of silence", a euphemism for perjury and dishonesty by peace officers.

22.

The customs, policies and practices of the above defendants, and each of them, caused the constitutional injuries to Plaintiff herein.

## COUNT III – LOUISIANA STATE LAW CLAIMS FOR BATTERY AND FOR EXCESSIVE FORCE

23.

Plaintiff repeats, re-alleges, and incorporates by reference all of the preceding allegations of this Complaint.

24.

The above named defendants are jointly, severally and in solido liable to Plaintiff for the Louisiana State torts of battery and for excessive force, as more fully set forth above.

25.

As more fully set forth herein, Plaintiff alleges that defendants' actions were unreasonable under the circumstances.

26.

Among other things, given the lack of risk and danger that, in fact, was faced by the officer, the nature of the offense or behavior involved, the fact that there was no chance of escape by Plaintiff, the fact that there were alternative methods of arrest or subduing the arrestee, considering the physical size, strength and weaponry of defendants as compared to that of Plaintiff, and the fact that there were, in fact, no exigencies of the moment facing defendants, Plaintiff alleges that defendants, and each of them, are liable for battery and for excessive force.

27.

As a direct and proximate cause of the above, Plaintiff sustained serious personal injuries, for which he had to seek medical treatment and for which Plaintiff will require future medical treatment, all of which entitles Plaintiff to damages as more fully set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in his favor and against defendants, and each of them, jointly and severally, as follows:

1. For a declaration that defendants' conduct deprived Plaintiff of his rights, privileges, and immunities secured by the Constitution of the United States;

2. For an injunction, prohibiting in the future defendants' illegal acts and misconduct complained of herein;

3. For compensatory general, special, and economic damages in an amount according to proof;

4. For damages incurred due to Plaintiff's pain and suffering, mental anguish, loss of physical function, loss of enjoyment of life, and medical expenses, past, present, and future.

5. For punitive damages;

6. For attorneys' fees in accordance with any and all statutes and laws, including without limitation those attorneys' fees pursuant to 42 U.S.C. § 1988;

7. For costs incurred herein; and

8. For such other and further relief as this court may deem just and proper.

**RESPECTFULLY SUBMITTED BY:**

s/ Philip J. Kaplan
**Philip J. Kaplan (LA State Bar # 14415)**
**LAW OFFICES OF PHILIP J. KAPLAN**
3278 Wilshire Blvd., Suite 106
Los Angeles, CA 90010
Phone: (213) 480-8981
Fax: (213) 480-8941
Email: philipkaplan@ca.rr.com
ATTORNEY FOR PLAINTIFF,
LOGAN N. MILLS

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this action pursuant to Federal Rules of Civil Procedure, Rule 38.

**RESPECTFULLY SUBMITTED BY:**

s/ Philip J. Kaplan
**Philip J. Kaplan (LA State Bar # 14415)**
**LAW OFFICES OF PHILIP J. KAPLAN**
3278 Wilshire Blvd., Suite 106
Los Angeles, CA 90010
Phone: (213) 480-8981
Fax: (213) 480-8941
Email: philipkaplan@ca.rr.com
ATTORNEY FOR PLAINTIFF,
LOGAN N. MILLS

Logan N. Mills #532042
Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

March 10, 2014

Bruce G. Whittaker
Attorney at Law
P.O. Box 791984
New Orleans, LA 70719

Dear Mr. Whittaker:

You did an extremely impressive brief and it is obvious that you really put a lot of work into it. You are a very good writer and I am extremely fortunate to have you as my appellate lawyer. I also am very pleased that you did not raise an insufficient evidence or excessive sentence argument, as all it would have served to do is take focus away from the strong issues you raised.

On another note, I wanted to ask you, to be on the safe side, if you intend on filing a reply brief. I figured with as much work as you put in the original brief that you intended to do a reply brief anyway. I just wanted to make sure as I really do not want the State to have the last word, and I simply do not have the capabilities that you do.

One other concern I have is the exhibits. I'm assuming you received the same record I did (13 Volumes), but the Clerk did not include copies of all of the exhibits that were entered into evidence. These are important as they go a long way in showing the ridiculous nature of the Bogalusa Police Officers' testimony. For example, Defense Exhibit #20, is an extremely gruesome picture of me in the hospital. I am unrecognizable; my face looks like ground meat. Yet Officer Lyons testified he pistol-whipped me in the back of the head, and not in the facial area.

I think it is important to show the substantial impeachment of the Bogalusa Police Officers for one reason: all three of them identify me as the passenger. Therefore, if the First Circuit gets far enough to conduct a harmless-error analysis, they are going to look at the rest of the evidence in the record – what supports/contradicts me being the passenger/driver. Although I am certainly not anxious to do anything that might delay this appeal process even further, I also think these exhibits are material. What can we do about getting them supplemented into the record? I greatly appreciate your time and dedication to my cause.

Sincerely,

Logan N. Mills

EXHIBIT
**B**

FIRST CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

COURT OF APPEAL FIRST CIRCUIT
FILED
FEB 1 7 2014
CLERK

RECEIVED
CLERK'S OFFICE
FEB 1 8 2014
COURT OF APPEAL
FIRST CIRCUIT

---

NO. 2013-KA-0573

---

STATE OF LOUISIANA

Appellee

V.

LOGAN NESTOR MILLS

TIMELY

Appellant

---

A CRIMINAL PROCEEDING ON APPEAL FROM

THE TWENTY-SECOND JUDICIAL DISTRICT COURT

FOR THE PARISH OF WASHINGTON

THE HONORABLE AUGUST HAND, JUDGE

DOCKET NO. 11-CR5-113331

Original brief of Appellant

Respectfully submitted:

Bruce G. Whittaker
Louisiana Appellate Project
P.O. Box 791984
New Orleans, LA 70179
(504) 554-8674
bruce@whittakerlaw.com

EXHIBIT
C

**TABLE OF CONTENTS**

*Page*

Table of Authorities ..... 3

Statement of Jurisdiction ..... 6

Statement of the Case ..... 6

Assignments of Error ..... 7

Issues Presented for Review ..... 8

Statement of Facts ..... 8

Summary of Argument No. 1 ..... 21

Argument No. 1 ..... 21

Summary of Argument No. 2 ..... 26

Argument No. 2 ..... 26

Summary of Argument No. 3 ..... 36

Argument No. 3 ..... 36

Conclusion ..... 43

# TABLE OF AUTHORITIES

*CASES*

Page

Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)............30

Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)...............30

Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). ....................................................................................................34

MacFarlane v. Grasso, 696 F.2d 217 (2d Cir. 1982) ............................................37

Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339 (2d Cir. 1994)...............................................................................................37

State v. Asberry, 808 So. 2d 472 (La.App. 1 Cir. 2001).........................................31

State v. Bennett, 550 So. 2d 201 (La.App. 3 Cir. 1989)..........................................34

State v. Bourque, 622 So.2d 198 (La.1993). ........................................................25

State v. Bowie, 00-3344 (La. 4/30/02), 813 So. 2d 377, 385, cert. denied, 123 S. Ct. 416, 154 L. Ed. 2d 297, 71 U.S.L.W. 3264 (2002)..............................30

State v. Cross, 93-1189, (La.6/30/95), 658 So.2d 683............................................25

State v. Cullens, 168 La. 976, 123 So. 645 (1929).................................................42

State v. Domangue, 476 So.2d 986 (La. App. 1st Cir. 1985). ...............................30

State v. Henderson, 99-1945 (La. App. 1 Cir. 6/23/00), 762 So.2d 747, writ denied, 2000-2223 (La. 6/15/01),793 So.2d 1235........................................22

State v. Johnson, 94-1379 (La. 11/27/95), 664 So. 2d 94.......................................42

State v. Jones, 474 So.2d 919 (La.1985). ..............................................................25

State ex rel. LaFleur v. Donnelly, 416 So.2d 82 (La. 1982)................................. 30

State v. Lee, 559 So. 2d 1310 (La.1990)...............................................................22

State v. Martin, 458 So. 2d 454 (La.1984)............................................................40

State v. Overton, 337 So. 2d 1201 (La. 1976).......................................................40

State v. Price, 476 So. 2d 989 (La. App. 1st Cir. 1985).........................................41

State v. Quatrevingt, 93-1644, (La. 2/28/96), 670 So. 2d 197, cert. denied, 519 U.S. 927, 117 S. Ct. 294, 136 L. Ed. 2d 213 (1996)........................................31

State v. Ramirez, 30 So. 3d 833 (La.App. 5 Cir. 2009)....40

State v. Rankin, 465 So. 2d 679 (La. 1985). ....31

State v. Saia, 212 La. 868, 33 So. 2d 665 (1947)....42

State v. Salat, 672 So. 2d 333 (La.App. 1 Cir. 1996)....42

State v. Shexnayder, 96-98 (La. App. 5 Cir. 11/26/96), 685 So. 2d 357, writ denied, 97-0067 (La. 5/16/97), 693 So. 2d 796, cert. denied, 522 U.S. 839, 118 S. Ct. 115, 139 L. Ed. 2d 67 (1997)....31

State v. Taylor, 2003-1834 (La. 5/25/04), 875 So.2d 58....22

State v. Thomas, 589 So. 2d 555 (La. App. 1st Cir. 1991)....41

State v. Vale, 95-1230 (La. 1 /26/96), 666 So. 2d 1070....31

State v. Williams, 2002-1406 (La. 4/9/03), 844 So. 2d 832....31

State v. Youngblood, 235 La. 1087 (La. 1958)....35

Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993)....34

Wright v. Olin Corp., 697 F.2d 1172 (4th Cir. 1982) ....37

*STATUTORY AUTHORITY*

Federal Rule of Civil Procedure 8(e)(2) .......... 37

La. Const. Art. I, § 16 .......... 30

La. Const. Art. V, § 10 .......... 6

La. C.Cr.P. art. 797 .......... 21

La. C.Cr.P. art. 799 .......... 21

La. C.Cr.P. art. 921 .......... 41

La. C.E. art. 607 .......... 41

La. C.E. art. 611 .......... 30

La. C.E. art.801 .......... 40

La. C.E. art. 802 .......... 40

La. C.E. Art. 804(B) (3) .......... 41

La. R.S. 14:18(6) .......... 35

La. R.S. 14:27:30 .......... 16

La. R.S. 14:64 .......... 16

La. R.S. 14:64.3 .......... 16

La. R.S. 14:96 .......... 16

U.S. Const. Amend. VI .......... 21

## STATEMENT OF JURISDICTION

This Honorable Court has jurisdiction over this case pursuant to Article V, Section 10, of the Louisiana Constitution of 1974.

The judgment complained of is attached to this brief.

## STATEMENT OF THE CASE

Appellant Logan Nestor Mills, with co-defendant Walter Roy Aswell, was charged by bill of information in count 1 with armed robbery, count 2 with armed robbery with a firearm, in counts 3, 4, and 5, with counts of attempted first degree murder involving victims Scott Seals, Patrick Lyons, and Chad Cassard, respectively, and in count 6 with aggravated obstruction of a highway, violations of La.R.S. 14:64, 14:64.3, 14:27:30, and 14:96. (R.pp. 35-36). He was arraigned and pled not guilty on June 1, 2011. (R.p.1). On July 23 and 30, 2012, and August 10, 2012, the trial court heard and denied appellant Mills' Motions to Suppress Evidence and Confession, and to Quash. (R.pp. 8-12; 46; 95-110; 563-923).

Trial before a jury of twelve as to appellant standing alone was held on August 13 through 20, 2012, concluding with verdicts of guilty as charged on counts 1, 2, 3, 4, and 6, and not guilty on count 5, involving the alleged attempted murder of Chad Cassard. (R.pp. 13-30; 86-88; 91). On September 10, 2012, the court heard and denied a Motion for New Trial and Motion for Post Verdict Judgment of Acquittal. (R.pp. 31; 95-109; 143; 152). After a waiver of delays the court sentenced appellant as follows: on count 1, armed robbery, to sixty years at hard labor without benefit of probation, parole, or suspension of sentence, on count 2, use of a firearm in an armed robbery, to five years to run consecutive to count 1, count 3 and 4, forty years at hard labor without benefit of probation, parole, or suspension, and count 6, fifteen years at hard labor without benefit of probation, parole, or suspension. The sentences on counts 1, 3, 4, and 6 were ordered to run concurrently with one another, and all with

credit for time served. (R.pp. 31; 153-160). Appellant was then arraigned on an habitual offender bill of information filed on count 1, the armed robbery count, to which multiple bill he tendered a plea of not guilty. (R.pp. 31-32; 89; 162).

On November 20, 2012, appellant was adjudicated a second felony offender and on the armed robbery count re-sentenced appellant to seventy years at hard labor, all other sentences to remain the same. (R.pp. 34; 2164-2167).

Appellant comes now before this Court on original appeal.

**ASSIGNMENT OF ERROR NO. 1**

It was error to deny defense challenges for cause of four jurors who for their respective reasons made it clear to the court that they were unqualified to serve on the jury that tried appellant's case. As appellant exhausted his peremptory challenges, prejudice is presumed. The error mandates reversal.

**ASSIGNMENT OF ERROR NO. 2**

The trial court denied appellant his constitutional right of confrontation by refusing to allow him to cross-examine Walter Aswell regarding the great leverage under which he was testifying pursuant to the plea bargain he had confected with the State of Louisiana. The trial court's refusal to allow the jurors to learn the circumstances of Aswell's plea bargain prevented them from evaluating his credibility and denied appellant the right to present a defense. The error was not harmless.

**ASSIGNMENT OF ERROR NO. 3**

It was error to permit the State to impeach appellant with a hearsay statement contained within an unverified personal injury petition prepared and filed by a person other than appellant. The error in this case was not harmless as it served to directly undermine the credibility of the accused on a central issue at trial. The error was so egregious as to warrant reversal.

## ISSUE PRESENTED FOR REVIEW NO. 1

Is it error to deny challenges for cause where the jurors make it clear that they cannot impartially serve?

## ISSUE PRESENTED FOR REVIEW NO.2

Is it error to deny the accused his right of confrontation by prohibiting the jury from learning about the circumstances of a testifying co-defendant witness's plea bargain?

## ISSUE PRESENTED FOR REVIEW NO.3

Is it error to permit the State to impeach the accused with a hearsay pleading written by a non-testifying third party?

## STATEMENT OF FACTS

Sandra Sheridan testified that on the morning of April 20, 2011, she was working at her station as a bank teller at the Capital One on Columbia Street in Bogalusa when the bank was robbed. (R.pp. 1304-1306). She stated that there were two robbers, white males, wearing "hoodies," masks and gloves, and each carrying a gun. (R.p. 1311). She described the first of the two as the shorter of the two. (R.p. 1311). The shorter one pointed his gun at the tellers and told them to keep their hands up ant that they had "30 seconds." (R.p. 1311). The taller one "kept turning around, like kind of casing" . . . [and] came up to Miranda's window with a gun, at her, demanding money." (R.p. 1311). The women complied with the robbers demands and, when the duo left, Sheridan telephoned her manager to report the incident. (R.pp. 1317-1318).

Abby Schaffer told the jury that she was at the Capital One that day working at a desk as a "relationship banker." (R.p. 1326). While so engaged she saw "two guys in black masks with weapons in their hands walk past me up to the teller line."

(R.p. 1327). "And then they said, 'Get your hands up," and that's when I got my hands up." (R.p. 1327). When the duo left she got a glimpse of the getaway vehicle and noted it to be "a black Jeep type SUV." (R.p. 1328).

Geraldine Ledet testified that she and a friend happened to be driving by the Capital One on Columbia on the morning of April 20, 2011, when her friend exclaimed "the bank has just been robbed, you know. And I . . . looked, and there was a gentleman running to the vehicle that we were right behind. And he got in the vehicle." (R.p. 1348). Moments later, upon seeing a police officer, Ledet stopped and let her friend out of the car who "flagged the policeman down and said the bank had just been robbed. . . . " (R.p. 1349). Although Ledet recalled a second person she focused her attention on the driver "because I was right behind the vehicle . . . ." (R.p. 1349). She noted that she would not be able to identify the person, however. (R.p. 1357).

Dianna Thomas testified that she was with Ledet and "just happened to look at the bank, and I actually saw a man run out. He had a hood on, and he was reaching down picking money up and putting it in a bag, and ran and got in a black Jeep, black vehicle." (R.pp. 1361-1362). She telephoned the police department as fast as she could. (R.p. 1362). When they saw a police vehicle in the area, Thomas jumped out and told the officer what she had seen. (R.p. 1362). On cross she noted that the person she saw enter the Jeep got into the driver's seat of the Jeep but she would not be able to identify him. (R.p. 1364).

Wanda Terrell told the jury that she saw "two people coming out of the bank . . . . they had on like a hoodie . . . . I saw one of them bend down. He was apparently picking up something." (R.p. 1372). Her daughter said, "That bank is being robbed." (R.p. 1372). Terrell watched the two get into a vehicle and slowly drive off. (R.p. 1372). She followed the vehicle, a black Jeep, as it drove towards Mississippi, and

watched as police vehicles intercepted it and commenced pursuit. (R.pp. 1373-1374).
She could not identify either occupant of the Jeep. (R.p. 1376).

Kermit Martin testified that he was in Wanda Terrell's vehicle and saw
"bundles of money laying. A guy coming out with a hood on. One guy was getting
in the Jeep on the other side. The other guy was picking the money up." (R.p. 1386).
He dialed 911 and reported a bank robbery in progress. (R.p. 1386).

Amanda Carnegie told the jury that she saw "two people coming out to the
bank. They were dressed similar. I seen them drop, I seen one of the people drop
money. I saw him stop, pick the money up and continue to a run towards the black
SUV." (R.p. 1400). On cross she acknowledged that she did not see the faces of the
two and could not be certain if the first person to exit the bank entered the driver's
seat. (R.p. 1405).

Sherman Gaspard of the Pearl River County Sheriff's Office testified that he
was not involved in the original investigation on April 20, 2011, but was called out
on April 28 "to assist the Bogalusa Police Department in looking for a weapon that
was possibly used in the incident on the 20th." (R.p. 1624). He went to the location
were the stop was made and the subjects arrested and "got out on foot and began
searching for the weapon." (R.p. 1625). He found a gun and identified it in open
court for the jury. (R.pp. 1626-1628).

Carl Fullilove of the Mississippi Crime Lab testified as an expert in firearms
examination and tool mark identification and told the jury that he examined three
Glock .40 caliber pistols, a Heckler & Koch 9mm pistol, and a 9mm Beretta pistol.
(R.pp. 1652-1657). He compared 9mm casings in evidence to the firearms and
determined that they were all ejected by the 9mm Beretta. (R.pp. 1658-1659). He
likewise compared multiple .40 caliber casings to the weapons in evidence and
determined that they were all fired from the three Glocks in evidence. (R.p. 1662).

Darryl Perkins of the Mississippi Department of Public Safety testified that at about 10:30 a.m. on April 20, 2011, he received a call that there had been a shooting in Pearl River County and the two victims had been transported to Forrest General Hospital in Hattiesburg. (R.p. 1707). Perkins went to the hospital were he was directed to "victim number one's room. At that time, he was combative, you know, really irate. Doctor's and nurses working on him." (R.p. 1708). He then observed "victim number two." (R.p. 1708). Perkins identified appellant Logan Mills as number one and Walter Aswell as number two. (R.p. 1708). A magazine containing two 9mm bullets was found on the person of Walter Aswell. (R.p. 1714).

Shelby Smith of the Mississippi Bureau of Investigations told the jury that he assisted in the investigation of the scene in the White Sands area of Pearl River County where he had been advised officers had discharged their firearms, (R.pp. 1736-1737). Pursuant to his investigation he obtained statements from the officers regarding the discharge of their firearms. (R.p. 1755). He admitted on cross that the information he received did not agree with the physical evidence. (R.p. 1789).

Lt. Patrick Lyons of the Bogalusa Police Department testified that he was on patrol on Columbia Street in a marked police unit when he happened to see a vehicle make an illegal u-turn right in front of him. (R.p. 1827). Intending to warn or ticket the motorist he slowed down his vehicle only to have a woman approach his vehicle stating, "You're going to think I'm crazy, but there was two black guys that just robbed a bank." (R.p. 1831). She added that the two entered a black Jeep. (R.p. 1831). Shortly thereafter Lyons heard a dispatch regarding a robbery at the Capital One and told the dispatcher that a witness described to him the getaway vehicle as a black jeep. (R.p. 1831). The next thing he knew, he saw a black jeep and activated his lights and siren to make a traffic stop. (R.p. 1832). The black jeep did not pull over in response to the signal and instead increased its speed. (R.p. 1833). Lyons noticed

the passenger "turns around in his passenger seat and starts making motions with his hand." (R.p. 1833). Lyons demonstrated for the jury the motions, which he described as causing him to think "he's loading a magazine and we're getting ready, you know, to have a gunfight or something." (R.p. 1834). As the vehicle continued on, another police vehicle driven by Officer Scott Seals joined in the pursuit. (R.p. 1835). The officers attempted to effect a "rolling road block" with the result that " . . . the jeep starts slowing down, we all kind of start slowing down. So at the base of the bridge the driver turns back around in his chair and starts shooting at Officer Seals. I could hear the pops, my window is rolled down and I could see Scott Seal's rear window explode." (R.p. 1835). Then, "the passenger fires four or five rounds, he turns back around in the seat facing me and shoots out his back glass of the jeep and starts shooting at my vehicle." (R.p. 1836). "We continue on and cross the line, cross the bridge and the passenger is still shooting." (R.p. 1836). When traffic cleared, Lyons fired at the jeep with his service weapon just as the convoy was "getting off the bridge . . . ." (R.p. 1837). "We passed Crossroads Feed and Seed, he's still shooting at me. I remember seeing Wheat's Lumberyard, we get past the Crossroads and we're still traveling eastbound. They're still shooting at me at the time . . . and I return fire somewhere around the Crossroads." (R.p. 1838).

Shortly thereafter "Officer Seals and Cassard came around me for some reason . . . . . - - and they came around me. There was still some gun play going on. The jeep started slowing down and pulling into Sheila's parking lot." (R.p. 1839). In Sheila's parking lot, "The driver got out and I saw he had a pistol and I yelled, 'Police. Stop!' He didn't obey my commands. I think there was still some shooting going on outof the jeep, I'm not really sure. I returned fire at hm probably six or eight times. . . . . The driver broke and he took off running to the left . . . . I kept shooting . . . . I had to do a magazine change . . . . I shot a couple of times and he went down." (R.p. 1841).

Lyons ran up to the driver where City Marshall John Sumrall and he handcuffed the driver after a brief struggle. (R.pp. 1844-1845). "Well, it was very chaotic. It was basically like a barroom fight. I holstered my weapon on the ground with the bad guy. They were tussling with him. We kept telling him, 'Stop resisting. Stop resisting.' He kept going for his gun, kept going for his gun. . . . . And at that time, I only, I had two choices. One was to kill him right there and two, was to use my service weapon on him so I started hitting him with my service weapon and gained control of him." (R.p.1847). Lyons identified a photograph depicting a bullet hole through his drivers' side mirror that occurred when he was "on the bridge somewhere . . . ." (R.p. 1849). He identified other bullet holes in his radiator and windshield. (R.pp. 1849-1850).

Lyons identified appellant in open court as the person he identified as the passenger. (R.p. 1852). He marked a map indicating where the first shots were fired and noted that it was at the base of the bridge on the Louisiana side. (R.p. 1856). Lyons admitted that he hit appellant "four or five times" "about the head and shoulders with my pistol . . . ." (R.pp. 1864; 1865). In addition, appellant Mills had already been shot, as it turned out. (R.pp. 1864-1865). Lyons advised that Aswell had been shot in the right hip area. (R.p. 1890). Lyons denied striking Aswell in the head and did not witness anyone else do so. (R.pp. 1890-1891).

**[At this point in the trial - the morning of August 17, 2012 - please refer to Record on Appeal Volume 2 of 3, starting at page 315.]**

Miranda Myers testified that she was engaged in her duties as a teller at the Columbia Street Capitol One when she happened to observe "two guys with masks on and guns and to the right . . . one guy came directly to me and then pulled his, a gun on me and told me to give him the money, and that's what I proceeded to do." (R.pp. 316-317). She also triggered a silent alarm. (R.p. 317). She could not identify

the perpetrators due to their masks. (R.p. 319).

Walter Aswell testified and told the jury that he was incarcerated having pled guilty as charged to armed robbery, three counts of attempted murder of police officers, and aggravated obstruction of a highway, for which he was exposed to an agreed upon sentence of between twenty-five and thirty years. (R.pp. 322-323).

Aswell stated that for a time appellant Logan Mills, a friend of his, began living with he and his mother in Mandeville. (R.pp. 323-324). At some point he and appellant talked about an armed robbery, although he couldn't recall who first broached the subject. (R.p. 326). Ultimately, "We had decided that we would rob a bank and take as much money as we could from them." (R.p. 326). Aswell said that he was unfamiliar with Bogalusa. (R.p. 326). He claimed that the weapons were supplied by appellant Mills. (R.p. 326). Aswell purchased the ammunition from Walmart. (R.p. 327). The guns were loaded the night before the robbery. (R.p. 327). The two got from Mandeville to Bogalusa in a vehicle they stole for that purpose. (R.p. 327).

Aswell claimed that he drove the vehicle from St. Tammany up to Washington Parish. (R.p. 327). He claimed that he drove at the direction of appellant Mills all the way to the Capital One. (R.p. 328). Aswell testified that he was wearing "blue jeans and a hoodie jacket" with a "Tee shirt wrapped around my face." (R.p. 329). He claimed appellant was similarly attired. (R.p. 329). They were both wearing latex gloves which he claimed were supplied by appellant Mills. (R.p. 329). Aswell stated that they put the gloves on before entering the vehicle. (R.p. 329).

At the bank, Aswell exited the vehicle first. (R.p. 329). With regard to planning, Aswell claimed, "Well, I knew, I knew we were going to go in to get the money from there and once we were inside I decided to turn around to make sure there was no one that was going to be behind us, or I guess a security guard or

anything like that." (R.p. 330). Appellant went up to the teller window while Aswell claimed to hang back a bit "More in the lobby area." (R.p. 330).

After the robbery the two left the bank and reentered the Jeep. (R.p. 331). On the way to the vehicle Aswell picked up money that appellant dropped. (R.pp. 331-333). Upon reentering the vehicle Aswell claimed that he once again was at the wheel. (R.p. 333). At appellant's direction, he claimed, he turned towards Mississippi. (R.p. 334). Within moments, however, he saw a police officer on his tail with lights and siren activated. (R.p. 334). Aswell sped off attempting to avoid capture. (R.p. 334). During the pursuit Aswell denied at any time firing a weapon at the police. (R.p. 334). He claimed that appellant fired "like a few times." (R.pp. 334-335). Aswell, "wasn't paying attention to Logan. I guess he was shooting at the officers, you know. I wasn't watching him or anything." (R.p. 335). He nonetheless stated that he believed that appellant fired through the front and back windshields of the Jeep during the pursuit. (R.p. 336).

Eventually the Jeep stopped and Aswell ran, leaving his gun behind in the vehicle. (R.pp. 336-337). While running he was shot and in reaction dropped to the ground. (R.p. 337). Aswell did not see where appellant ran. (R.p. 338). Aswell stated that he was about six foot two and believed himself taller than appellant. (R.p. 338).

On cross Aswell noted that he suffered "pretty significant" injuries in the incident, a "shot in my elbow, my right elbow, right hip, and I had been, I had been beaten and I had a skull fracture." (R.p. 347). He described the shooting as happening as he was running away empty handed, "I was shot in the arm first and then got shot in the hip and went down." (R.p. 348). Aswell claimed that after he went face down "the officer came to me, put handcuffs on me before anything happened, and after the handcuffs were on me, they beat me, they beat me." (R.p. 349). One officer threatened to kill him, stating, "If I wanted to, I could kill you right

now. I ought to blow your brains out . . . . ." (R.p.351). As it is, his skull fracture required surgery that left him with a plate in his head and a scar running from ear to ear. (R.pp. 365- 366).

Aswell claimed that appellant exited the bank first - and yet sat in the passenger seat waiting for him. (R.p. 366). He disagreed with any eye witness that claimed the first person to exit entered the driver's seat. (R.p. 368). Aswell denied coercing appellant and likewise denied being coerced by him. (R.p. 377).

Chad Cassard told the jury that on April 20, 2011, he was employed by the Bogalusa Police Department. (R.p. 402). He was in uniform and in a marked unit that day when he overheard the report of a bank robbery. (R.p. 404). He joined the pursuit and while so engaged heard Lt. Seals on the radio report, "Shots fired, shots fired." (R.p. 406). He did not hear those shots as he was too far behind the suspect vehicle. (R.p. 407). When he got closer, however, after the chase had moved into Mississippi he heard gunshots. (R.p. 408). Near Sheila's Grocery the suspect vehicle stopped and two suspects alighted. (R.pp. 409-410). Cassard claimed that he could see the passenger in the Jeep firing out of the rear window during the pursuit. (R.pp. 410-411).

When the Jeep stopped Cassard "fired fifteen rounds" into it as "They were firing back at my officer." (R.p. 411). As he was reloading, "the passenger exited the vehicle. When he exited the vehicle, he had a backpack on his left shoulder, the pistol in his right hand. He pointed his pistol at me." (R.p. 411). "At that point the passenger run to the front of the vehicle. The driver gets out, runs to the front. They meet up. The passenger proceeded . . . eastbound through the field." (R.p. 411). He could not see the face of the passenger due to the mask he was wearing. (R.pp. 412). The driver had no mask. (R.p. 412). He lost sight of the passenger but stayed focused on the driver. (R.pp. 412-413).

As he observed the driver "running a full sprint" Cassard "fired four shots" and "On the fourth shot the driver fell to the, fell face first to the ground." (R.p. 414). Shortly thereafter Cassard exited his vehicle and approached the subject on foot to hear Seals saying, "I got him here, I got him here." (R.p. 417). Seals and the subject started struggling, soon joined by Cassard, and then Lyons. (R.pp. 418-419). At some point Lyons beat the subject, subduing him. (R.p. 419). The subject was then handcuffed and removed from the woods. (R.pp. 419-420). He identified appellant as that subject. (R.p. 421).

Cassard noted that after hearing Seals call out, "I got him over here, show me your hands, show me your hands," he then almost immediately heard gunfire. (R.p. 457). He didn't know at that point if Seals had fired or had been fired upon. (R.p. 457). Cassard later heard that appellant had been shot in the shoulder and the ankle. (R.pp. 458-459). Cassard indicated however that appellant was not shot after he was apprehended. (R.pp. 462-463). On cross Cassard again distinguished the two subjects as, "The passenger had a mask on, a backpack. The subject in the field didn't appear to have a mask on and had no backpack." (R.p. 468).

Deputy Scott Seals testified that on April 20, 2011, he was on patrol in for the Bogalusa Police Department when he heard a radio report of a bank robbery. (R.pp. 506-507). He fell in behind a unit driven by Lt. Lyons and joined the pursuit. (R.p. 508). At one point he attempted to get into position to create a rolling roadblock whereupon ". . . I heard gunshots and my back glass exploded, my back window of my unit exploded." (R.p. 508). After shattering the window the bullet struck the cage right behind Seals head, leaving an indentation in the metal frame. (R.p. 509). As result of the gunfire, Seals sped off ahead. (R.p. 510). He then pulled over and waited for the Jeep to show up again. (R.p. 511). When it did he heard a gun shot and felt a burning sensation in the leg.(R.p. 511). "After he passed me, I got back behind

Lieutenant Lyons. We continued traveling east. You could see, you could hear, I could hear gunshot coming back, uh, with vehicles passing, people riding bicycles side the street and all that. There was still gunshots. When traffic were clear, I could see Lieutenant Lyons, you know, shooting back at the vehicle." (R.p. 511).

When the Jeep stopped, two people exited and ran. (R.p. 512). Seals drove up into the field to where the subject shot by Cassard had dropped. (R.p. 513). When it appeared that the subject was coming up with his gun, Seals "began shooting." (R.p. 513). After he shot "maybe four, five, six" times he saw the subject fall. (R.p. 513). When he knelt to handcuff him the subject started struggling. (R.p. 514). Lyons joined in with Seals and Cassard and the subject was eventually subdued and handcuffed. (R.pp. 514-516). Once he was completely subdued, he grabbed the subject's gun and threw it into the woods out of reach. (R.p. 516). He identified appellant Mills in open court as that subject. (R.p. 518).

**[At this point in the trial - the morning of August 18, 2011 - please switch to Record on Appeal Volume 12 of 13, starting at page 1945.]**

Appellant testified that the robbery idea first came up a month or two before the incident. (R.p. 1987). When Aswell first broached the subject, appellant thought he was joking. (R.p. 1987). "But after an awkward silence, you know, I realized he really wasn't joking." (R.p. 1988). Nonetheless, the subject "never came up again until the night before this happened." (R.p. 1988).

That night appellant and Aswell went jogging on the Trace at around midnight as was their new habit - their "cardio kick." (R.p. 1991). Appellant noticed that Aswell had a backpack with him. (R.pp. 1991-1994). All of a sudden appellant "heard a zipper. But he asked me about robbing a bank again. And I thought he was joking. He was behind me and it's very dark." (R.p.1994). "And I told him that it was a stupid idea. That is was going to get us killed or in prison forever." (R.p. 1994).

Appellant "stopped and turned around, what are you talking about? And he said, you know, we are going to rob a bank in Washington Parish. I could tell right then and there he was serious. It wasn't a joke." (R.p. 1995). He could see now that Aswell had a gun and "he's just pointing it at me." (R.p. 1996).

Aswell threw to appellant "a stack of clothes that was in the backpack. It was a pair of oversized jeans and a sweatshirt. He told me to put those on. . . . .Oh, there was a black T-shirt with it as well. He told me to put it around my face as a mask. . . . . . he told me how to tie it like a mask." (R.pp. 1997-1998). The two then walked on with the armed Aswell trailing appellant by fifteen feet or so, with Aswell directing the terrified appellant every step of the way as they went. (R.pp. 1998-2001). Aswell ordered appellant to "go grab car door handles and see if they're unlocked, and then see if the keys are in the ignition." (R.p. 2001). Eventually they found the black Jeep whereupon Aswell ordered appellant to get in the drivers seat and drive. (R.p. 2003). Having taken the vehicle at about 6:00 a.m. they had time to kill before the banks would open and so the two drove around for a while. (R.pp. 2003-2007).

Eventually, they ended up at the Capital One Bank where "he told me, for the first time during this whole morning, that he wanted me to come inside." (Rp. 2007). Aswell wanted Mills to make sure that the silent alarm wasn't activated, otherwise, "we are going to get killed." (R.p. 2007). Aswell gave appellant a pair of latex gloves to wear. (R.p. 2007). At the bank, Aswell said "if I do not get out of the car whenever he says go, he's going to shoot me right there." (R.p. 2008). Fearing for his life, appellant continued to do as Aswell commanded, following Aswell's instructions "to a T." (R.p. 2009). Appellant walked in, raised the gun he received from Aswell, and "she immediately started putting money on the counter." (R.p. 2009). After grabbing the money he ran to the car and drove off as ordered. (R.pp. 2011-2012).

During the drive away appellant Mills did as he was told out of fear for his life. (R.pp. 2013-2014). Aswell kept telling him during the drive, "play it cool and don't stop." (R.p. 2015). Aswell had a pistol in his hand, "this whole time, he's had his pistol in his hand. Just gripping it throughout the entire night. He's had the pistol just handy, ready to go." (R.p. 2017). Aswell shot out the back window of the police car that tried to block them in. (R.p. 2017). Aswell later shot at a police car behind them. (R.p. 2019). Eventually, they coasted into a parking lot, exited the Jeep, and ran. (R.p. 2019). Aswell ordered appellant to grab the backpack. (R.p. 2020). He did as he was told and fled on foot. (R.p.2020). While running, he was shot in the ankle and fell to the ground. (R.p. 2020). Once on the ground, appellant was quickly handcuffed. (R.p. 2021). While incapacitated on the ground, shot, and handcuffed, appellant was kicked in the face and ribs and struck in the face with a pistol. (R.p. 2022). As a result, he filed a civil lawsuit against the officers involved. (R.p. 2023).

Appellant specifically denied shooting at the police that day or firing the weapon at any point during the incident. (R.p. 2024).

On cross examination appellant testified that the bank tellers were telling the truth but that Aswell and the three police officers were lying. (R.p. 2045). Appellant maintained that he "didn't do it of my own free will . . . ." (R.p. 2050).

The defense called Bogalusa Chief of Police Joe Culpepper testified that he reported the incident as including "the suspects got out of the Jeep shooting at [the] officers" and that in fact "that is the way" the facts were presented to him. (R.p. 2079). Culpepper admitted that Aswell made a complaint that he was unlawfully abused by the arresting officers. (R.p. 2089). Culpepper claimed that his departmental internal investigation found that complaint could not be substantiated due to Aswell's inability to identify the officers responsible for the abuse. (R.pp. 2089-2090). He claimed that although he reviewed the MBI report on the investigation he noted "no

inconsistencies" in their report which revealed no 9mm casings at the arrest scene despite the claims of Bogalusa PD that the suspects got out of the Jeep shooting at the officers. (R.p. 2092).

## SUMMARY OF ARGUMENT AND ARGUMENT NO. 1

## ASSIGNMENT OF ERROR NO. 1 AND

## ISSUE PRESENTED FOR REVIEW NO. 1

**It was error to deny defense challenges for cause of four jurors who for their respective reasons made it clear to the court that they were unqualified to serve on the jury that tried appellant's case. As appellant exhausted his peremptory challenges, prejudice is presumed. The error mandates reversal.**

In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have 12 peremptory challenges, and the state 12 for each defendant. La. C. Cr. P. Art. 799. Armed robbery is necessarily punishable by hard labor. La. R.S. 14:64.

In the present case, the defense exercised all 12 of its 12 peremptory challenges, excusing jurors Watson, Massey, Jackson, Provenzano, Huang, St. Pierre, Amacker, Breedlove, Gunnell, Crain, Brock, and Varnado. (R.pp.14-15).

La. C. Cr. P. Art. 797 provides in pertinent part as follows:

The state or the defendant may challenge a juror for cause on the ground that:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

* * *

In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for cause; and (2) Use of all his peremptory challenges. Prejudice is presumed when a defendant's challenge for cause is erroneously denied and the defendant exhausts all his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Taylor, 2003-1834, pp. 5-6 (La. 5/25/04), 875 So.2d 58, 62.

When assessing whether a challenge for cause should be granted, the district judge must look at the juror's responses during his or her entire testimony, not just "correct" isolated answers or, for that matter, "incorrect," isolated answers. State v. Lee, 559 So. 2d 1310, 1318 (La.1990).

A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the prospective juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to the law reasonably may be inferred. However, the trial court is vested with broad discretion in ruling on a challenge for cause; its ruling will, not be disturbed on appeal absent a showing of an abuse of discretion. State v. Henderson, 99-1945, p. 9 (La. App. 1 Cir. 6/23/00), 762 So.2d 747, 754, writ denied, 2000-2223 (La. 6/15/01),793 So.2d 1235.

In this case appellant exhausted his peremptory challenges. He submits that the trial court abused its discretion in denying his challenges for cause to jurors Jackson, Huang, Gunnell, and Crain.

Elizabeth Jackson told the court "I really have a strong opinion about guns." (R.p. 1014). When asked if she could put her personal opinions aside, she told the court, "I wouldn't say I couldn't, but I would try, you know." (R.p. 1016). She told defense counsel, when asked if she thought her strong opinions "will cause you to be

unduly prejudiced against my client?" that she "can't really answer you that. I would try." (R.p. 1087). "I would try to be fair, but I do have this . . .[concern] . . . It's there." (R.p. 1089). "It hits me every night on television, you know." (R.p. 1089). With regard to appellant's right to remain silent, Jackson stated, ". . . you know, to know his intent with that gun, I probably would want to hear that from him." (R.pp. 1099-1100). "I would like to know, you know, what he's thinking about that gun before he headed off to do it." (R.p. 1100). "But I would want to know why he would think he would have to take a gun." (R.p. 1100).

The defense challenged Jackson for cause noting that her strong feelings about guns would impel her to hold appellant's right to remain silent against him should he choose to exercise that right. (R.pp. 1127-1129). The court denied the challenge. (R.p. 1130).

Lili Huang told the court that "English is my second language, and I think that kind of effects my ability to judge the case." (R.p. 1019). "But the problem is when I hear people talking, there are some, a lot of vocabularies I just get . . . ." The Court: "Okay. So you have a language barrier to some extent." A: "Yes." (R.p. 1020). "I'm afraid that I couldn't, you know, when they're doing the trial, probably don't understand like what they are saying. That's my problem." (R.p. 1021). In fact, to demonstrate her lack of understanding she told the court that as best she could tell, the case before the court was " . . . something about a police - - somebody carrying a gun that killed somebody . . . ." (R.p. 1021). Huang told the defense that she was afraid that her language difficulties would inhibit her ability to understand the testimony or legal concepts involved in the case before her: "Yeah, I'm afraid it will. I mean, sometimes I don't understand a word, I just skip it . . . so I just guess what it means." (R.p. 1118). Although she believed she had kept up, she was worried that she would not understand going forward, and was concerned that she "wouldn't even

know." (R.p. 1118). She said she would thus "Probably" be uneasy if selected as a juror. (R.pp. 1118-1119).

The defense challenged Huang for cause noting her language difficulties which challenge was denied. (R.pp. 1130-1131).

Mary Gunnell told the court she worked at Washington Bank in 1975 through 1977 and while so employed "I went through three bank robberies." (R.pp. 1169-1170). While talking to the Court she advised, "It still brings back memories" and in fact became so emotional that the court took notice. By the Court: "Yeah, I can tell you're getting a little emotional. Is it going to be a problem for you to listen to some of the facts like that?" A: "It's possible." The Court: "I can tell you're already getting shook up over it." (R.p. 1170). The Court then asked the panel, " . . . does anybody feel like you just cannot be a fair juror? For purposes of this trial, if you feel like you can't be? I guess I'm looking at you Ms. Gunnell. That was pretty - - "A: "It was traumatic." (R.p. 1182). She nonetheless nodded to indicate that she thought she "should be able" to sit through the trial. (R.p. 1182). She told defense counsel that "It would bother me, but . . . I'm not going to hold it against him, you know. But yes, it might bother me." (R.p. 1225).

The defense challenged Gunnell for cause for bias, noting that her emotions got the better of her at the mere recollection of her prior victimization, with tears forming in her eyes. (R.p. 1239). The State admitted "she got choked up." (R.p. 1240). The court denied the challenge. (R.p. 1241).

Kelly Crain told the judge "I was in a bank robbery. . . . It was April of 1998. . . . ." (R.p. 1170). The judge asked her if she suffered "Long-term effects" to which she replied, "Oh yeah. It's daily. You get scared. My husband, he's at work every third day. So I don't go to bed until two or three o'clock in the morning. I'm scared somebody is going to come in. I have to protect my family. Even though that was

many years ago. I still have those effects." (R.pp. 1170-1171). Ms. Crain did later

state that "This is a different situation so, I mean, I cannot put what happened to me

on him." (R.p. 1184).

The defense challenged Crain for cause for bias which challenge was denied.

(R.pp. 1238-1241).

Appellant submits that the trial court was in error.

An erroneous ruling depriving an accused of a peremptory challenge is a

substantial violation of his constitutional and statutory rights and constitutes

reversible error. State v. Cross, 93-1189, (La.6/30/95), 658 So.2d 683, 686; State v.

Bourque, 622 So.2d 198, 225 (La.1993). "A challenge for cause should be granted,

even when a prospective juror declares his ability to remain impartial, if the juror's

responses as a whole reveal facts from which bias, prejudice or inability to render

judgment according to law may be reasonably implied." State v. Jones, 474 So.2d

919, 926 (La.1985).

Juror Jackson candidly told the Court that her dislike of guns was so great that

she would expect the accused to explain why he possessed a firearm, to the detriment

of his privilege against self-incrimination. Juror Huang candidly advised the court

that she could not adequately understand the proceedings due to her difficulty with

English.

Jurors Gunnell and Crain made it clear that they were each laboring under

emotional difficulties such that "bias, prejudice or inability to render judgment

according to the law" could be reasonably implied. Both jurors expressed deep and

longstanding emotional damage as a result of their personal experiences as victims

of bank robbery.

Gunnell, the victim of three armed bank robberies, had tears well up in open

court even though over thirty years had passed since her victimization. Crain told the

judge that she still "daily" suffered from the effects of her victimization from a bank robbery in "April of 1998" such that, in the present tense, as she told the judge, "I'm scared somebody is going to come in. I have to protect my family." (R.pp. 1170-1071). If **that** is not evidence from which "bias, prejudice or inability to render judgment according to the law" can be reasonably implied, what is? Both jurors candidly expressed emotional responses to the crime alleged at trial sufficient to cause anyone to imply that it would impact their ability to be impartial.

Appellant submits that the trial court erred. The four referenced challenges for cause should have been granted. The error in this case mandates reversal.

## SUMMARY OF ARGUMENT AND ARGUMENT NO. 2

## ASSIGNMENT OF ERROR NO. 2 AND

## ISSUE PRESENTED FOR REVIEW NO. 2

**The trial court denied appellant his constitutional right of confrontation by refusing to allow him to cross-examine Walter Aswell regarding the great leverage under which he was testifying pursuant to the plea bargain he had confected with the State of Louisiana. The trial court's refusal to allow the jurors to learn of the circumstances of Aswell's plea bargain prevented them from evaluating his credibility and denied appellant the right to present a defense.**

As noted above, appellant's former co-defendant, Walter Aswell, cut a deal with the State wherein he plead guilty as charged and agreed to testify for the State against appellant in exchange for an agreed upon sentencing range. In particular, he testified on direct that he had pled guilty to three counts of attempted murder of police officers, one count of armed robbery, and one count of aggravated obstruction of a highway, for which he would receive an agreed upon sentence of between twenty-five and thirty years, "for testifying." (R.pp. 322-323).

In cross-examination concerning the deal, the following exchange developed in pertinent part:

DEFENSE: Now let's talk about this plea deal that you got. You spoke with your lawyer about an offer that was extended to you and it was agreed that you'd come testify for the state against Logan Mills, right.?

ASWELL: Yes, sir.

DEFENSE: And your expected sentence is somewhere between twenty five and thirty years, correct?

ASWELL: Yes, sir.

* * *

DEFENSE: **Now you have considerably more exposure than that twenty five to thirty years that Ms. Wall asked you about, right?**

STATE: Objection, Your Honor. May we approach?

COURT: Approach.

(At the bench).

COURT: What is your objection?

STATE: I object because it is speculation unless he can show that, I mean, it is a multiple sentence and anything in that years is up to you, **so to suggest that because of his testimony for the state he got something less than the maximum, I think it's inappropriate.** I think it is speculative to what he could have gotten, because it's not the district attorney but Your Honor that sentences.

* * *

STATE: It's twenty five to thirty. That's what it is. I think **the record reflects his testimony was to be consistent with his prerecorded pretrial**

**statements and if he deviated from that it would be invalid. Your Honor is aware of what the plea agreement was.**

DEFENSE: I was here. I'm saying if he doesn't testify in conformity with his written statement he's no longer bound.

COURT: You can question him in that manner, but that's not exactly what you were saying. You were going into potential exposure if he didn't plead guilty.

DEFENSE: Correct.

* * *

DEFENSE: And if he lies, if he does not testify in conformity with the statement, it's more if he lies. If it's not in conformity, Your Honor is not bound and can max him out. That's what I'm trying to get at.

COURT: If you want you can go into that, **but you can't talk about what the maximum sentence is.**

DEFENSE: . . . .I understand the basis of her objection, but it goes directly to the heart of the motivation and reason for testifying and they have a potential ninety nine year sentence hanging over his head.

COURT: I understand the line of questioning and **I think the approach was improper.**

DEFENSE: Is it your appreciation if he does not testify in conformity with the statement you are not bound?

COURT: **But that does not open it up to question on maximum sentence.** I may invite the question if you don't testify in conformity with the prior statements, that opens up the potential for a much longer sentence **without going into specifics.**

DEFENSE: I did not get into that on what is the possible exposure, and let me ask, I assume you are ruling I am limited to asking if he's aware of way more exposure. **I can't ask him about possible maximum exposure?**

COURT: **That's inviting the jury to know what the potential exposure is for your client.**

* * *

. . . . **I will not allow you to talk about what the maximum sentences are.**

* * *

DEFENSE: I object to Your Honor's ruling and would like to note my objection. I think the Court's ruling is inconsistent and impermissible limiting my inquiry to the sentence as it is would limit my ability to cross examination on this sentence in that regard. That is central to cross, because the maximum exposure if he did not testify exactly the way the state wants . . . . That goes to bias. Additionally because of the limitation placed on me by the ruling, I move for a mistrial.

* * *

DEFENSE: Note my objection.

(R.pp. 353-359).

The judge, and the State, and Aswell, all knew that if Aswell didn't toe the line and testify in conformity with his pre-trial statements that he then faced a potential sentence of ninety nine years on the armed robbery, fifty years on each of the three counts of attempted murder, and fifteen years on the aggravated obstruction. Aswell certainly knew that the deal was: **play ball and get a sentence of between 25 and 30 or deviate from the script and face a potential sentence of 264 years.** It was under

such a threat that Aswell plead guilty - and it was under such a threat that he testified before the jury that convicted appellant.

Indeed, the court and counsel were **required** to make certain that Aswell knew what the maximum penalty exposure was for each of the crimes to which he plead guilty: before the trial court can accept a plea of guilty, it must first be determined that the accused has a full understanding of his Boykin rights, the acts sufficient to constitute the offenses for which he is charged and the range of possible sentences, including, specifically, the maximum penalty exposure. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State ex rel. LaFleur v. Donnelly, 416 So.2d 82 (La. 1982); State v. Domangue, 476 So.2d 986 (La. App. 1st Cir. 1985).

Thus the people to whom knowledge of that exposure mattered the most were denied that information, depriving appellant the tools with which to effectively cross examine the most critical witness against him, the person appellant accused of coercing him into the criminal acts that resulted in his conviction and sentence of seventy years. Such an obvious and fundamental denial of appellant's constitutional and statutory right of confrontation cannot be cured by resort to the soothing balm of harmless error analysis. The error in this case on such a critical aspect of confrontation concerning such a key witness mandates reversal.

A defendant's right to demonstrate facts and circumstances, which might influence a witness's perceptions or color his testimony (thereby lessening the weight the fact-finder might accord the testimony), is an important function of the right to confront and cross-examine embodied in the Sixth Amendment to the United States Constitution and La. Const. Art. I, § 16. Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); State v. Bowie, 00-3344 (La. 4/30/02), 813 So. 2d 377, 385, cert. denied, 123 S. Ct. 416, 154 L. Ed. 2d 297, 71 U.S.L.W. 3264 (2002).

This Court has agreed:

The broad right to impeach the witness for bias or interest is dictated by La.C.E. art. 607 D(1), by the statutory right to full cross-examination ( La. C.E. art. 611 B), and by the constitutional right of confrontation. La. Const. art. I, § 16; U.S. Const. Amend. VI. See State v. Quatrevingt, 93-1644, pp.23-24 (La. 2/28/96), 670 So. 2d 197, 210, cert. denied, 519 U.S. 927, 117 S. Ct. 294, 136 L. Ed. 2d 213 (1996).

State v. Asberry, 808 So. 2d 472, 475 (La.App. 1 Cir. 2001).

The possibility that the State may have some "leverage over a witness due to that witness's pending criminal charges is recognized as a valid area of cross-examination." State v. Rankin, 465 So. 2d 679, 681 (La. 1985). A witness's hope or knowledge that he will receive leniency from the State in exchange for his testimony is highly relevant to establish bias or interest. State v. Bowie, supra. A witness's bias or interest may arise from arrests, pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding the conduct. State v. Vale, 95-1230 (La. 1 /26/96), 666 So. 2d 1070, 1072; State v. Shexnayder, 96-98 (La. App. 5 Cir. 11/26/96), 685 So. 2d 357, writ denied, 97-0067 (La. 5/16/97), 693 So. 2d 796, cert. denied, 522 U.S. 839, 118 S. Ct. 115, [Pg 8] 139 L. Ed. 2d 67 (1997). Moreover, even after pending charges have been resolved, bias may arise from a witness's, for example, "vulnerable status as a probationer." Davis v. Alaska, 415 U.S. at 318, 94 S. Ct. at 1111.

In State v. Williams, 2002-1406 (La. 4/9/03), 844 So. 2d 832, during cross-examination of a State's witness, the defense counsel questioned the witness concerning a favorable plea bargain he had received in connection with a prior charge three months before the defendant's trial. The prosecutor immediately objected to any questions about the nature of the witness's plea bargain. After excusing the jury, both the prosecutor and the State's witness denied that the plea bargain had any connection with the defendant's case. On that basis, the trial court sustained the state's objection and precluded defense counsel from asking the witness any more than whether he had a prior conviction. The Louisiana Supreme Court reversed and stated that "Even

assuming that [the witness] had no motive to protect a guilty plea premised on a specific condition (express or implied) that he would testify against relator and his codefendants, the witness may have subjectively believed that continued cooperation with the state was necessary to protect his probationary status and to forestall any chance of going to jail." State v. Williams, 02-1406 at p. 7, 844 So. 2d at 835. The Supreme Court further noted that without the full context of the proceedings set out before them, the jurors lacked any basis for assessing how much pressure the witness may have felt to cooperate with the prosecution. The language in Williams is telling on this point and worthy of quotation at length:

> Jurors knew from Ancar's direct testimony that he had pleaded guilty to possession of cocaine and had received probation. However, **without the full context of the proceedings set out before them**, including the terms of the plea bargain, jurors lacked any basis for **assessing how intertwined the two cases may have been in Ancar's mind**, how closely associated the plea bargain in one case was to his appearance as a victim/witness in the other, and **how much pressure Ancar may have felt to cooperate in the prosecution of relator and his co-defendants, not only to protect his probationary status but also to distance himself** from the darker implications arising out of the loss of thousands of dollars in cash from his trailer and testimony of family members that the perpetrators were looking for money and drugs only a month after he had been implicated in the cocaine sales to undercover agents.

State v. Williams, 844 So. 2d 832, 835-836 (La. 2003).

The language quoted from Williams makes clear the importance of informing the jury of **all** of the particulars of the plea bargain so that **the jury** can evaluate the witness' testimony in the context of the witness' exposure, as only then will the jury be able to assess how the potential for a much greater sentence may have played on Aswell's mind.

In appellant's case all the jury was allowed to learn was that pursuant to the plea agreement Aswell faced a sentence of between twenty-five and thirty years, dependent upon his truthful testimony before the court. As such, it would appear to a lay person that there was at most a five-year swing in play - that testimony pleasing to the State

might result in a sentence of twenty-five years but that otherwise the maximum was thirty. The leverage would amount to a possible increase in sentence of only twenty percent.

Appellant's jury was prohibited by the court from knowing the truth: if Aswell testified in agreement with appellant that Aswell was the leader of the criminal episode, if Aswell testified that he coerced appellant into participation, if Aswell testified that he, not appellant, was the passenger in the vehicle, if Aswell simply recanted his statements to the police, then, under those circumstances, **all deals were off and his sentencing exposure was as high as 264 years.** Rather than a five year club hanging over his head, with a potential increase of a mere twenty percent, Aswell had literally hundreds of years of punishment, a sentence ten times greater, looming over his head if he did not testify in the manner agreed. If the jury had been made aware of the enormous power of the inducement hanging over Aswell's head, they may have justifiably questioned his veracity on key aspects of the case against appellant.

The trial court in fact made the case for the importance of the sentencing exposure information to the jurors in their evaluation of the evidence, by revealing his concern that the jury learn that appellant too faced such grave punishment:

COURT: **That's inviting the jury to know what the potential exposure is for your client.**

(R.p. 357).

There can be **no question** that the jury was entitled to that important information in evaluating Aswell's credibility.

It is not sufficient that appellant's counsel was permitted to "in general" question Aswell about the plea agreement "without going into specifics" as the trial

judge ordered. (R.pp. 356-357). Appellant Logan Mills has a constitutional and statutory right of confrontation which he sought to exercise to the full extent allowed by law. Partial confrontation is not enough. See e.g., State v. Bennett, 550 So. 2d 201, 204 (La.App. 3 Cir. 1989)(Although defense counsel was permitted to question witness in general concerning his plea agreement, trial judge's rulings prevented defense counsel from fully disclosing to the jury the benefits received for testimony and from showing bias or impartiality arising therefrom. It was important for the jury to be apprised of the maximum sentence the witness could have received for the crime before the plea arrangement was entered into. This information was essential, for without it, the jury was limited in its ability to determine the bias or impartiality of the witness. Reversed upon finding that the trial judge's rulings denied defendant his constitutional right of confrontation and statutory right to question a witness concerning that witness's bias or interest in the case.)

It is noteworthy that the court that declared the defendant by merely taking the stand had "opened the door" to impeaching cross examination on a rank hearsay federal pleading not of his making, was the same court that was careful to keep shut the door to the jury learning what appellant's maximum exposure could be: at all costs, *even at the cost of the constitutional right of confrontation*, the court kept ***that*** door shut tight! That said, the denial of defendant's right to confrontation is subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). In determining harmless error it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that

the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, the overall strength of the prosecution's case. Delaware v. Van Arsdall, supra.

As noted above, Aswell was an absolutely critical witness for the State both for supporting the State's case in chief **and** for directly attacking the heart of the defense. Indeed, the trial court's error in denying appellant his right of confrontation also seriously impinged upon appellant's constitutional right to present a defense.

Aswell testified about the planning of the robbery, the acquisition of the firearms, ammunition, disguises, the vehicle, the selection of the target, the selection of the escape route, the shooting at the police. **On all critical aspects of the criminal episode he testified in a way so as to divert attention from himself and to shift blame upon appellant.** No other witness was so positioned to help the State make its case against appellant. The importance of his testimony cannot be overstated.

Appellant's defense was one of justification: he claimed that he was coerced into committing the armed robbery by Aswell. La. R.S. 14:18(6). Whether or not the trial court was impressed with that defense, it was the defense appellant chose to present. To that end, he was entitled to present relevant evidence on the point. See e.g., State v. Youngblood, 235 La. 1087 (La. 1958). His counsel's need to confront Aswell and challenge his credibility was thus essential to the exercise of appellant's constitutional right to present a defense, as well as his right of confrontation.

Aswell's testimony - and credibility - was thus extremely important to the

prosecution's case. Given the singularity of his testimony it was surely not cumulative, and was in many important aspects completely uncorroborated by any witness. The question of who entered the driver's seat to drive away from the bank was contested throughout the trial. If Aswell were to be believed, it was he at the wheel and appellant who fired upon the police. If appellant were to be believed, appellant was at the wheel and Aswell was the shooter, lending critical support to appellant's claim that he acted in response to Aswell's armed coercion. In no way can one conclude that the error of the denial of confrontation in this case was harmless beyond a reasonable doubt.

The error mandates reversal and remand for a new trial.

## SUMMARY OF ARGUMENT AND ARGUMENT NO.3

## ASSIGNMENT OF ERROR NO. 3 AND

## ISSUE PRESENTED FOR REVIEW NO.3

**It was error to permit the State to impeach appellant with a hearsay statement contained within an unverified personal injury petition prepared and filed a person other than appellant. The error in this case was not harmless as it served to directly undermine the credibility of the accused on a central issue at trial. The error was so egregious as to warrant reversal.**

As was made clear at trial, pursuant to his arrest appellant Logan Mills suffered serious injuries as a result of gunshot wounds to the body, and multiple kicks and other blows to the head and body, administered by law enforcement agents, which injuries necessitated lengthy hospitalization and convalescence. Reasonably believing that the injuries were the result of unlawful excessive force, appellant sought legal advice as to his options for recovery for the pain and suffering he endured. To that end, counsel was engaged for the preparation and filing of a "1983"

Complaint for Damages in the Eastern District of Louisiana.

Philip J. Kaplan, a Louisiana attorney, prepared a complaint accordingly and filed it in the appropriate jurisdiction in a timely manner. The matter, styled "Logan N. Mills v. City of Bogalusa, et al," was assigned number 12-CV-00991. In the unverified complaint attorney Kaplan wrote, inter alia, that appellant Mills "was involved with an armed robbery" (paragraph 4). In paragraph 5, attorney Kaplan wrote: "After the above-alleged acts, the above defendants [Lyons, Seals, and Cassard] . . . were involved in the pursuit of a vehicle, **in which Plaintiff was a passenger**."

[Parenthetically, it is worth noting that the Federal Rules allow for inconsistent and even contradictory pleading. Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency. Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339, 343 (2d Cir. 1994) ("[A] party may properly submit a case on alternative theories."). "The inconsistency may lie either in the statement of the facts or in the legal theories adopted . . . ." 2A JAMES W. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE P 8.32, at 8-214 to 8-215 (2d ed. 1994). The current federal rules are designed to be afford greater flexibility than their predecessors. The flexibility afforded by Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims. See, e.g., MacFarlane v. Grasso, 696 F.2d 217, 224-25 (2d Cir. 1982) (holding that § 1983 plaintiff conceded existence of disputed agency policy only to the extent that he challenged the constitutionality of that policy, but not for purposes of other claims); Wright v. Olin Corp., 697 F.2d 1172, 1184 (4th Cir. 1982) ("It is often appropriate to assess particular Title VII claims and defenses

alternatively under different theories.").]

In the criminal trial appellant Logan Mills maintained that he was coerced by his co-defendant Aswell throughout the course of the incident, including being forced to drive the getaway vehicle at gunpoint, at the direction of Aswell, as Aswell fired upon the pursuing police officers. The State, on the other hand, maintained that appellant was the passenger in the getaway vehicle so as to suggest to the jury that it was appellant who fired upon the pursuing police officers. The issue of who was driving the vehicle was contested throughout trial.

Mindful of the "passenger" language contained in the Complaint, and aware of the State's desire to interrogate appellant about the contents of the pleading so as to impeach the defense theory, defense trial counsel made a motion in limine concerning the matter prior to appellant taking the stand at trial, which matter was addressed in pertinent part as follows:

DEFENSE: It is the defense's contention that complaint is unverified and that those statements are hearsay and inadmissible. They're not under the case law cited in my motion in limine, a judicial admission of any kind, and thus, not proper fodder for cross-examination with regard to statements contained therein.

Additionally, Judge, those are the statements his civil lawyer . . . made in the petition . . . . The fact of the petition I think is clearly relevant. The fact that you filed suit and are seeking damages against these officers, that's certainly grounds for cross-examination. But I think the statements contained within the petition are the hearsay statements of his civil counsel, who is not hear to testify and is not here to testify and is not here to testify about the basis for those statements. . . .

***

(R.p. 1972).

The trial judge denied the Motion in Limine in pertinent part as follows:

COURT: Relative to this motion in limine, the Court is going to deny the motion in limine. **Although its not a judicial confession, it is still a statement against interest that it's in a legal proceeding. And if he takes the stand, he opens the door to be cross-examined upon those pleadings,** and he can explain the purpose of those representations if he wants to take the position he was the driver.

It's not a judicial confession that somehow precludes him from raising other legal findings. **But in filing it, he has opened the door, if he takes the stand to being examined on what is in there.** If he wants to say well, I told my lawyer something differently, that's up to him when he gets on the stand, but it's fair game.

* * *

(R.pp. 1978-1979).

With the sanction of the trial court, the State was thus unleashed to question appellant about a document not of his making.

In a good faith effort to minimize the anticipated damage that would flow from the trial court's error, defense trial counsel broached the subject first, with appellant acknowledging that the unverified petition referred to him as a "passenger" in the vehicle engaged in the pursuit. (R.pp. 2023-2024). Appellant was constrained to then tell the jury that "the way it was explained to me is the legal definition of a passenger is anybody in the vehicle, even the driver. To me, it would sound like, you know, just a typical passenger. But those were written by an attorney, so I'm assuming he used

the legal definition of passenger." (R.p. 2024).

On cross the State did indeed question appellant at length about the "passenger" language contained within the federal complaint, reading the pertinent passage to the jury aloud, and even questioning appellant concerning conversations he had engaged in with counsel regarding his case. (R.pp. 2048-2049). Significantly, appellant made it clear that the "passenger" language could not have come from appellant as he had never spoken to attorney Kaplan, that any information Kaplan obtained likely came from appellant's criminal defense attorney, thus underscoring the simple indisputable fact that **the unverified federal lawsuit was rank hearsay**. (R.p. 2049).

Thus the record is clear: the unverified federal lawsuit was not a judicial confession - the trial judge concedes as much - but it was likewise most certainly **not** a "statement against interest" despite the trial court's claim to the contrary - it was hearsay - and there is no "opened the door" exception to the bar against hearsay that permitted such improper effort impeachment. Compare, e.g. State v. Overton, 337 So. 2d 1201, 1206 (La. 1976)("Where defense counsel went on cross-examination, the State had the right to follow on redirect.").

Hearsay is an out-of-court oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art.801. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Ramirez, 30 So. 3d 833, 843 (La.App. 5 Cir. 2009). Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Martin, 458 So. 2d 454, 460 (La.1984).

As a general rule, a party may attack the credibility of a witness by examining him or her concerning any matter having a reasonable tendency to disprove the truthfulness of his or her testimony. La. C.E. art. 607( C).

La. C.E. Art. 804(B) (3) provides as follows:

Statement against interest. --A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

* * *

La. Code Evid. art. 607 D(2) provides:

D. Except as otherwise provided by legislation:

* * * *

(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

The improper impeachment and/or questioning of a witness will not require the reversal of a conviction absent a clear showing that the matters complained of are of such an extremely prejudicial nature that the defendant was deprived of a fair and impartial trial. See La. C.Cr.P. art. 921 State v. Thomas, 589 So. 2d 555, 567 (La. App. 1st Cir. 1991); State v. Price, 476 So. 2d 989, 993 (La. App. 1st Cir. 1985). Mistrial is a drastic remedy, and should be granted only when defendant suffers such

substantial prejudice that he has been deprived of any reasonable expectation of a fair

State v. Salat, 672 So. 2d 333, 338 (La.App. 1 Cir. Apr. 4, 1996)

Appellate courts should reverse convictions for errors where the accused's

substantial rights have been violated. See State v. Johnson, 94-1379 (La. 11/27/95),

664 So. 2d 94, 100. This comports with the general theory that "appeals in criminal

cases are not granted merely to test the correctness of the trial court's ruling, but only

to rectify injuries caused thereby." Id., citing State v. Saia, 212 La. 868, 33 So. 2d

665, 668 (1947), quoting from State v. Cullens, 168 La. 976, 123 So. 645, 648 (1929).

The harmless error inquiry "is not whether, in a trial that occurred without the

error, a guilty verdict would surely have been rendered, but whether the guilty verdict

actually rendered in *this* trial was surely unattributable to the error." State v. Johnson,

664 So. 2d at 102, quoting Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124

L. Ed. 2d 182 (1993). (Emphasis in original.)

The foregoing jurisprudence makes the point crystal clear: the unverified

federal court petition was inadmissible hearsay. No "door had been opened" by the

filing of that document in the civil proceeding. Indeed, appellant's counsel

anticipated the matter by making the motion in limine before the matter was disclosed

in open court. The trial court's ruling opened the door. That ruling was without

question in error.

The error in this case was particularly egregious in its effect.

The credibility of appellant was at the heart and soul of his defense. If the jury

believed he was the victim of the threat-by-deadly-force coercion of Walter Aswell,

he was not guilty. If the jury believed Aswell, he was guilty of the crimes charged.

The respective roles of appellant and Aswell in the getaway vehicle was of particular

importance in assigning blame - and proving the defense.

If appellant was the driver of the getaway car, then his claim that he drove

away at gunpoint while the armed passenger Aswell fired at the pursuing police made sense. If appellant was the passenger, however, his defense claim was completely gutted. Thus the hearsay impeachment served to undermine appellant on the most critical point of defense. That impeachment, coming under the auspices of a legal pleading prepared by an attorney purportedly working in appellant's interests, was no doubt cloaked with unusual significance in the eyes of the lay persons on the jury. The jury very well may have thought such a document to reflect the "truth" as told by the accused to his counsel, appellant's protestations to the contrary notwithstanding. In this case, the impact of such impeachment was not harmless beyond a reasonable doubt.

## CONCLUSION

Appellant submits that his convictions and sentences should be set aside and the case remanded for further proceedings.

Respectfully submitted,

Bruce G. Whittaker No. 08339
Louisiana Appellate Project
P.O. Box 791984
New Orleans, LA 70179
(504) 554-8674

## CERTIFICATE

I hereby certify that on February 17, 2014, a copy of the above and foregoing has been served by U.S. mail as follows:

Kathryn Landry
Attorney for the State
P.O. Box 82659
Baton Rouge, LA 70884

Logan N. Mills #532042
General Delivery
Louisiana State Penitentiary
Angola, LA 70712

BRUCE G. WHITTAKER

COURT OF APPEAL FOR THE FIRST CIRCUIT

STATE OF LOUISIANA

---

NO. 2013-KA-0573

---

STATE OF LOUISIANA

Plaintiff/Appellee

VERSUS

LOGAN NESTOR MILLS

Defendant/Appellant

---

ON APPEAL FROM THE 22ND JUDICIAL DISTRICT COURT
PARISH OF WASHINGTON
DOCKET NO. 11-CR5-113331

---

THE HONORABLE AUGUST HAND, Judge
PRESIDING

---

# ORIGINAL BRIEF ON BEHALF OF THE STATE OF LOUISIANA, PLAINTIFF-APPELLEE

---

Respectfully submitted:

**STATE OF LOUISIANA**
WALTER P. REED, District Attorney
22nd Judicial District Court

By: [signature]
KATHRYN LANDRY, Bar No. 19229
Special Appeals Counsel
Post Office Box 82659
Baton Rouge, LA 70884-2659
Telephone: (225) 766-0023
Facsimile: (225) 766-7341

**(CRIMINAL APPEAL)**

EXHIBIT
D

# TABLE OF CONTENTS

| | Page |
|---|---|
| Table of Contents | ii |
| Table of Authorities | iii |
| Summary of Argument | 1 |
| Argument | 3 |
| Conclusion | 8 |
| Certificate of Service | 8 |

# TABLE OF AUTHORITIES

## LOUISIANA CODE OF CRIMINAL PROCEDURE:

C.Cr.P. art. 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

## LOUISIANA CODE OF EVIDENCE:

C.E. art. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

## LOUISIANA CASES:

Cross v. Cutter Biological, Div. of Miles Inc., 676 So. 2d 131, 144 (La. App. 4 Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

State v. Bowen, 806 So.2d 749, 752–53 (La. App. 5 Cir. 2001) . . . . . . . . . . . . -6-

State v. Edwards, 750 So.2d 893 (La. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

State v. Ellis, 677 So. 2d 617 (La. App. 2 Cir. 1996) . . . . . . . . . . . . . . . . . . . . -4-

State v. Lindsey, 948 So.2d 105 (La. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

State v. Ruffin, 82 So. 3d 497 (La. App. 4 Cir. 2011) . . . . . . . . . . . . . . . . . . . -4-

## SUMMARY OF ARGUMENT

In his first assignment of error, defendant argues the trial court erred in denying four challenges for cause to prospective jurors. The State submits defendant waived this alleged error with respect to prospective jurors Gunnell and Crain because he did not object to the trial court ruling. With regard to the merits of the claim, the State submits the challenges for cause were properly denied. The trial court's determination should not be disturbed unless a review of the entire voir dire *as a whole* indicates an abuse of discretion, and the State submits no abuse of discretion has been shown.

In his second assignment of error, defendant argues the trial court improperly limited his cross-examination of co-defendant, Walter Aswell, as to his plea agreement. Aswell testified regarding his plea agreement and his understanding to the proposed sentences and the fact that he could have been sentenced to substantially more time had he not entered into the plea agreement. The only limitation imposed by the trial court was not allowing Aswell to testify as to the potential maximum sentences he could have received for each charge, because that would inform the jury of the potential sentences for this defendant since the charges were the same. The State submits that defendant was able to expose any potential bias or motivation of Aswell through his cross-examination herein and the trial court did not improperly limit that examination. Alternatively, the State further submits any such error was harmless.

In his third and final assignment of error, defendant argues the trial court erred in allowing the State to cross-examine defendant regarding statements made in a federal civil lawsuit which he filed against law enforcement officials arising from his arrest on the charges at issue herein. Although defendant did move, prior to his

testimony, to exclude any reference to the civil suit, and that motion was denied by the trial court, following that, defendant opened the door to this issue by testifying on this issue under direct examination.  Moreover, the State submits the civil suit did not constitute hearsay.  A statement is not hearsay if the statement is offered against the party and is a statement by a person authorized by him to make a statement concerning the subject.  The allegations contained in that lawsuit were made by a person authorized by defendant to make a statement concerning the subject, i.e. his counsel in that action, and therefore, the civil suit does not constitute hearsay and was properly admissible.  Alternatively, the State submits any error was harmless.

## ARGUMENT

## ASSIGNMENT OF ERROR NO. 1

### Denial of Challenges for Cause

In his first assignment of error, defendant argues the trial court erred in denying four challenges for cause against prospective jurors Jackson, Huang, Gunnell and Crain.

La. C.Cr.P. art. 800(A) provides that a defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection. Although defendant did lodge an objection to the ruling by the trial court as to prospective jurors Jackson and Huang, he did not do so as to the ruling on prospective jurors Gunnell and Crain. Record at p. 1241. As a result, the State submits that any alleged error with regard to these two prospective jurors was waived. Nevertheless, the State will further address the merits of defendant's argument.

As to prospective juror Jackson, defendant argues that her strong feelings about guns resulted in an expectation that defendant would explain why he possessed a gun, which was contrary to his right against self-incrimination. Although Ms. Jackson stated that she would like to hear from defendant, she also stated that she would not hold it against him if he exercised his right against self-incrimination. Record at p. 1099. During voir dire, all of the prospective jurors, including Ms. Jackson, indicated they understood that the State had the burden of proof, not the defendant, and it could not be held against him to let the State meet its burden. Record at p. 1059. The trial court found that Ms. Jackson only indicated she would like to hear from defendant, but there was no valid basis for to strike her for cause. Record at p. 1129-1130. A

trial court's denial of a defendant's challenge for cause of a juror who stated that she would "like to hear" from defendant is not an abuse of discretion. State v. Ruffin, 82 So. 3d 497 (La. App. 4 Cir. 2011). Although a prospective juror expresses some doubt about defendant's failure to testify but affirms that she will decide the case strictly on the evidence presented, the trial court is entitled to find that the juror will accept the law as instructed. State v. Ellis, 677 So. 2d 617 (La. App. 2 Cir. 1996). The State submits the trial court properly denied the challenge for cause against Ms. Jackson.

As to prospective juror Huang, defendant argues the trial court erred in denying the challenge for cause due to her language difficulties. Although Ms. Huang did express reservations about her ability to understand because English was her second language, she testified that she graduated from Bogalusa High School, and there were only some words which she does not completely understand. However, the same could be true of anyone, particularly in a legal proceeding. Moreover, later in voir dire, she was asked whether there was anything that had been discussed that she did not understand, and she replied that there was not anything that she had not understood. Record at p. 1020, 1118. There was no valid basis for granting this challenge.

As to prospective jurors Gunnell and Crain, the basis for the challenge for cause was the fact that both had been victims of bank robberies in the 1970s and 1998 respectively. Nevertheless, Ms. Gunnell testified that she would not hold that against this defendant, that she would listen to all of the evidence, she would make sure the case was proven beyond a reasonable doubt, and the State was not at an advantage. Record at p. 1183, 1224-1225. Ms. Crain also testified that she would make sure the case was proven, and if not, would return a not guilty verdict, and she would not put

what happened to her in the past on this defendant. Record at p. 1184-1185, 1224. The trial court found that both women were unequivocal in their statements that they could be fair and denied the challenges. Record at p. 1241.

The trial court has great discretion in ruling on a challenge for cause and a juror's fitness to serve. One reason for this is that the impact of voir dire cannot fully be conveyed in the written transcript. The trial court's determination will not be disturbed unless a review of the entire voir dire *as a whole* indicates an abuse of discretion. State v. Edwards, 750 So.2d 893 (La. 1999); State v. Lindsey, 948 So.2d 105 (La. 2007). The State submits that there was no abuse of discretion in the rulings at issue, and this assignment of error is without merit.

**ASSIGNMENT OF ERROR NO. 2**

**Denial of Testimony Regarding Details of Plea Agreement**

In his second assignment of error, defendant argues the trial court improperly limited his cross-examination of co-defendant, Walter Aswell, as to his plea agreement.

Aswell testified that he pled guilty to the charged crimes of armed robbery, aggravated obstruction of a highway, three counts of attempted first degree murder of a police office and illegal use of a firearm. He testified that he was told his sentence would be twenty-five to thirty years. Record at p. 322-323. Under cross-examination, Aswell testified that he agreed to testify in exchange for the plea. Aswell admitted that a condition of his not facing substantially more time was his testimony that the statement he gave to the police was the truth. Record at p. 359. He was told that he could not get more than thirty years if he testified under the plea agreement. Record at p. 359-360. The only limitation imposed by the trial court was not allowing Aswell to testify as to the potential maximum sentences he could have

received for each charge, because that would inform the jury of the potential sentences for this defendant since the charges were the same. Record at p. 357. As stated, Aswell did admit that he could have gotten substantially more time without the plea, and he testified that he was required to testify in this case as part of the plea. The right to cross-examine a witness includes the right to question the witness concerning any bias or self-interest attached to the witness's testimony. However, the right to confrontation is not so unlimited as to require permitting a defendant on cross-examination of state witnesses to make any and all inquiries of whatever character. State v. Bowen, 806 So.2d 749, 752–53 (La. App. 5 Cir. 2001). The State submits that defendant was able to expose any potential bias or motivation of Aswell through his cross-examination herein and the trial court did not improperly limit that examination.

Alternatively, the State further submits any such error was harmless in light of the evidence presented during trial herein, and the verdict was surely unattributable to any alleged error limiting the testimony of Walter Aswell. The State submits this assignment of error is without merit.

**ASSIGNMENT OF ERROR NO. 3**

**Hearsay**

In his third and final assignment of error, defendant argues the trial court erred in allowing the State to cross-examine defendant regarding statements made in a federal civil lawsuit which he filed against law enforcement officials arising from his arrest on the charges at issue herein.

On direct examination, defendant testified that he was aware the civil suit was filed on his behalf but he did not prepare the petition or sign anything for it. Record at p. 2023. Defendant had testified at trial that he was the driver of the vehicle.

However, under direct examination, he further testified that it was explained to him that the reference in the civil suit to him as a passenger was a legal term which included anyone in the vehicle, whether or not a driver. Record at p. 2023-2024. He confirmed this understanding under cross-examination. Record at p. 2048-2049.

Defendant argues that the trial court erred when it allowed the State to impeach him with the allegations in the civil lawsuit. Although defendant did move, prior to his testimony, to exclude any reference to the civil suit, and that motion was denied by the trial court, following that, defendant opened the door to this issue by testifying on this issue under direct examination. During cross-examination on the same issue, the trial court found that defendant opened the door under direct examination and the questioning was permissible. Record at p. 2047.

Nevertheless, the State further submits that the allegations in the federal lawsuit do not constitute hearsay pursuant to La. C.E. art. 801. Subsection (D)(2)(c) of that article provides that a statement is not hearsay if the statement is offered against the party and is a statement by a person authorized by him to make a statement concerning the subject. Under direct examination, defendant testified that he filed the civil suit. Record at p. 2023. Under cross examination, defendant testified that he was represented by the attorney who filed the suit. Record at p. 2046. Accordingly, the State submits that the allegations contained in that lawsuit were made by a person authorized by defendant to make a statement concerning the subject, i.e. his counsel in that action, and therefore, the civil suit does not constitute hearsay and was properly admissible. *See* Cross v. Cutter Biological, Div. of Miles Inc., 676 So. 2d 131, 144 (La. App. 4 Cir. 1996) (An allegation in a pleading in another suit is an extrajudicial admission and is admissible as evidence, but is not a conclusive presumption.)

Alternatively, the State submits that any error in the admission of this evidence was harmless. There was other testimony that defendant was a passenger in the vehicle. *See* testimony of Lt. Lyons, record at p. 1852 and Walter Aswell, record at p. 333. The State submits that the verdict herein was surely unattributable to any error in the admission of this evidence. For the foregoing reasons, the State submits this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the State of Louisiana respectfully requests that the convictions and sentences herein be affirmed.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Original Brief on Behalf of The State of Louisiana has been mailed to the opposing counsel herein:

Bruce Whittaker
Post Office Box 791984
New Orleans, LA 70179

Baton Rouge, Louisiana this 27th day of March, 2014.

KATHRYN LANDRY

FIRST CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

---

NO. 2013-KA-0573

---

STATE OF LOUISIANA

Appellee

V.

LOGAN NESTOR MILLS

Appellant

---

A CRIMINAL PROCEEDING ON APPEAL FROM

THE TWENTY-SECOND JUDICIAL DISTRICT COURT

FOR THE PARISH OF WASHINGTON

THE HONORABLE AUGUST HAND, JUDGE

DOCKET NO. 11-CR5-113331

****************************************************

# REPLY BRIEF OF APPELLANT

****************************************************

Respectfully submitted:

Bruce G. Whittaker
Louisiana Appellate Project
P.O. Box 791984
New Orleans, LA 70179
(504) 554-8674
bruce@whittakerlaw.com

EXHIBIT
E

# TABLE OF AUTHORITIES

*CASES*

Page

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)..............9

California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)...........7

Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)..........7

Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). ..........8

Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).......10

Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)..........10

Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)...............7

State v. Asberry, 808 So. 2d 472 (La.App. 1 Cir. 2001)..........7

State v. Boutte, 384 So. 2d 773 (La. 1980). ..........4

State v. Brumfield, 546 So. 2d 1241 (La.App. 1 Cir. 1989)..........7

State v. Davis, 818 So. 2d 76 (La.App. 1 Cir. 2001)..........7

State v. Harrison, 484 So.2d 882 (La.App. 1st Cir.), writ denied, 488 So.2d 688 (La. 1986)..........7

State v. Jenkins, 476 So.2d 475 (La.App. 1st Cir. 1985)..........7

State v. Jones, 474 So.2d 919 (La.1985)..........5

State v. Overton, 337 So. 2d 1201 (La. 1976)..........11

State v. Quatrevingt, 93-1644 (La. 2/28/96), 670 So. 2d 197, cert. denied, 519 U.S. 927, 117 S. Ct. 294, 136 L. Ed. 2d 213 (1996)..........7

State v. Robinson, 817 So. 2d 1131(La. 2002)..........7

State v. Vanderpool, 493 So. 2d 574 (La.1986) ..........4

Strickler v. Greene, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) ......10

Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). ..........8

United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). ....................10

*STATUTORY AUTHORITY*

La.C.Cr.P. Art. 800 ....................4

La.C.Cr.P. Art 841 ....................4

La.C.E. art. 607 ....................7

La. C.E. art. 611. ....................7

La. Const. Art. I, § 16....................7

U.S. Const. Amend. VI....................6

**MAY IT PLEASE THE COURT:**

Appellant herewith replies to the arguments of the State regarding each assignment in turn.

## ASSIGNMENT OF ERROR NO. 1

It was error to deny defense challenges for cause of four jurors who for their respective reasons made it clear to the court that they were unqualified to serve on the jury that tried appellant's case.

**The State contends** in part that the challenges for cause error was waived because while counsel challenged the four jurors Jackson, Huang, Gunnell, and Crain, for cause, counsel did not then also object to the court's denial of the challenges for cause of jurors Gunnell and Crain.

In State v. Vanderpool, 493 So. 2d 574 (La.1986) the appellate court held that pursuant to La.C.Cr.P. Art. 800, the failure to object to the denial of a challenge for cause barred appellate review of the denial. The Supreme Court reversed on this issue. The supreme court pointed out that an objection need not be raised by incantation, citing La. C.Cr. P. Art 841 and State v. Boutte, 384 So. 2d 773 (La. 1980). The court noted that it was sufficient that the party make known the action it desired or the objection to the action of the court, and the grounds therefor. The court further indicated that the objection requirement is not inflexible and went on to hold that the defendant "made it known he wanted the deputy sheriff excused and voiced the reasons why." Vanderpool, supra at 575. The court specifically said "this is sufficient to preserve the issue for appeal." Vanderpool, supra at 575.

Appellant herein made clear his desire for the challenges and the bases of each. There is no "belt and suspenders" requirement to preserve the cause challenge error, despite the state's claim to the contrary.

As to the merits of the issue, Jurors Gunnell and Crain both revealed that they were laboring under emotional difficulties such that "bias, prejudice or inability to render judgment according to the law" could be reasonably implied. Both jurors expressed deep and longstanding emotional damage as a result of their personal experiences as victims of bank robbery.

Gunnell, the victim of three armed bank robberies, had tears well up in open court even though over thirty years had passed since her victimization. Actual tears in a courtroom full of strangers, thirty years after the fact, would have to count as facts indicative of "bias, prejudice or inability to render judgment according to law."

Crain told the judge that she still "daily" suffered from the effects of her victimization from a bank robbery in "April of 1998" such that, in the present tense, as she told the judge, "I'm scared somebody is going to come in. I have to protect my family." (R.pp. 1170-1071). Daily suffering for an incident recalled to the month over 15 years later must surely count as facts indicative of "bias, prejudice or inability to render judgment according to law."

Both jurors candidly expressed emotional responses to the crime alleged at trial sufficient to cause anyone to imply that it would impact their ability to be impartial. Such powerful lingering and specific after-effects are strong evidence from which "bias, prejudice or inability to render judgment according to the law" must be reasonably implied. "A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Jones, 474 So.2d 919, 926 (La.1985). Clearly, in this case, despite the jurors declarations of impartiality, their responses "as a whole" reveal facts from which an inability to serve must be reasonably implied. The denial of the challenges for cause was reversible error.

## ASSIGNMENT OF ERROR NO. 2

The trial court denied appellant his constitutional right of confrontation by refusing to allow him to cross-examine Walter Aswell regarding the enormous leverage under which he was testifying pursuant to his plea bargain with the State of Louisiana.

**The State contends** that apprising the jury that Aswell faced a possible increase of sentence of up to five years sufficiently informed the jury of his potential "bias or self-interest."

**The State further contends** that any such error in this case "was harmless in light of the evidence presented during the trial herein . . . ."

APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL

RIGHT OF CONFRONTATION

Aswell cut a deal that was tremendously more substantial and favorable than the jury was led to believe. The deal required him to testify according to plan in exchange for which he would receive a sentence of sentence of between 25 and 30 years. Were he to deviate from the script, however, he would face a potential sentence of **264 years - a swing of over 200 years** - not a swing of only 5 years. It was under that threat that Aswell plead guilty - and it was under that threat that he  testified before the jury that convicted appellant.  Indeed, one can imagine the court, Aswell, and the State all with fingers-crossed, as Aswell testified about the 5 year inducement "deal," mindful all the while that **the truth** was tremendously other than the jury was ever told. The fact is, the enormous threat under which Aswell testified was kept secret from the trier of fact.

The Confrontation Clause of the Sixth Amendment of the U.S. Constitution guarantees an accused the right to be confronted with the witnesses against him. This

is a bedrock procedural guarantee applicable in both federal and state prosecutions. Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The Sixth Amendment safeguards the right of the defendant to confront his accuser and to subject the accuser's testimony to rigorous testing in an adversarial proceeding before the trier of fact. California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).

Generally, to attack the credibility of a witness, a party may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony. See La.C.E. art. 607(C); State v. Robinson, 817 So. 2d 1131(La. 2002).

This Court has agreed:

> The broad right to impeach the witness for bias or interest is dictated by La.C.E. art. 607 D(1), by the statutory right to full cross-examination ( La. C.E. art. 611 B), and by the constitutional right of confrontation. La. Const. art. I, § 16; U.S. Const. Amend. VI. See State v. Quatrevingt, 93-1644, pp.23-24 (La. 2/28/96), 670 So. 2d 197, 210, cert. denied, 519 U.S. 927, 117 S. Ct. 294, 136 L. Ed. 2d 213 (1996).

State v. Asberry, 808 So. 2d 472, 475 (La.App. 1 Cir. 2001).

Failure to allow cross-examination about pending criminal charges to show bias or interest is reversible error. State v. Davis, 818 So. 2d 76, 84 (La.App. 1 Cir. Nov. 9, 2001); State v. Brumfield, 546 So. 2d 1241, 1246 (La.App. 1 Cir. 1989); State v. Harrison, 484 So.2d 882 (La.App. 1st Cir.), writ denied, 488 So.2d 688 (La. 1986); State v. Jenkins, 476 So.2d 475 (La.App. 1st Cir. 1985).

Appellant's jury was *prohibited* by the court from knowing the truth: if Aswell testified in agreement with appellant that Aswell was the leader of the criminal episode, if Aswell testified that he coerced appellant into participation, if Aswell testified that he, not appellant, was the passenger in the vehicle, *if Aswell simply recanted his statements to the police*, then, **his sentencing exposure was not 30 years**

**but as high as 264 years!** Rather than a five year club hanging over his head, with a potential increase of a mere twenty percent, Aswell had literally hundreds of years of punishment, a sentence **ten times greater**, looming over his head if he did not testify in the manner agreed. If the jury had been made aware of the enormous power of that inducement hanging over Aswell's head, they may have justifiably questioned his veracity on key aspects of the case against appellant. There can be **no question** that the jury was entitled to that important information in evaluating Aswell's credibility.

THE DENIAL OF THE RIGHT WAS NOT HARMLESS

In determining harmless error it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, the overall strength of the prosecution's case. Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

As noted above, Aswell was an absolutely critical witness for the State both for supporting the State's case in chief **and** for directly attacking the heart of the defense. Indeed, the trial court's error in denying appellant his right of confrontation also

seriously impinged upon appellant's constitutional right to present a defense.

Aswell testified about the planning of the robbery, the acquisition of the firearms, ammunition, disguises, the vehicle, the selection of the target, the selection of the escape route, the shooting at the police. On all critical aspects of the criminal episode he testified in a way so as to divert attention from himself and to shift blame upon appellant. **No other witness was so positioned to help the State make its case against appellant.** It was not cumulative. The importance of his testimony cannot be overstated.

Appellant's defense was one of justification. His counsel's need to confront Aswell and challenge his credibility was thus essential to the exercise of appellant's constitutional right to present a defense, as well as his right of confrontation.

Aswell's testimony - and credibility - was thus extremely important to the prosecution's case. Given the singularity of his testimony it was surely not cumulative, and was in many important aspects completely uncorroborated by any witness. The question of who entered the driver's seat to drive away from the bank was contested throughout the trial. If Aswell were to be believed, it was he at the wheel and appellant who fired upon the police. If appellant were to be believed, appellant was at the wheel and Aswell was the shooter, lending critical support to appellant's claim that he acted in response to Aswell's armed coercion. In no way can one conclude that the error of the denial of confrontation in this case was harmless beyond a reasonable doubt.

Indeed, the impeaching effect of the exposure faced by Aswell was so great that the prohibition against its use at trial was tantamount to a court sanctioned Brady/Giglio due process violation, not cured by harmless error analysis.

In Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),

the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the Supreme Court extended this principle to include evidence that impeaches a witness's credibility. 405 U.S. at 154.

There are three elements of a Brady/Giglio violation: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (internal quotation marks omitted).

Evidence is prejudicial or material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (citing Bagley, 473 U.S. at 678). But a "reasonable probability" may be found even where the remaining evidence would have been sufficient to convict the defendant. See Strickler, 527 U.S. at 290.

Refusing to allow appellant to confront and impeach Aswell regarding the leverage in play was tantamount to failing to disclose that leverage to the defense. The effect on appellant's right of confrontation was the same as if the state had failed to disclose the deal in the first place. Thus, the trial court's prohibition against full confrontation amounts to a court-sanctioned Brady/Giglio due process violation.

Had the leverage at issue been kept from appellant until after trial, this Court

would be faced with a compelling Brady/Gigilio violation new trial issue. Instead, the trial court *sanctioned* the restriction on confrontation, making the violation all the more egregious. Such an error cannot be cured by resort to harmless error analysis.

The error mandates reversal and remand for a new trial.

## ASSIGNMENT OF ERROR NO. 3

It was error to permit the State to impeach appellant with a hearsay statement contained within an unverified personal injury petition prepared and filed by a person other than appellant.

**The State contends** in part that the error was waived because by testifying about the lawsuit during direct examination, appellant "opened the door" to cross examination on the issue. The fact is that appellant testified about the matter on direct only *because* the trial court had ruled the lawsuit's contents admissible. Attempting to mitigate the damage caused by the court's error did not "open the door" - and it certainly did not cure or forgive the trial court error.

The record is clear: the unverified federal lawsuit was not a judicial confession - the trial judge conceded as much - and was likewise most certainly **not** a "statement against interest" despite the trial court's claim to the contrary - it was hearsay - and there is no "opened the door" exception to the bar against hearsay that permitted such improper impeachment. Compare, e.g. State v. Overton, 337 So. 2d 1201, 1206 (La. 1976)("Where defense counsel went on cross-examination, the State had the right to follow on redirect.").

The credibility of appellant was at the heart of his defense. If the jury believed he was the victim of the threat-by-deadly-force coercion of Walter Aswell, he was not guilty. If the jury believed Aswell, appellant was guilty of the crimes charged. The respective roles of appellant and Aswell in the getaway vehicle was of particular

importance in assigning blame - and proving the defense.

If appellant was the driver of the getaway car, then his claim that he drove away at gunpoint while the armed passenger Aswell fired at the pursuing police made sense. If appellant was the passenger, however, his defense claim was completely gutted. Thus the hearsay impeachment served to undermine appellant on the most critical point of defense. That impeachment, coming under the auspices of a legal pleading prepared by an attorney purportedly working in appellant's interests, was no doubt cloaked with unusual significance in the eyes of the lay persons on the jury. The jury very well may have thought such a document to reflect the "truth" as told by the accused to his counsel, appellant's protestations to the contrary notwithstanding. In this case, the impact of such impeachment was not harmless beyond a reasonable doubt.

## CONCLUSION

Appellant submits that his convictions and sentences should be set aside and the case remanded for further proceedings.

Respectfully submitted,

Bruce G. Whittaker No. 08339
Louisiana Appellate Project
P.O. Box 791984
New Orleans, LA 70179
(504) 554-8674

**CERTIFICATE**

I hereby certify that on April 4, 2014, a copy of the above and foregoing has been served by U.S. mail as follows:

Kathryn Landry
Attorney for the State
P.O. Box 82659
Baton Rouge, LA 70884

Logan N. Mills #532042
General Delivery
Louisiana State Penitentiary
Angola, LA 70712

BRUCE G. WHITTAKER

1/10/14 Docketed Rerted 2 Pand

IN THE

FIRST CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

RECEIVED
CLERK'S OFFICE
APR 09 2014
COURT OF APPEAL
FIRST CIRCUIT

NO.: 2013-KA-0573

COURT OF APPEAL FIRST CIRCUIT
FILED
APR 08 2014
CLERK

STATE OF LOUISIANA,
*Appellee,*

Versus

LOGAN NESTOR MILLS,
*Appellant.*

TIMELY

APPEAL FROM THE TWENTY-SECOND JUDICIAL DISTRICT COURT
FOR THE PARISH OF WASHINGTON, STATE OF LOUISIANA
THE HONORABLE AUGUST J. HAND, JUDGE PRESIDING
DOCKET NO. 11-CR5113331, DIVISION "B"

# PRO SE REPLY BRIEF

A TRUE COPY
DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA
DATE March 23, 2015

Respectfully submitted:

Logan N. Mills #532042
Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

CRIMINAL APPEAL

EXHIBIT
F

# TABLE OF CONTENTS

Table of Authorities....iii

Appellant's Reply to State's Original Brief....1

Statement of Jurisdiction....1

Assignment of Error No. 1....1

- Denial of Challenges for Cause....1
- Potential Juror Jackson....1
- Potential Jurors Gunnel and Crain....4

Assignment of Error No. 2....6

Assignment of Error No. 3....7

Conclusion....7

Certificate of Service....8

# TABLE OF AUTHORITIES

*Louisiana Constitution of 1974*

Article V, § 10 ........ 1

*Cases*

State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683 ........ 3

State v. Domino, 444 So.2d 268 (La.App. 1 Cir. 1983) ........ 5

State v. Ellis, 28,282 (La.App. 2 Cir. 6/26/96), 677 So.2d 617 ........ 3

State v. Hallal, 557 So.2d 1388 (La. 1990) ........ 6

State v. Joiner, (1927) ........ 6

State v. Pinion, 06-2346 (La. 2007), 968 So.2d 131 ........ 5

State v. Ruffin, 11-0135 (La.App. 4 Cir. 12/21/11), 82 So.3d 497 ........ 2

*Other Authorities*

Uniform Rules–Courts of Appeal, Rule 2-12.6 ........ 1

## APPELLANT'S REPLY TO STATE'S ORIGINAL BRIEF

## STATEMENT OF JURISDICTION

Jurisdiction vests in this Honorable Court by virtue of Article V, § 10 of the Louisiana Constitution of 1974 and Uniform Rules--Courts of Appeal, Rule 2-12.6.

## ASSIGNMENT OF ERROR NO.1

***Denial of Challenges for Cause***

The State's response is conclusory and misleading. The only cases the State cited are either contrary to its position, or general, well-established holdings that support Appellant's claim. As Appellant will demonstrate, the State's own argument defeats its purpose.

### Potential Juror Jackson

The State ignored the most critical aspect of the voir dire of Mrs. Jackson, particularly, **that she was never rehabilitated after she made several unambiguous statements that she would want to hear from Appellant as to why he had a gun**. Louisiana jurisprudence is clear: a juror who makes such a statement must be struck for cause, unless she is rehabilitated. This fact confirms that the trial court erred in not excusing Mrs. Jackson. The cases the State cited in its response make this point clear.

The State responds that: "Although Ms. Jackson stated that she would like to hear from defendant, she also stated that she would not hold it against him if he exercised his right against self-incrimination. Record at p. 1099" (State's brief, p. 3).

What Mrs. Jackson actually said was, "I would probably want to, but I

**don't think** I would hold it against him." (R.p. 1100). The State minimized the equivocal nature of Mrs. Jackson's response, taking it out of context, and ignoring everything she said after that; to wit: "And you talked about the traffic deal, that's not as big a thing with me as the actual robbery. Of **course, I guess, you know, to know his intent with that gun, I would probably want to hear that from him.**" (R.pp. 1099-1100). "**I would like to know, you know, what he's thinking about that gun** before he headed off to do it." (R.p. 1100). "**But I would want to know why he would think he would have to take a gun.**" (R.p. 1100). This was the last time Mrs. Jackson was questioned.

The State cited State v. Ruffin, 11-0135 (La.App. 4 Cir. 12/21/11), 82 So.3d 497, for the proposition that a prospective juror's statement that they would "like to hear" from the defendant is not enough to sustain a challenge for cause. (State's brief, p. 4). That is *not* what Ruffin held.

> A trial judge's refusal to excuse a prospective juror is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, **when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence.** State v. Taylor, 03-1834 (La. 5/25/04), 875 So.2d 58, 62. (**emphasis added**).

*Id.* at 515.

In Ruffin, the prospective juror Ms. Williams, initially made several statements indicating she would like to hear from the defendant. The trial court then reiterated the defendant's constitutional right not to testify and cautioned the jurors not to hold his silence against him. *Id.* at 515. The trial court then asked Ms. Williams what her position on the issue was. She stated unequivocally that she would not hold the defendant's right to remain silent

against him and that she could follow the law. *Id.* at 515. In Appellant's case, however, Mrs. Jackson was never rehabilitated.

The State also cites State v. Ellis, 28,282 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, for the proposition that the trial court is entitled to find that the juror will accept the law as given if a juror expresses some doubt about defendant's failure to testify, but nevertheless affirms that she will decide the case strictly on the evidence presented. (State's brief, p. 4). What the State leaves out, however, is that a juror who makes a seemingly prejudicial statement to the defense **must still be rehabilitated**, as the Court in Ellis acknowledged.

> When questioned by defense counsel, she stated that the defendant's failure to testify would not bear on her decision, but she would 'wonder' why he did not testify. Defense counsel followed up by asking if his failure to testify "might enter into" her decision; she replied, "**Not really. I feel like I would have to know the defendant to make that decision.**" **(emphasis added)**.

Ellis *id.* at 624.

After this exchange, defense counsel in Ellis made it clear that anyone who served on the jury would have to set aside personal feelings and apply the law as instructed. Both defense counsel and the prosecutor subsequently asked the panel if any of them would not apply the law; several jurors raised their hands, but the juror in question did not. *Id.* at 624. The Second Circuit conceded the record showing was minimal, containing no spoken assertion from the juror that she would accept the law. The Court held, however, unlike in State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683, the record was not completely devoid of effort to instruct the juror. Ellis, *id.* at 625.

"The trial judge was present throughout voir dire and could assess her

silent responses to group questions. By failing to assert, when questioned, that she would refuse to apply the intoxication law she obviously convinced the trial judge that she was rehabilitated." *Id.* at 625. Again, in Appellant's case, Mrs. Jackson was never rehabilitated, either individually or as a group. Ellis, just like Ruffin, only serves to support Appellant's claim, and undermine the State's position.

Finally, the State responds that the voir dire must be considered *as a whole* in reviewing for an abuse of discretion. (State's brief p. 5). Although the State is correct on this point, this certainly does not help its position regarding Mrs. Jackson. **Everything** Mrs. Jackson said evinced an extremely strong bias against guns which was so profound it would impel her to hold Appellant's right to remain silent against him. The closest she ever came to saying she could follow the law was her lone response that she **does not think** she would hold (the right to remain silent) against Appellant. Most importantly, **Mrs. Jackson was never rehabilitated** after her several emphatic statements that she would want to hear from Appellant (as to) why he would have a gun.

**Potential Jurors Gunnel and Crain**

The State responds that the challenges for cause for these two jurors are not preserved for appellate review because Appellant did not object to the trial court's ruling and state the grounds thereto. The State cites no caselaw supporting its position. Apparently, for good reason. The Louisiana Supreme Court has already expressly rejected the position advanced by the State.

"[A]n objection that counsel had been forced to except an obnoxious

juror as the result of the trial court's erroneous ruling on one or more cause challenges has not been an aspect of the Court's jurisprudence for preserving error in the denial of cause challenges for over 50 years . . ." State v. Pinion, 06-2346 (La. 2007), 968 So.2d 131, 136. The Court further held, "In jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule by stating his grounds for a cause challenge and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause." *Id.* at 136.

The State also contends that each of these prospective jurors maintained they could be impartial. According to the State, Mrs. Gunnel said, "she would make sure the case was proven beyond a reasonable doubt." (State's brief, p. 4). Mrs. Gunnel made no such statement. (R.pp. 1139-1237). The State responds that the trial court did not err in refusing to excuse Mrs. Gunnel and Mrs. Crain because it found both women were unequivocal in their statements that they could be fair and denied the challenges. Such declarations of impartiality, however, should not be taken in a vacuum.

"Mere statements of jurors of their impartiality cannot be mechanically accepted when they are placed in juxtaposition to evidence of bias, prejudice, or interest." State v. Domino, 444 So.2d 268, (La.App. 1 Cir. 1983). Mrs. Gunnel started crying when just talking about her prior victimization during several bank robberies, all occurring over 35 years ago. (R.pp. 1169-1170). Mrs. Crain testified she is so traumatized by her past victimization that she still suffers effects daily and is afraid to go to sleep when her husband is at work because she is afraid somebody is going to come in. (R.p. 1179). All this emotional damage stems from a bank

robbery that occurred more than 15 years prior. It was not reasonable for the trial court to conclude that these women would be able to remain impartial, despite their attestations to the contrary.

> It is the natural impulse of all men, with rare exceptions, when the direct question is put to them, especially by one in authority, such as a district attorney or a trial judge, to declare that they believe they can disregard a preconceived opinion and render a fair and impartial verdict upon the evidence submitted to them. In general, they are sincere in their statement and belief. **The declaration, however, should not only proceed from the mouth of the venireman, but it should be made in connection with a state of facts showing that it is probable true.** [sic] **(emphasis added).**

State v. Joiner, 112 So. 503, (La. 1927).

The State placed undue emphasis on the responses of these prospective jurors. The totality of the circumstances and longstanding emotional damage displayed by these two women lead to the inevitable conclusion that bias, prejudice, or inability to follow the law may be reasonably implied. State v. Hallal, 557 So.2d 1388 (La. 1990).

## ASSIGNMENT OF ERROR NO. 2

The only point that merits attention is the State's argument regarding the application of the harmless-error analysis to Errors No. 2 and 3. Responding to Error No. 2, the State contends that the error in unduly restricting the cross-examination of Walter Aswell is harmless. On the other hand, responding to Error No. 3, the State refers back to Aswell's testimony (that Appellant was the passenger) to say that the error of impeaching Appellant with the inadmissible civil petition was harmless. Such circular reasoning only serves to stress the need to impeach Aswell with the full extent of his motivation and bias.

The State spent a total of two sentences arguing why Error No. 2 was harmless. The State has failed to meet its burden of proving beyond a reasonable doubt that the error in unduly restricting the cross-examination of Walter Aswell did not contribute to the verdict. See Appellate Counsel's original brief, pages 26-36.

## ASSIGNMENT OF ERROR NO. 3

The State spent a total of three sentences arguing why Error No. 3 was harmless. The State has failed to meet its burden of proving beyond a reasonable doubt that the error in impeaching Appellant with the inadmissible civil petition did not contribute to the verdict. See Appellate Counsel's original brief, pages 36-43.

## CONCLUSION

As demonstrated above, the State's response has no merit. In light of the claims raised in Appellate Counsel's original brief, Appellant is entitled to a new trial.

Logan N. Mills #532042
Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

# CERTIFICATE OF SERVICE

I do hereby certify that the foregoing has been served upon:

**Opposing Counsel**:

Kathryn Landry
Attorney for the State
P.O. Box 82659
Baton Rouge, LA 70884

**Appellate Counsel**:

Bruce G. Whittaker
Attorney at Law
P.O. Box 791984
New Orleans, LA 70179

by placing a copy of same in a properly addressed envelope into the hands of the Classification Officer assigned to my unit along with a Withdrawal form made out to the General Fund, LSP, Angola, LA 70712 for the cost of postage and a properly filled out Inmate's Request for Indigent/Legal Mail form, receiving receipt for same in accordance with the institution's rules and procedures for the sending of legal mail.

Done this 7th day of April, 2014.

Logan N. Mills

IN THE

FIRST CIRCUIT COURT OF A

STATE OF LOUISIANA

RECEIVED
CLERK'S OFFICE
MAY 21 2014
COURT OF APPEAL
FIRST CIRCUIT

NO.: 2013-KA-0573

COURT OF APPEAL FIRST CIRCUIT
FILED
MAY 30 2014
CLERK

STATE OF LOUISIANA,
*Appellee,*

Versus

LOGAN NESTOR MILLS,
*Appellant.*

APPEAL FROM THE TWENTY-SECOND JUDICIAL DISTRICT COURT
FOR THE PARISH OF WASHINGTON, STATE OF LOUISIANA
THE HONORABLE AUGUST J. HAND, JUDGE PRESIDING
DOCKET NO. 11-CR5113331, DIVISION "B"

# PRO SE SUPPLEMENTAL BRIEF

A TRUE COPY
DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA
DATE March 23, 2015

Respectfully submitted:

Logan N. Mills #532042
Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

CRIMINAL APPEAL

EXHIBIT
G

# TABLE OF CONTENTS

Table of Authorities....iii

Statement of Jurisdiction....1

Statement of the Case....1

Assignments of Error....1

Issues Presented for Review....2

Statement of Facts....2

Summary of Argument....6

Assignment of Error No. 1....7

Assignment of Error No. 2....14

Assignment of Error No. 3....17

Assignment of Error No. 4....20

Assignment of Error No. 5....25

Assignment of Error No. 6....27

Conclusion....28

Certificate of Service....29

# TABLE OF AUTHORITIES

***United States Constitution***

Fifth Amendment....................13,16,19,24,27

Sixth Amendment....................13,16,19,24,25,27

Fourteenth Amendment....................13,16,19,24,25,27

***Louisiana Constitution of 1974***

Article I, § 2....................13,16,19,24

Article I, § 13....................16,19,25,27

Article I, § 16....................13,16,19,24,27

Article I, § 17(A)....................13

Article I, § 19....................27

Article V, § 10....................1

***Statutes***

La.C.Cr.P. Art. 774....................20

La.C.E. Art. 403....................17

***Federal Cases***

Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973)....................17,18

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824 (1967)....................23

Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004)....................18,19

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995)....................25,27

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979)....................26

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984)....................25-27

Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078 (1993)....................23,24

Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930 (1978)....................27

Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884 (1991)....................23

***State Cases***

State v. Azema, 633 So.2d 723 (La.App. 1 Cir. 1993)....16

State v. Brumley, 320 So.2d 129 (La. 1975)....8

State v. Chapman, 298 So.2d 753 (La. 1974)....9

State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683....7,9

State v. Davenport, 445 So.2d 1190 (La. 1984)....9

State v. Domino, 444 So.2d 268 (La.App. 1 Cir. 1983)....12

State v. Duplessis, 457 So.2d 604 (La. 1984)....8,27

State v. Gibson, 391 So.2d 421 (La. 1980)....16,23

State v. Hallal, 557 So.2d 1388 (La. 1990)....10

State v. Hilton, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027....26

State v. Jacobs, 99-1659 (La. 6/29/01), 789 So.2d 1280....8,13

State v. Joiner, 163 La. 609, 112 So. 503 (La. 1927)....13

State v. Lee, 346 So.2d 682 (La. 1977)....26

State v. Lee, 559 So.2d 1310 (La. 1990)....9

State v. Leger, 05-0011 (La. 7/10/06), 936 So.2d 108....25

State v. Lewis, 12-1021 (La. 3/19/13), 112 So.3d 796....24

State v. Matthis, 07-0691 (La. 11/2/07), 970 So.2d 505....25

State v. Sugar, 408 So.2d 1329 (La. 1982)....8

State v. Taylor, 93-2201 (La. 2/28/96), 669 So.2d 364....24

State v. Washington, 491 So.2d 1339 (La. 1986)....25

## STATEMENT OF JURISDICTION

Jurisdiction vests in this Honorable Court by virtue of Article V, § 10 of the Louisiana Constitution of 1974.

## STATEMENT OF THE CASE

Mills adopts and incorporates his Appellate Attorney's Statement of the Case.

## ASSIGNMENTS OF ERROR

1.   It was error to deny defense challenges for cause of four jurors who for their respective reasons made it clear to the court that they were unqualified to serve on the jury that tried appellant's case.

2.   The trial court denied appellant his constitutional right of confrontation by refusing to allow him to cross-examine Walter Aswell regarding the great leverage under which he was testifying pursuant to the plea bargain he had confected with the State of Louisiana.

3.   It was error to permit the State to impeach appellant with a hearsay statement contained within an unverified personal injury petition prepared and filed by someone other than appellant.

4.   The prosecutor committed reversible error during closing argument by making highly prejudicial, inflammatory remarks and intentionally misstating testimony regarding the most contested issue in the trial.

5.   Defense counsel rendered constitutionally ineffective assistance by failing to contemporaneously object to the prosecutor's flagrant misconduct.

6.   Mills was deprived of a trial with any semblance of fairness.

## ISSUES PRESENTED FOR REVIEW

1.  Is it error to deny challenges for cause where the jurors make it clear that they cannot impartially serve?

2.  Is it error to deny the accused his right of confrontation by prohibiting the jury from learning about the circumstances of a testifying co-defendant's plea bargain?

3.  Is it error to permit the State to impeach the accused with a hearsay pleading written by a non-testifying third party?

4.  Did the prosecutor commit reversible error during closing argument by making highly prejudicial statements and intentionally misstating testimony on the most contested issue of the case?

5.  Did defense counsel render constitutionally ineffective assistance by failing to contemporaneously object to the prosecutor's flagrant misconduct?

6.  Was Mills denied a trial with any semblance of fairness?

## STATEMENT OF FACTS

Mills adopts and incorporates his Appellate Attorney's Statement of Facts, supplementing as follows:

Kermit Martin testified that the person he saw pick up the bundle of money laying on the sidewalk got in the passenger seat of the getaway vehicle. (R.p. 1392). When asked if he was sure about that, Mr. Martin replied, "I am positive." (R.p. 1392).

Geraldine Ledet testified that the first person she saw ran around and got in the driver's seat. (R.p. 1357). Ms. Ledet testified that she saw another person, "I don't remember like exactly him running to the vehicle, whatever, I just seen somebody stop and go down like, you know, like to get something and come back up. But I only, the driver of the vehicle is the only person I actually seen, you know." (R.p. 1357).

Walter Aswell testified he bent down and picked up the stack of

money that Mills dropped. (R.p. 377). A single stack of money was found on the floor between the passenger seat and door. (R.p. 378), (S – Ex. 14-B). Aswell went in the bank second, and came out of the bank second. (R.p. 366). Aswell admitted he was behind Mills "at all times during the robbery." (R.p. 366). When defense counsel asked "Did anybody, any of the officers, make any statements with regard to Logan?" Aswell replied, "They told me they killed him. They said they shot him in the face and I don't need to worry about seeing him again." (R.p. 371). The gun Aswell gave Mills, before going in the bank, had no clip in it. (R.p. 2037).

Officer Cassard testified on direct that he first heard shots fired somewhere between Carroll's Wrecker Service and the bridge. (R.p. 405). Cassard noted that Carroll's Wrecker Service is "About like half a mile to three-quarters of a mile" from the bridge. (R.p. 426). The bridge crosses the Mississippi state line. (R.p. 443). On cross, Cassard acknowledged that he gave a statement to the Mississippi Bureau of Investigations the day after the incident stating, "When I caught up to them, I was the fifth car in line, and as we were topping the bridge, and I could see Officer Seals trying to get around them, and as he got around them, within seconds, he advised all of us that shots were fired." (R.p. 432).

When asked about this discrepancy as to where the shooting started, Cassard explained "Well, at the time I was giving the statement, it was only one day after the accident, and everything seemed kinda jumbled together, and as time has went on, my memory has gotten a lot better." (R.p. 432). Cassard's written report, dated 5/4/11 — two weeks after his statement to MBI — also says the first shots were fired as Cassard topped the bridge. (R.p. 438). When questioned about the difference in his direct testimony and his

own written report, Cassard stated, "I'm not doubting that my report may be different than what I say right now." (R.p. 441).

Cassard denied striking Walter Aswell. (R.p. 453). When asked how Walter Aswell received his injuries, Cassard stated, "He fell face first. I don't know." (R.p. 464). Aswell was apprehended in a grassy field. (D – Ex. 24). When asked how could somebody get a skull fracture from falling face first, Cassard responded, "I don't know." (R.p. 464). Cassard told the Mississippi Bureau of Investigations that "when the passenger came out of the vehicle, he come out of the vehicle pistol in hand shooting." (R.p. 488).

Lt. Patrick Lyons testified he told Chief Culpepper that the suspects continued shooting as they ran into the field. (R.p. 1900). Lyons did not see the suspects bend down and pick up ejected shell casings as they were running away. (R.p. 1902). Lyons also testified that when he came around the corner of the woodline, he observed "Three people going at it and I see arms and legs and, you know, they're exchanging blows and everything else. (R.p. 1916). When asked if Seals and Cassard were standing up, Lyons replied, "Yes, sir. All three of them are." (R.p. 1917). Lyons denied striking Walter Aswell and did not have an explanation as to how he got a fractured skull. (R.p. 1891). Lyons agreed it would be tactically unsound to holster a weapon when approaching an armed suspect. (R.p. 1921).

Officer Seals testified that he shot at Mills "four, five, six, something like that" times. (R.p. 513). "All I saw he fell. So I approached with my gun, walked up, approached him. He was laying face down first. The gun was maybe a foot or so laying here, so I holstered my gun, kneeled down to grab him and handcuff him." (R.pp. 513-514). When asked "Did at any time he get up and engage you in a standing fight?" Seals responded, "No, sir." (R.p. 533).

Seals further acknowledged that anybody who would have testified to such would be incorrect.[1] (R.p. 533).

Shelby Smith of the Mississippi Bureau of Investigations testified "We handle mostly all police-related shootings in Mississippi. The agencies that are involved must be a non-biased agency. They do not usually want their own agency to handle it so they call us to handle it for them, gathering the facts in all of the situation." (R.p. 1739). Smith admitted he was the case officer responsible for the compilation of all the information and in determining what happened. (R.p. 1767).

Smith testified Detective Spears from the Pearl River County Sheriff's Office took photographs of the officers involved. (R.pp. 1766-1778). Smith conceded that he had never seen the photographs, did not endeavor to get them, and did not know where they were. (R.p. 1768). Smith did not make any attempt to interview either Aswell or Mills. (R.p. 1782). Smith did not attempt to see if Mills wounds were consistent with what the officers described. (R.p. 1784). Smith conceded that was additional information that might have shed some light on what transpired. (R.p. 1784). Smith did not know that Walter Aswell had suffered any injuries besides the two gunshot wounds. (R.p. 1792).

Dr. Richard Friend testified that Mills suffered from a moderate to severe concussion and that he lost consciousness for 35 to 70 minutes. (R.pp. 175-176). Dr. Friend stated Mills had "severe swelling to the face, which I believe was, it was – one side of the face was much more swollen than the other. And they couldn't open the eye to examine the pupils." (R.p. 176).

1 The transcript reflects a substantial inaccuracy. When Mr. Mary asked, "Anybody that would have testified that they came upon the two of y'all in a – I'm sorry – the three of y'all, engaged in a, in a standing encounter, would be wholly correct." (emphasis added). The last word, "correct," should be "incorrect." This was obviously an error in the transcription process, as evidenced by the question and answer immediately preceding.

When asked if any of the swelling occurred secondary to being administered fluids, Dr. Friend responded, "[I] don't know, with any degree of medical certainty, how that could occur from getting fluids." (R.p. 178). Dr. Friend also testified that it was most likely a bullet fragment that caused Mills' lung to collapse. (R.p. 180).

## SUMMARY OF ARGUMENT

Mills' defense was one of justification, therefore, his guilt or innocence rested entirely on whether the jury believed him or not. As such, Mills' credibility was paramount to his defense. A closely related and hotly contested issue was, "Who got in the driver's seat when leaving the bank?" If the jury found Mills to be the passenger, his defense necessarily crumbles. The State's case was not flattering and its main witnesses were severely impeached. Mills, however, never had a fair chance to present his defense.

Mills' trial was a constellation of errors that began with jury selection and continued through closing arguments. First, the trial court denied four challenges for cause for jurors whose responses clearly demonstrated partiality. During the presentation of the State's case, Mills was prevented from impeaching his main accuser, Walter Aswell, with the tremendous leverage the State had upon him. Then the court allowed Mills to be impeached by a paragraph from an unverified "1983" complaint that Mills had never seen before and that was filed by a California attorney whom Mills had never met nor spoke with. Finally, during closing argument, the prosecutor made numerous inflammatory remarks calculated to arouse passion and prejudice and misstated perhaps the most critical testimony adduced in the trial. The absence of fairness fatally infected Mills' trial.

## ASSIGNMENT OF ERROR NO. 1

**It was error to deny defense challenges for cause of four jurors who for their respective reasons made it clear to the court that they were unqualified to serve on the jury that tried appellant's case.**

Mills adopts and incorporates his Appellate Counsel's Assignment of Error No. 1 and argument, supplementing as follows:

### Elizabeth Jackson

Appellate Counsel argued that defense counsel challenged Mrs. Jackson for cause because her strong feelings about guns would impel her to hold Appellant's right to remain silent against him, should he choose to exercise that right. Mills would also like to highlight three additional facts:

1) **Mrs. Jackson was never rehabilitated after her emphatic statements that she would want to hear from Mills as to why he had *that* gun.**

> A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where *subsequently, on further inquiry or instruction*, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence.

State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683, 687.

When defense counsel asked Mrs. Jackson if she would hold Mills' right to remain silent against him, she answered, "I would probably want to (hear from Mills), but I **don't think** I would hold it against him. And you talked about the traffic deal, that's not as big a thing with me as the actual robbery. **Of course, I guess, you know, to know his intent with that gun, I would probably want to hear that from him."** (R.pp. 1099-1100).

"**I would like to know, you know, what he's thinking about that gun** before he headed off to do it." (R.p. 1100). "**But I would want to know why he would think he would have to take a gun.**" (R.p. 1100).

This was the last time Mrs. Jackson was questioned. Neither the trial court nor the prosecutor attempted to rehabilitate Mrs. Jackson. The rehabilitation of a prospective juror is the duty of the trial court, in the first instance. State v. Jacobs, 99-1659 (La. 6/29/01), 789 So.2d 1280, 1287. "The juror might possibly have been rehabilitated upon further questioning by the prosecutor or the trial judge. Unfortunately for the state, she was not. Reversible error occurred when the defense challenge for cause was denied." State v. Sugar, 408 So.2d 1329, 1331 (La. 1982). Mrs. Jackson was **never rehabilitated** after her closing statements. The trial court was required to either attempt to rehabilitate Mrs. Jackson, or remove her for cause. The court erred by doing neither.

**2) Not only did the trial court fail to rehabilitate Mrs. Jackson, the court refused defense counsel's request for further voir dire of Mrs. Jackson.**

Because the object of the law is to select impartial jurors to try the issue between the State and the defendant, counsel in criminal cases should be allowed a wide latitude in voir dire examination. State v. Brumley, 320 So.2d 129, 130 (La. 1975). On the other hand, a trial court has the discretion to limit voir dire examination, as long as the limitation is not so restrictive as to deprive defense counsel of a reasonable opportunity to probe to determine bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Duplessis, 457 So.2d 604, 606 (La.1984).

In imposing limitations on voir dire examination, however, a trial court must act with great caution to avoid an abuse of its sound discretion to determine the scope of the examination. State v. Chapman, 298 So.2d 753, 757 (La.1974).

The error regarding the failure to rehabilitate Mrs. Jackson is beyond dispute. On two occasions, defense counsel asked the trial court to allow further voir dire of Mrs. Jackson. The first time, the prosecutor cut him off. (R.p. 1129). The second time, the trial court cut him off. (R.p. 1130). The last three responses from Mrs. Jackson indicated an insistent desire to hear from Mills. A prospective juror who has an issue with a defendant's privilege against self-incrimination necessarily takes issue (subconsciously or not) with the concept of the presumption of innocence.

> The Fifth Amendment to the United States Constitution and Art. I, § 16 of the Louisiana Constitution protect a defendant from being forced to testify against himself. We have stated that it is an important part of voir dire examination to discover any prospective juror who may have difficulty understanding this right (the presumption of innocence) as well as to discover a juror who may hold it against a defendant who exercises this right.

Cross, *id.*, at 687.

A juror who is incapable of recognizing a defendant's presumption of innocence is not competent to serve. State v. Davenport, 445 So.2d 1190, 1194-1195 (La. 1984). Furthermore, "This Court has specifically rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of the prospective juror that he will follow the law as given him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant." State v. Lee, 559 So.2d 1310, 1316 (La. 1990). It was not reasonable for the trial

court to refuse further questioning, especially in light of Mrs. Jackson's final, persistent statements.

3) **Trial counsel challenged Mrs. Jackson for cause on a second ground, i.e., her extreme bias against guns (in general).**

> While the trial judge is accorded broad discretion in ruling on challenges for cause, this Court has cautioned that "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to follow the law **may be reasonably implied." (emphasis added).**

State v. Hallal, 557 So.2d 1388, 1389-1390 (La. 1990).

Mrs. Jackson never declared her ability to remain impartial in the first place. The voir dire of Mrs. Jackson is particularly barren. Everything she did say, however, bespeaks an intense animosity toward guns. Every time she took a half step forward ("I would try"), she took three steps backwards by what she said afterward, as will be demonstrated.

Mrs. Jackson's opinion about guns was so strong she volunteered it when the trial court asked the prospective jurors if any of them have been victims of a crime; "I haven't been the victim of a crime or anything like that, but I **have a very strong opinion about guns.**" (R.p. 1013). "But, you know, we've recently had that shooting and so much of what we see on TV I think if they couldn't have got hold of a gun it wouldn't have happened. But I **have a really strong opinion about guns.**" "And then they had a shooting at the mosque or whatever it was a week ago." "They said that, you know, in the movie shooting, you know, you order some of them online. It's just so easy to get the guns." (R.p. 1014). By the court: "So you just have a strong opinion about -" A: "**Yes, I do.**" The court: "-- guns in the public?" A: "**Yes, I do.**"(R.p. 1016).

Later on, defense counsel broached the subject, "Do your strong opinions about guns, do you think that will cause you to be unduly prejudiced against my client? I knew you said you would try." [Mrs. Jackson]: "I can't really answer you that. I would try." (R.p. 1087). "But if they left home and said 'I better take this gun,' I think that something up there says, you know, 'I might need to use it and I would use it.'" (R.p. 1088). "I just think that, you know, if he didn't have plans of killing anybody, he wouldn't have took it. Because that's what you do with guns, you kill." (R.p. 1088). "I would try to be fair, but I do have this . . . [concern] . . . It's there." (R.p. 1089). "It's there. It hits me every night on television, you know. They take five minutes of the first of the news to say this one was killed here, and this one was killed here." (R.p. 1089). "It takes at least five minutes of the beginning of the news to get through all of that. And if they couldn't get those guns --" (R.p. 1090).

Everything Mrs. Jackson said evinced an overwhelming prejudice toward guns. Her opinions were so strong she repeatedly interrupted the trial court and defense counsel to voice them. (R.pp. 1015, 1089, 1100). Mrs. Jackson never declared her ability to remain impartial and decide the case according to the law and evidence. The trial court committed reversible error in failing to rehabilitate Mrs. Jackson, refusing to bring her up to the bench for further questioning and declining to excuse her for cause.

<u>Mary Gunnell and Kelly Crain</u>

Appellate counsel argued that these prospective jurors should have been excused for cause because bias, prejudice or inability to render judgment according to the law may be reasonably implied. Mills would like to make one additional point:

1.  **The trial court placed undue emphasis on these prospective jurors' declarations that they would not hold their prior victimization against Mills.**

"Mere statements of jurors of their impartiality cannot be mechanically accepted when they are placed in juxtaposition to evidence of bias, interest or prejudice." State v. Domino, 444 So.2d 268, 270 (La.App. 1 Cir. 1983). When denying the challenges for cause for Mrs. Gunnell and Mrs. Crain, the trial court stated, "I think they were unequivocal in their responses that they could be fair. And I truly take them for their word on that." (R.p. 1241). The court relied upon the sincerity of their declarations and missed the point entirely. Whether Mrs. Gunnell or Mrs. Crain were unequivocal in their responses is immaterial if their "responses reveal facts from which bias, prejudice or inability to follow the law may be reasonably implied."

Mrs. Gunnel broke down crying when just talking about her prior victimization during several bank robberies, all occurring over 35 years ago. (R.pp. 1169-1170). Even the prosecutor let it slip, "She stopped crying at some point." (R.p. 1240). Mrs. Crain testified she is so traumatized by her past victimization that she still suffers effects daily and is afraid to go to sleep when her husband is at work because she is scared somebody is going to come in. (R.p. 1179). This deep-seated emotional trauma stems from a bank robbery that occurred more than 15 years prior.

Of course Mrs. Gunnel and Mrs. Crain wanted to be fair, and knew it would be wrong to hold their prior victimization against Mills. Mills does not doubt the sincerity of their statements; they certainly were not consciously lying. The point is, however, that both of these women clearly suffered from longstanding emotional damage and it was not reasonable for the trial court to "mechanically accept" their declarations of impartiality.

> It is the natural impulse of all men, with rare exceptions, when the direct question is put to them, especially by one in authority, such as a district attorney or a trial judge, to declare that they believe they can disregard a preconceived opinion and render a fair and impartial verdict upon the evidence submitted to them. **In general, they are sincere in their statement and belief. The declaration, however, should not only proceed from the mouth of the venireman, but it should be made in connection with a state of facts showing that it is probable true.** [sic] **(emphasis added).**

State v. Joiner, 163 La. 609, 614, 112 So. 503, 505 (La. 1927).

***Prejudice***

Louisiana constitutionally provides the accused with the right to challenge jurors peremptorily. "Therefore an erroneous ruling of a trial judge which deprives a defendant of one of his peremptory challenges constitutes a substantial violation of a constitutional and statutory right requiring reversal of his conviction and sentence." Jacobs, *supra*, at 1284. Had the trial court properly excused the three above-referenced jurors for cause, Mills would have peremptorily struck Kenneth Martin,[2] Michael Reed,[3] and Lena Dykes.[4] Because of the trial court's erroneous denial of these three challenges for cause, Mills has been denied due process, the right to a fair trial and his constitutionally secured peremptory challenges, in violation of Article 1, §§ 2, 16 and 17(A) of the Louisiana Constitution of 1974 and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

---

2 Due to numerous associations with the Bogalusa Police Dept. and frequent contact with Lt. Lyons in particular, as well as Walter Reed – District Attorney for the 22nd JDC.

3 Due to demeanor and disingenuous responses.

4 Due to Detective Kendall Bullen being her next door neighbor.

## ASSIGNMENT OF ERROR NO. 2

**The trial court denied appellant his constitutional right of confrontation by refusing to allow him to cross-examine Walter Aswell regarding the great leverage under which he was testifying pursuant to the plea bargain he had confected with the State of Louisiana.**

Mills adopts and incorporates his Appellate Counsel's Assignment of Error No. 2 and argument, supplementing as follows:

Appellate counsel argued the trial court erred in limiting the cross-examination of the State's star witness, and that the error was not harmless. Mills would like to make two additional points:

1. **The trial court should have not been concerned about the jury learning the maximum sentencing exposure Mills faced because they already indicated, as a whole, this information would not affect their decision.**

The trial court refused to allow defense counsel to ask Aswell what his maximum sentencing exposure was because "That's inviting the jury to know what the potential exposure is for your client." (R.p. 357). During voir dire, however, the prosecutor asked the panel if they could put any potential sentence the judge might impose out of their mind when "judging" this case. "Does everyone think they could put that away, put that aside?" (Prospective jurors respond affirmatively.). (R.p. 1041).

2. **Aswell's testimony was not merely cumulative because the witnesses who "corroborated" his version of events (namely, that he was the driver) were substantially impeached.**

Lt. Lyons, Officer Cassard and Officer Seals all testified that they did not strike Walter Aswell. (R.pp. 1891, 453, 531). It is undisputed that Aswell was severely beaten after he was apprehended. (R.p. 349). In fact,

Aswell was beaten so severely that he suffered a fractured skull, had to have a metal plate put in his head, and has a scar that runs from ear to ear. (R.pp. 365-366). Neither Lyons, Cassard or Seals had any explanation as to how that could have happened to Aswell. (R.pp. 1891, 464, 531). Seals testified that after he shot Mills he approached with his gun drawn, saw a gun within Mills' reach, **holstered his gun** and proceeded "to the ground." (R.pp. 513-514). Seals further testified that Mills was facing him when he fired. (R.p. 532). Mills was shot in the back. (R.p. 179). The bullet traversed in a downward trajectory and was most likely the cause of Mills' collapsed lung. (R.p. 180).

Even though Mills had already been shot twice, with one of the bullets likely having collapsed his lung, Seals claimed he could not get Mills under control. (R.p. 200). Then Officer Cassard comes to aid Seals, but alleged that neither of them could get Mills handcuffed. (R.p. 200). Cassard is six feet two inches and weighs approximately 200 pounds. (R.p. 461). Finally Lt. Lyons comes around, and after "four or five" strikes with his pistol, Mills is finally subdued. (R.pp. 1864-1865). Mills is five foot, nine inches tall and weighs approximately 140 pounds. (R.p. 237).

Additionally, Lt. Lyons testified that Mills was standing up, engaged in a fistfight with Seals and Cassard. (R.p. 1917). Seals flatly contradicted this. (R.p. 533). Lyons also testified that he told Chief Culpepper the suspects continued shooting as they ran into the field. (R.p. 1900). Of course, there were no 9mm casings found outside of the getaway vehicle. (R.p. 1775). Officer Cassard testified that he heard "shots fired" over his radio before he got on the bridge. (R.p. 426). The statement Cassard gave to the Mississippi Bureau of Investigations and his own written report, however, accounts for

him being at the top of the bridge when he first heard "shots fired" over the radio. (R.pp. 432, 437). Cassard's explanation for this contradiction was that "as time has went on, my memory has gotten a lot better." (R.p. 432).

Mills is not arguing witness credibility or insufficient evidence; that is a function solely within the province of the trier of fact. "Justice Harlan, concurring in Bumper v. North Carolina, 391 U.S. 543, 552, 88 S.Ct. 1788, 1793, 20 L.Ed.2d 797, 804, (1968) reminds us that '(c)rediting or discrediting evidence is the function of the trier of fact." State v. Gibson, 391 So.2d 421, 427 (La.1980). "A determination of the weight of the evidence is a question of fact; and in criminal cases such a determination is not subject to appellate review." State v. Azema, 633 So.2d 723, 727 (La.App. 1 Cir. 1993). Mills is simply pointing out that it cannot be fairly said that Aswell's testimony was "corroborated" and therefore cumulative.

*Prejudice*

Mills has been denied due process, the right to a fair trial and the right to confront his accusers, in violation Article 1, §§ 2, 13 and 16 of the Louisiana Constitution of 1974 and the Fifth, Sixth and Fourteenth Amendments to the United Stated Constitution.

## ASSIGNMENT OF ERROR NO. 3

**It was error to permit the State to impeach appellant with a hearsay statement contained within an unverified personal injury petition prepared and filed by someone other than appellant.**

Mills adopts and incorporates his Appellate Counsel's Assignment of Error No. 3 and argument, supplementing as follows:

Appellate Counsel argued that the "1983" complaint was inadmissible hearsay and that its introduction was not harmless. Mills would like to make two additional points.

**1. The hearsay rule is designed to prevent untrustworthy evidence from reaching the jury in the first place.**

"The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." Chambers v. Mississippi, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

The court allowed Mills to be impeached by a paragraph from an unverified "1983" complaint that Mills had never seen before and that was filed by a California attorney[5] whom Mills had never met nor spoke with. (R.pp. 2047-2049). What could be more suspect than that? It is clear from the record the trial court failed to engage in the balancing test mandated by La.C.E. Art. 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

5 Appellate Counsel's brief refers to Mr. Kaplan as a Louisiana attorney. (p. 37). Mr. Kaplan is in fact a California attorney. (R.p. 2047).

Probative value – Evidence has "probative value" if it tends to prove an issue. That an unverified "1983" complaint which Mills had never seen before and that was filed by an attorney that Mills had never met nor spoke with happens to refer to Mills as a passenger does not tend to prove that he was in fact the passenger.

Misleading the jury – was all the introduction of the complaint served to do. Mills never told defense counsel that he was the passenger (R.p. 2049). Defense counsel, therefore, could not have relayed this information to Mills' civil attorney. Because of Ms. Wall's examination of Mills, however, that is exactly the impression the jury received: Q: "So you have spoken to him haven't you?" A: "No, I haven't. They talk." Q: "Okay. So you talk to Mr. Mary and it's Mr. Mary who tells Philip Kaplan the allegations in this lawsuit?" (R.p. 2049).

**This left the distinct false impression** Mills told defense counsel that he was the passenger, who then relayed this information to Mr. Kaplan, and now defense counsel is helping Mills lie on the stand. In any event, "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay may not be applied mechanistically to defeat the ends of justice." Chambers, *id.*, at 302.

2. **Out of court statements that are testimonial are barred, under the Confrontation Clause, unless the witness is unavailable and the accused had a prior opportunity to cross-examine the witness.**

Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. Crawford v Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused--in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person that who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."

*Id.*, at 51.

The "1983" complaint, as used against Mills, was unquestionably testimonial. It "bore witness" against Mills by appearing to directly contradict him on the most contested issue throughout the trial. Critically, the complaint was used for the substantive purpose of proving the truth of the matter asserted by its out-of-court author — namely, that Mills was the passenger in the getaway vehicle. This was the central fact in question at Mills' trial, and it was dispositive of his guilt. Mills was denied the opportunity to confront the complaint's out-of-court author, Philip Kaplan.

***Prejudice***

The trial court's ruling was a failure to observe fundamental fairness essential to the very concept of justice, in violation of Article 1, §§ 2, 13 and 16 of the Louisiana Constitution of 1974 and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

ASSIGNMENT OF ERROR NO. 4

**The prosecutor committed reversible error during closing argument by making highly prejudicial, inflammatory remarks and intentionally misstating testimony regarding the most contested issue in the trial.**

La.C.Cr.P. Art. 774 states:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
>
> The argument shall not appeal to prejudice.

***Closing Argument***

Ms. Wall demonstrated she will do whatever it takes to secure a conviction. She repeatedly made highly inflammatory remarks and misquoted testimony to such an extent that it cannot be labeled as anything other than intentionally misleading the jury in a desperate attempt to shore her case.

"She had been promoted to head teller. But after Logan Mills walked into that bank with a gun and pointed it in her face and demanded money from her, she couldn't recover from that. She never went back to work at that bank." (R.p. 205). Regarding Officer Seals, "You saw how upset he'd got as to remembering his family would have been left behind if that plexiglass failed him, which it came close to." (R.p. 212).

As previously stated, the issue of who was driving the getaway vehicle was contested throughout the trial. Five civilian witnesses saw Mills and Aswell leaving the bank. Kermit Martin testified that the person who picked up the stack of money got in the passenger seat. (R.p. 1392). Geraldine Ledet testified that the first person she saw ran around and got in the driver's seat. Ledet further testified that she saw someone else bending down

and picking up something, but didn't actually see him running to the vehicle. (R.p. 1357). Diana Thomas, however, put the person picking up money as the one who got in the driver's seat. (R.p. 1364). Amanda Carnegie said she cannot be certain if the first person out of the bank got in the driver's seat. (R.p. 1405). Wanda Terrell was never asked. (R.pp. 1370-1379).

Out of five people, two identified Mills as the driver, one identified him as the passenger, the fourth one can't be certain and the fifth one was not asked. Ms. Wall turned this around to say that **four out of five** of these civilian witnesses identified Mills as the passenger, and the fifth witness was simply mistaken. (R.pp. 244-245). "And Ms. Ledet said that she didn't notice it. She only saw one person. She only saw the person who bent down to pick up the dropped money, come out and get in the driver's side. And that's what Ms. Thomas saw, too. They didn't see Logan Mills come out first and get in the passenger's side. They saw the person who picked up the money get in the driver's side." (R.p. 244).

"Amanda Carnage (phonetic), her mother Wanda Terrell, and you heard them testify. Amanda was sitting in the passenger seat and her mom was driving. And they were across the intersection. And they both said they saw two people come out. The first person who came out got in the passenger side. And the second person who came out bent over and picked up something, got in the driver's side." (R.p. 245).

"Now Ms. Terrell's brother, Ms. Carnage's uncle, Kermit Martin, he did get them switched up. He said that he thought the second person who came out got in the passenger side. But the – you had five people – and four of them are absolutely in agreement. And Mr. Martin, who was in the backseat, got a little – got them switched." (R.p. 245).

Ms. Wall continued "Sometime in the last month, he smoked pot. He lied about that too." (R.p. 252). Mills never said he did not smoke pot, rather, he simply said he had just finished drug court. (R.pp. 1982-2060).

Regarding Aswell's inability to identify any of the three Bogalusa officers as the one who stuck the gun in his face, Ms. Wall said, "And here in the courtroom he said it wasn't these three officers." (R.p. 255). What Aswell actually said was "They, they could've been . . . . I, I didn't get a clear look at that person's face." (R.p. 399). Even the trial court sustained defense counsel's objection to this mischaracterization. (R.p. 399).

Ms. Wall went on "But what we're trying is an armed robbery of Miranda Myers. Talk about a hero. This woman came in four days after giving birth to re-live something that destroyed her life 16 months ago. This young woman didn't just have a job, she had a career that she doesn't have any more, because of Logan Mills." (R.pp. 255-256).

When Dr. Friend testified, Ms. Wall tried to make the most of the fact that Mills' medical records state he was struggling and trying to pull out tubes. Dr. Friend corrected Ms. Wall " – and anytime the sedation becomes a little bit lighter; that's very common in patients when you have a tube down your throat, a tube up your nose and chest, a tube in your chest? A normal response to that is to struggle. (R.p. 183). During redirect, defense counsel made it even clearer "Now she asked you some questions about his pulling on chest tubes. That's not indicative of a level of consciousness, is it?" A: "No. Combative behavior – combative behavior is very common is patients that are being ventilated and have tubes in them and are experiencing pain. The normal response is to pull at everything and try to – to stop it. And we see that in virtually every patient that's being ventilated

if they're not being sedated enough." (R.pp. 186-187). Ms. Wall turns that around and says, "And what do we know? He was still fighting at the hospital." (R.p. 260). This is not a permissible inference, it is a lie. Finally, Ms. Wall states "He is guilty as sin." (R.p. 262).

Ms. Wall is an experienced prosecutor with 25 years of experience. (R.p. 538). This is nothing more than a classic example of a prosecutor playing the "harmless error" game. Enough to prejudice the defendant, but not enough to obtain a reversal. Ms. Wall, however, went too far. Such flagrant misconduct mandates reversal.

***Standard of Review***

The Louisiana Supreme Court adopted the federal test for harmless error announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as a practical guide for determining whether substantial rights of the accused have been violated. Gibson, *id.*, at 427. (La.1980). Chapman tests whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman, *id.*, at 24. An error did not contribute to the verdict when the erroneous trial feature is unimportant in relation to everything else the jury considered on the issue. Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).

Chapman was refined in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d. 182 (1993). The Sullivan inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would have surely been rendered, but whether the guilty verdict in *this* trial was surely unattributable to the error." *Id.*, at 279. Moreover, the burden of proving harmlessness rests squarely on the shoulders of the party benefiting from the error. State v. Lewis,

12-1021 (La. 3/19/13), 112 So.3d 796, 805. The Sullivan harmless error analysis applies to claims of prosecutorial misconduct during closing argument. State v. Taylor, 93-2201 (La. 2/28/96), 669 So.2d 364, 375.

***Argument***

The jury spent three hours deliberating. (R.pp. 298-302). That is a considerable amount of time considering the straightforward question they had to decide: "Is Mills telling the truth?" Defense counsel failed to object to the most important mischaracterization, *i.e.*, Ms. Wall's summation of the testimony of the lay witnesses outside the bank. Mills' defense is only possible if he was the driver.

Mills guilt or innocence rested entirely on his credibility. A credibility determination is largely one of demeanor, and not apparent from a cold record. It cannot be said, **beyond a reasonable doubt**, that Ms. Wall's misstatement of arguably the most critical testimony adduced in Mills' trial, had no influence on the verdict.

## ASSIGNMENT OF ERROR NO. 5

**Defense counsel rendered constitutionally ineffective assistance during closing argument by failing to contemporaneously object to the prosecutor's flagrant misconduct.**

### *Standard of Review*

The Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 13 of the Louisiana Constitution of 1974 guarantee a criminal defendant the right to effective assistance of counsel.

The standard of review for a claim of ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by the Louisiana Supreme Court in State v. Washington, 491 So.2d 1339 (La. 1986), requires a reviewing court to reverse a conviction if the defendant establishes: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced him to the extent that the trial was rendered unfair and the verdict suspect, *i.e.* that counsel's errors undermined the proper functioning of the adversary process. State v. Matthis, 07-0691 (La. 11/2/07), 970 So.2d 505, 509; State v. Leger, 05-0011 (La. 7/10/06), 936 So.2d 108, 143.

A defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. Strickland, 466 U.S. at 693. The question is not whether the petitioner would more likely than not have received a different verdict, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

While a reviewing court must examine the "totality of circumstances and the entire record" to assess counsel's performance, "[s]ometimes a single error is so substantial that it alone causes the attorney's performance to fall below the Sixth amendment standard." Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir. 1979). In the interest of judicial economy, a claim of ineffective assistance of counsel may be addressed on direct appeal when the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel. State v. Hilton, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, 1035.

***Argument***

Defense counsel made some objections during closing argument, but he missed the most important one, i.e., Ms. Wall's mischaracterization of the lay witnesses' testimony outside the bank. Defense counsel compounded the error by making speaking objections to other mischaracterizations, but not this one. This very will could be have been viewed as an acquiescence in the eyes of the jury. Defense counsel's performance fell below an objective standard of reasonableness by failing to, at the very least, make a contemporaneous objection and move for a mistrial at the end of closing argument. In State v. Lee, 346 So.2d 682 (La. 1977), the Louisiana Supreme Court endorsed the following view:

> one must recognize that the closing argument of the prosecutor may be so permeated with improprieties that constant objections may alienate jurors or underscore the mark rather than erase it from their minds. Therefore, an objection at the end of the summation should be considered timely, and in some cases should be allowed outside the presence of the jury. (citations omitted) 34 L.L.Rev. 746, 759 (1974).

*Id.*, at 685.

A reasonably competent attorney would have moved for a mistrial at the end of closing argument. The prejudice prong of the Strickland analysis is satisfied if this Court deems Mills' meritorious prosecutorial misconduct claim procedurally barred.

***Prejudice***

Mills has been denied the right to effective assistance of counsel, the right to a fair trial and the right to judicial review, in violation of Article 1, §§ 13, 16 and 19 of the Louisiana Constitution of 1974 and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

## ASSIGNMENT OF ERROR NO. 6

**Mills was denied a trial with any semblance of fairness.**

Assignments of Error Numbers one through five are substantial errors that individually require reversal. The totality of the circumstances, however, deprived Mills of trial with any semblance of fairness. Mills was prevented from impeaching his main accuser, Walter Aswell, with the substantial weight hanging over his head. Mills' credibility was undermined by highly prejudicial hearsay evidence that never should have been admitted. Finally, the prosecutor committed gross misconduct during closing argument, making inflammatory remarks and intentionally misstating crucial testimony. Mills' trial was anything but fair. The accumulation of these errors were of such magnitude so as to put Mills' trial in an entirely different light, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Taylor v. Kentucky, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); Kyles, *supra*; Strickland, *supra*; Duplessis, *supra*.

## CONCLUSION

For the reasons assigned in Appellate Counsel's original brief, Appellate Counsel's reply brief, Mills' pro se reply brief, and this brief herein, Mills is entitled to a new trial.

Logan N. Mills #532042
Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing has been served upon:

Opposing Counsel:

Kathryn Landry
Attorney for the State
P.O. Box 82659
Baton Rouge, LA 70884

Appellate Counsel:

Bruce G. Whittaker
Attorney at Law
P.O. Box 791984
New Orleans, LA 70179

by placing a copy of same in a properly addressed envelope into the hands of the Classification Officer assigned to my unit along with a Withdrawal form made out to the General Fund, LSP, Angola, LA 70712 for the cost of postage and a properly filled out Inmate's Request for Indigent/Legal Mail form, receiving receipt for same in accordance with the institution's rules and procedures for the sending of legal mail.

Done this 21st day of April, 2014.

Logan N. Mills

2013 KA 0573
Court of Appeal, First Circuit
Filed: 9/10/2014
Postmarked: 9/10/2014
Received: 9/11/2014

IN THE

FIRST CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

---

NO. 2013-KA-0573

---

STATE OF LOUISIANA
*Appellee*

Vs.

LOGAN NESTOR MILLS
*Appellant*

---

APPEAL FROM THE TWENTY-SECOND JUDICIAL DISTRICT COURT
FOR THE PARISH OF WASHINGTON, STATE OF LOUISIANA
THE HONORABLE AUGUST J. HAND, JUDGE PRESIDING
DOCKET NO. 11-CR5-113331, DIVISION "B"

---

# PRO SE APPLICATION FOR REHEARING

---

A TRUE COPY
DEPUTY CLERK
COURT OF APPEAL, FIRST CIRCUIT
STATE OF LOUISIANA
DATE March 23, 2015

Respectfully submitted:

Logan N. Mills
532042, Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

CRIMINAL APPEAL

EXHIBIT
H

## STATEMENT OF JURISDICTION

Jurisdiction vests in this Honorable Court by virtue of Article V, § 10 of the Louisiana Constitution of 1974 and Uniform Rules-Courts of Appeal, Rule 2-18.7.(C).

## STATEMENT OF THE CASE

Mills' convictions and sentences were affirmed on August 27, 2014, Whipple, C.J., Welch and Crain, JJ. presiding. This Application for Rehearing timely follows.

## REASONS FOR GRANTING REHEARING

This Court erred in holding that two of Mills' challenges for cause were not preserved for appellate review because defense counsel did not formally object after the trial court denied said challenges. The Louisiana Supreme Court has repeatedly held that a formal objection is not required to preserve a ruling on a challenge for cause. In reviewing Mills' confrontation violation, this Court misapplied the harmless error analysis. Instead of focusing on the impact of the error itself, this Court focused on the remaining evidence. Perhaps most important of all, this Court overlooked all of the points Mills raised in support of his Appellate Counsel's Assignments of Error.

## FACTS IN DISPUTE

This Court grossly mischaracterized the terms of Aswell's plea agreement. Aswell's faced a sentencing range of twenty-five to thirty years *if* he testified in conformity with his pretrial statement. If Aswell did not testify in conformity with his pretrial statement, his plea agreement was invalid. Even the State conceded that if Aswell "deviated from that it would be invalid." This Court's "finding" that Aswell's plea agreement was capped at thirty years even if he deviated from his pretrial statement is clearly erroneous. (See R.pp. 353-359).

## ASSIGNMENT OF ERROR NO. 1

**This Court erred in holding that two of Mills' challenges for cause were not preserved for review because Mills did not formally object. The Louisiana Supreme Court has repeatedly held that a formal objection is not required to preserve a challenge for cause for appellate review.**

### Mary Gunnell and Kelly Crain

This Court held that the denial of the challenges for cause regarding Mary Gunnell and Kelly Crain were not preserved for review because Mills did not object to the trial court's ruling on these challenges. This Court relied upon the "clear language of Article 800 and the procedure recited in *State v. Cousan*, 94-2503 (La. 11/25/96); 684 So.2d 382, 388-89, both of which require that a defendant lodge a contemporaneous objection to the trial court's ruling in order to assign as error the trial court's refusal to sustain his challenge for cause."

In so holding, this Court has overlooked the relationship between La.C.Cr.P. art. 800, which requires a contemporaneous objection, and La.C.Cr.P. art. 841, which defines the requirements for a contemporaneous objection. The issue before this Court is *not* whether a contemporaneous objection is required to preserve a ruling on a challenge for cause for appellate review; Article 800 clearly requires such. The issue before this Court is *what* constitutes a contemporaneous objection sufficient to satisfy the requirements of Article 800. To that end, this Court has been reversed/corrected by the Louisiana Supreme Court *twice* for holding that Article 800 requires a formal incantation, i.e., "note my objection."

In *State v. Vanderpool*, 476 So.2d 546 (La.App. 1 Cir. 1985), the defendant failed to object to the trial court's refusal to sustain his challenge for cause. This Court held that, "Because defendant neither objected to the trial court's ruling denying his challenge of Wilson Pitre for cause nor stated the nature of the objection and grounds therefor, he is thereby *prohibited* from assigning

the ruling as error, by the express terms of La.C.Cr.P. art. 800A." *Id.* at 547. The Louisiana Supreme Court reversed on this point, holding that the challenge for cause *was* preserved for appeal. *State v. Vanderpool*, 493 So.2d 574 (La. 1986). The Supreme Court held that "Our law is settled that an objection need not be raised by incantation" and that "the requirement that objection be raised contemporaneously is not meant to be inflexible, but is designed 'to promote judicial efficiency and to ensure fair play.'" *Id.* at 575 (citing *State v. Lee*, 346 So.2d 773 (La. 1980). Specifically, the Court noted that "Article 800 **should not be read to differ in this respect** from Article 841." *Id.* The Court further held that the defendant "made it known he wanted the deputy sheriff excused and voiced the reasons why," and that "this is sufficient to preserve the issue for appeal." *Id.*[1]

In holding that two of Mills' challenges for cause were not preserved for review, this Court also relied on "the procedure recited in *State v. Cousan*, 94-2503 (La. 11/25/96); 684 So.2d 382, 388-89." It is not understood exactly what "procedure" this Court is referring to because *Cousan* did not establish any new law (regarding voir dire) whatsoever. It *seems* this Court is referring to the following portion for the implicit proposition that *Cousan* tacitly overruled *Vanderpool*: "In response to the trial court's denial of the cause challenges, defendant objected, thereby preserving the issue for appeal, and exercised peremptory challenges to exclude Jurek and Johnson from the jury." *Id.* at 388.

Apparently, this Court interprets that sentence to mean that the *Cousan* Court, in an incredibly implicit manner, added a formal incantation requirement ("note my objection") to La.C.Cr.P. art. 800 — the same formal incantation

1 Appellate Counsel cited *Vanderpool* in his Reply Brief, but this Court overlooked Counsel's response on this issue. (Appellate Counsel's Reply Brief, p. 4).

requirement the *Vanderpool* Court explicitly held was <u>not</u> required to preserve a challenge for cause for appellate review. *Cousan* itself belies any such interpretation. Just one paragraph later, the *Cousan* Court states: "To preserve the issue for appeal, the defendant must also lodge a contemporaneous objection to the trial court's ruling. LA.CODE CRIM. PROC. ANN. art 800(A)." *Id.* at 389. What constitutes a contemporaneous objection is defined by La.C.Cr.P. art. 841, not La.C.Cr.P. art. 800. *Cousan* did not mention Article 841 and did not change the requirements of either article.

In *State v. Pinion*, 06-2346 (La. 10/26/07), 968 So.2d 131, the Supreme Court *again* corrected this Court for holding that a defendant must object to the denial of a challenge for cause. This Court held that Mills' "reliance" upon *Pinion* is "misplaced" because "*Pinion* involved the requirement of accepting an obnoxious juror to prove prejudice on appeal and made no mention of Louisiana Code of Criminal Procedure article 800." Although *Pinion* did not cite Article 800, it did cite Article 841, a necessary corollary. *Pinion*, read in context, suggests Mills' argument to be correct.

> Although the court of appeal faulted counsel for not making a general objection on the record to the composition of the jury, an objection that counsel had been forced to accept an obnoxious juror as the result of the trial court's erroneous ruling on one or more cause challenges has not been an aspect of the Court's jurisprudence for preserving error in the denial of cause challenges for over 50 years since *State v. Breedlove*, 199 La. 965, 7 So.2d 221 (1942) was legislatively superceded in the 1966 revisions to the Code of Criminal Procedure. *See State v. Robertson*, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1279-80. **In jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule by stating his grounds for a cause challenge and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause. La.C.Cr.P. art. 841.**

*Id.* at 136.

Moreover, Mills' argument regarding *Pinion* is consistent with the Second, Third, and Fifth Circuit Court of Appeal's interpretation of *Pinion*.[2] Regardless, this Court still misinterpreted firmly established precedent regarding the contemporaneous objection requirement when it faulted counsel for not making an objection during voir dire. Finally, for whatever reason, the *Pinion* Court deemed it necessary to remind this Court of what is required to preserve a cause challenge for appellate review.

If *Cousan* implicitly overruled *Vanderpool*, *Pinion*, in a much less implicit manner, overruled *Cousan*. The more logical conclusion, however, is that *Cousan* did not overrule *Vanderpool* and that *Pinion* merely reiterated well-established jurisprudence regarding what is required to preserve a cause challenge for appellate review.

When Mills' trial counsel challenged Ms. Gunnell and Ms. Crain for cause, he **vigorously** argued his reasons for the challenges. (R.pp. 1238-1240). After the trial court declined to sustain the challenges, trial counsel removed both of these prospective jurors with his remaining peremptory challenges. (R.p. 1246-47). This constitutes a contemporaneous objection and satisfies the objection requirements of Article 800.[3]

Mills respectfully submits that this Honorable Court has overlooked the relationship between La.C.Cr.P. art. 800 and La.C.Cr.P. art. 841, and further, misinterpreted *State v. Cousan*. In light of the foregoing, Mills respectfully requests this Honorable Court reconsider its holding and review the merits of the challenges for cause for these two prospective jurors.

2 *State v. Franklin*, 43,173 (La.App. 2 Cir. 9/17/08) 996 So.2d 387, 996; *State v. Sarpy*, 10-700 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, 1048; *State v. Anderson*, (La.App. 5 Cir. 10/27/09), 28 So.3d 324, 331-332. The Fourth Circuit has not ruled on this issue.

3 See *Vanderpool, supra; Pinton, supra; State v. Shoemaker,* 500 So.2d 385, 388 (La. 1987) ("There is no 'magic word' formula necessary for remarks to constitute an objection."); *State v. George*, 95-0110 (La. 10/16/95), 661 So.2d 975, 981 ("There are no formal or codified requirements detailing any specific form for an objection.").

## ASSIGNMENT OF ERROR NO. 2

**This Court misapplied the harmless error analysis to Mills' confrontation violation when it became the 13th juror and conducted what amounts to a "sufficiency of the evidence" evaluation.**

This Court held that the trial court's limitation on the cross-examination of Walter Aswell infringed upon Mills' constitutional right of confrontation. This Court determined that the error was harmless, however, because "the entire weight of the testimony and physical evidence contradicted the defendant's testimony and established that the defendant was the passenger in the Jeep and was in possession of the Beretta that was fired multiple times at the pursuing police officers."[4] In so holding, this Court arrogated itself to the function of the jury and proceeded to conduct a sufficiency of the evidence evaluation under the guise of harmless error analysis.

A proper application of the harmless error analysis requires a reviewing court to focus on the impact of the error, not the remaining properly admitted evidence.[5] In "applying" the harmless error analysis to Mills' confrontation violation, however, this Court focused solely on the remaining evidence. "Aswell's testimony contradicted that of the defendant; however, **for the purpose of the harmless error analysis, we must examine the record for corroboration** since it must be assumed that the damaging potential of the cross-examination was realized and that Aswell's testimony was discredited."[6] This Court overlooked the importance of Aswell's testimony: **he was the only witness who contradicted Mills that was not substantially impeached.**

4 *Mills*, at 18.

5 See *State v. Gibson*, 391 So.2d 421, 427 (La. 1980) ("We feel that focusing on the impact of the error rather than the untainted evidence will give more guidance to the trial courts since our decisions would not be as closely tied to the facts of the particular case."); *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d. 182 (1993) ("The inquiry, in other words, is not whether, in trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict rendered in *this* trial was surely unattributable to the error.").

6 *Mills*, at 16.

In seeking "corroboration," this Court relied heavily on the testimony of the three Bogalusa Police Officers. What this Court completely overlooked, however, is the fact that these three Bogalusa Police Officers were **substantially** impeached.[7] This Court also held that "the physical evidence contradicted" Mills' testimony. This Court overlooks the fact that this "physical evidence" was also handled by these same three officers. Finally, this Court's characterization of Mills' actions upon exiting the Jeep is wholly improper. Mills was being shot at; human instinct is to run. Mills does not know of anyone who has the stomach to stand in the face of gunfire and lie down; it is highly improbable the jury does either. This Court exceeded its jurisdiction and misapplied the harmless error analysis when it credited and relied upon **severely** impeached testimony for "corroboration."

Mills argument that this Court misapplied the harmless error analysis is further substantiated by several passages from this Court's opinion.

> Justification defenses are based on circumstances that make the accused's conduct excusable on policy grounds and are therefore treated as affirmative defenses that the accused must establish by a preponderance of the evidence. *See State v. Cheatwood*, 458 So.2d 907, 910 (La. 1984); *State v. Jeanfreau*, 11-1237 (La. App. 1 Cir. 2/10/12), 2012WL602384; *State v. Schell*, 492 So.2d 169, 171 (La. App. 1 Cir.), *writ denied*, 496 So.2d 1042 (La. 1986). The State is not required to prove the absence of excusable circumstances. *State in Interest of ML and PL*, 95-0045 (La. 9/5/95), 660 So.2d 830, 834.[8]

This passage is completely irrelevant for the purpose of harmless error analysis; every case cited therein is pertaining to a sufficiency of the evidence evaluation.[9] Mills did not raise a claim of insufficient evidence. Furthermore, whether Mills established his defense by a "preponderance of the evidence"

7 Mills pointed this out in his Supplemental Brief. (pro se Supplemental Brief, pp. 14-16).

8 *Mills*, at 15.

9 With the exception of *State in Interest of ML and PL*, which is a **parental rights termination proceeding.**

is question of fact that is not within the purview of this Court. "Louisiana's Constitution prohibits the review of facts in a criminal case."[10] The only exception to this rule is a sufficiency of the evidence evaluation under *Jackson v. Virginia*."[11] Although this entire passage has no place in a harmless error analysis, it does aptly demonstrate where this Court's focus is: sufficiency of the evidence, an issue not before it. The sufficiency of the evidence evaluation continues.

> It is the function of the jury to weigh the testimony of every witness. If the jury determines that a witness willfully or deliberately testified falsely to any material fact for the purpose of deceiving it, then the jury may conclude that the witness' testimony is unworthy of belief and disregard the entirety of the testimony as proving nothing. *See State v. Petitto*, 12-1670 (La.App. 1 Cir. 4/26/13), 116 So.3d 761, 770, *writ denied*, 13-1183 (La. 11/22/13), 126 So.3d 477. The jury's verdicts finding the defendant guilty of attempted first degree murder reflect that the jury clearly rejected the defendant's testimony that he was not the driver and that he did not fire shots at the police officers. The jury necessarily determined that the defendant testified falsely as to these material facts. Consequently, the jury was justified in rejecting the entirety of the defendant's testimony, including his justification defense.[12]

Again, this entire passage has absolutely nothing to do with harmless error analysis. If there was any doubt that this Court misapplied the harmless error analysis, the Court removes it with its final statements: "The jury clearly rejected the defendant's testimony, which was the only evidence that could have possibly supported his claimed defense of justification. **Therefore**, the confrontation error was harmless beyond a reasonable doubt."[13] The **confrontation error was harmless** beyond a reasonable doubt **because the jury clearly rejected the defendant's testimony**? It it clear that this Court simply removed the error

10 *State v. Sarrett*, 44,517 (La.App. 8/19/09), 17 So.3d 1053, 1055 (citing La.Const. Art. V, § 10(B)).

11 *Id.* at 1056; see also *State v. Landry*, 381 So.2d 462, 466 (La. 1980).

12 *Mills*, at 18.

13 *Mills*, at 19.

and proceeded to determine if there existed enough evidence left over to support the conviction. That is not a proper application of the harmless error analysis. "Although the standard requires a reviewing court to consider the evidence in order to determine if there is a reasonable possibility that the error had prejudicial effect, it does not permit a court to substitute for the verdict its judgment of what the jury would or should have decided in the absence of the error."[14]

## ASSIGNMENT OF ERROR NO. 3

This Court completely overlooked Mills' argument that the admission of the civil petition violated his right to due process and his right to confront the statement's out-of-court author, Philip Kaplan. This Court also overlooked Mills' argument that the trial judge failed to conduct the balancing test mandated by La.C.E. Art. 403. Furthermore, there was no showing that Attorney Kaplan was authorized to make such a statement. This Court erred when it mechanically applied the hearsay rule at the cost of Mills' constitutional rights.

## ASSIGNMENTS OF ERROR NO. 4, 5 & 6

This Court erred in its disposition of these three claims as well. Due to page limitations, time, limited understanding of the law, and size 14 font, Mills has run out of pages to argue why.

## CONCLUSION

In light of the foregoing, Mills respectfully requests that this Honorable Court grant a Rehearing and reconsider its previous ruling.

Respectfully submitted,

[signature]

Logan N. Mills
#532042, Cypress – 2
Louisiana State Penitentiary
Angola, LA 70712

14 *Gibson*, at 427.

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing has been served upon:

**Opposing Counsel:**

Kathryn Landry
Attorney for the State
P.O. Box 82659
Baton Rouge, LA 70884

**Appellate Counsel:**

Bruce G. Whittaker
Attorney at Law
P.O. Box 791984
New Orleans, LA 70179

by placing a copy of same in a properly addressed envelope into the hands of the Classification Officer assigned to my unit along with a Withdrawal form made out to the General Fund, LSP, Angola, LA 70712 for the cost of postage and a properly filled out Inmate's Request for Indigent/Legal Mail form, receiving receipt for same in accordance with the institution's rules and procedures for the sending of legal mail.

Done this 9th day of September, 2014.

Logan N. Mills

**DECLARATION OF PHILIP J. KAPLAN**

In accordance with the provisions of 28 U.S. C. § 1746, I, **Philip J. Kaplan**, make the following unsworn declaration, under penalty of perjury:

1. I represent Logan N. Mills in a matter entitled *Logan N. Mills v. City of Bogalusa etc. et al.* (Eastern District of Louisiana Case No. 12-cv-0991).

2. In April 2012, I filed a complaint in the above matter.

3. Before doing so, I did not meet or confer with Mr. Mills.

4. In paragraph 5 of the Complaint, it is alleged, among other things, that defendants "were involved in the pursuit of a vehicle, in which Plaintiff was a passenger."

5. By the use of the word 'passenger,' I was using it to mean an "occupant."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11 day of February 2016, at Los Angeles, California.

Philip J. Kaplan

EXHIBIT

I

**DECLARATION OF LOGAN N. MILLS**

In accordance with the provisions of 28 U.S.C. § 1746, I, **Logan N. Mills**, make the following unsworn declaration, under penalty of perjury:

1. Attorney Cameron Mary represented me at my criminal trial.

2. My family retained Mr. Mary within a few days after the instant crime.

3. Shortly after my family retained Mr. Mary, I informed him that my codefendant, Walter Aswell, was taking prescription psychotropic medication before and during the time of the crime.

4. I informed Mr. Mary of this information because I believed it might be relevant to my defense.

5. During trial, I asked Mr. Mary if he had checked into Aswell's mental health issues.

5. Mr. Mary responded that he "didn't have time."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 19th day of September, 2016, at Angola, Louisiana.

Logan N. Mills

EXHIBIT
J



A SAFE & PEST-FREE ENVIRONMENT WITHOUT RELIANCE ON PESTICIDES
Click Here to Learn More ➤

Locally Owned & Operated
Same Day Service
4-Hour Response Time

1-800-391-2565
FISCHERENV.COM

# Charges crumble after cell phone video uncovered

Resume
Email Video
CHARGES CRUMBLE, CIVIL RIGHTS SUIT FILED
43°
10:11
PINPOINT FORECAST
CARJACKING KOALA
EYEWITNESS SPORTS
Charges crumble after cell phone video uncovered

What the officers and attorneys did not know was that he had one critical piece of evidence on his side: grainy cell phone videos shot by his wife and nephew

Mike Perlstein / Eyewitness News *11:09 p.m. CST February 25, 2015*

*(Photo: WWLTV)*

WASHINGTON PARISH, La. -- One of the worst days of Douglas Dendinger's life began with him handing an envelope to a police officer.

In order to help out his family and earn a quick $50, Dendinger agreed to act as a process server, giving a brutality lawsuit filed by his nephew to Chad Cassard as the former Bogalusa police officer exited the Washington Parish Courthouse.

The handoff went smoothly, but Dendinger said the reaction from Cassard, and a group of officers and attorneys clustered around him, turned his life upside down.

"It was like sticking a stick in a bee's nest," Dendinger, 47, recalled. "They started cursing me. They threw the summons at me. Right at my face, but it fell short. Vulgarities. I just didn't know what to think. I was a little shocked."

Not knowing what to make of the blow-up, a puzzled Dendinger drove home. That's where things went from bad to worse.

"Within about 20 minutes, there were these bright lights shining through my windows. It was like, 'Oh my God.' I mean I knew immediately, a police car."

"And that's when the nightmare started," he said. "I was arrested."

A 'living hell'

He was booked with simple battery, along with two felonies: obstruction of justice and intimidating a witness, both of which carry a maximum of 20 years in prison. Because of a prior felony cocaine conviction, Dendinger calculated that he could be hit with 80 years behind bars as a multiple offender

EXHIBIT K

That kicked off two years of a living hell, as Dendinger described it, a period that is now the subject of Dendinger's federal civil rights lawsuit against the officers, attorneys and former St. Tammany District Attorney Walter Reed.

In a scene described in the lawsuit, Dendinger recounted a nervous night handcuffed to a rail at the Washington Parish Jail. He said he was jeered by officers, including Bogalusa Police Chief Joe Culpepper, who whistled the ominous theme song from "The Good, the Bad and the Ugly."

After his family posted bail, he said he was hopeful that the matter would be exposed as a big misunderstanding. After all, he thought, a group of police officers and two St. Tammany prosecutors witnessed the event.

"When I agreed to do it, I felt it was nothing more than someone asking to pick up a gallon of milk at the convenience store on the way home," Dendinger said. "I know I didn't anything wrong. I was worried, but people told me, 'Cooler heads will prevail.' "

But instead of going away, the case escalated.

Supported by two of his prosecutors who were at the scene, Reed formally charged Dendinger. Both prosecutors, Julie Knight and Leigh Anne Wall, gave statements to the Washington Parish Sheriff's Office implicating Dendinger.

With the bill of information, Dendinger's attorney Philip Kaplan said he got a bad feeling.

"It wasn't fun and games," Kaplan said. "They had a plan. The plan was to really go after him a put him away. That's scary."

The case file that was handed to Reed and his office was bolstered by seven witness statements given to Washington Parish deputies, including the two from Reed's prosecutors.

In her statement to deputies, contained in a police report, Knight stated, "We could hear the slap as he hit Cassard's chest with an envelope of papers... This was done in a manner to threaten and intimidate everyone involved."

Casssard, in his statement, told deputies, Dendinger "slapped me in the chest."

Washington Parish court attorney Pamela Legendre said "it made such a noise," she thought the officer "had been punched."

Police Chief Culpepper gave a police statement that he witnessed the battery, but in a deposition he said, "I wasn't out there." But that didn't stop Culpepper from characterizing Dendinger's actions as "violence, force."

When Dendinger saw the police report, he said his reaction was strong and immediate.

"I realized even more at that moment: These people are trying to hurt me."

**Critical evidence uncovered**

What the officers and attorneys did not know was that Dendinger had one critical piece of evidence on his side: grainy cell phone videos shot by his wife and nephew. Dendinger said he thought of recording the scene at the last minute as a way of showing he had completed the task of serving the summons.

In the end, the two videos may have saved Dendinger from decades in prison. From what can be seen on the clips, Dendinger never touches Cassard, who calmly takes the envelope and walks back into the courthouse, handing Wall the envelope.

"He'd still be in a world of trouble if he didn't have that film," said David Cressy, a friend of Dendinger who once served as a prosecutor under Reed. "It was him against all of them. They took advantage of that and said all sorts of fictitious things happened. And it didn't happen. It would still be going like that had they not had the film."

Dendinger spent nearly a year waiting for trial, racking up attorney's fees. As a disabled Army veteran on a fixed income, Dendinger said the case stretched him financially, but in his eyes, he was fighting for his life.

After nearly a year passed, his attorneys forced Reed to recuse his office. The case was referred to the Louisiana Attorney General's Office, which promptly dropped the charges.

Rafael Goyeneche, president of the Metropolitan Crime Commission and himself a former prosecutor, studied the videos. He did not hesitate in his assessment.

"I didn't see a battery, certainly a battery committed that would warrant criminal charges," Goyeneche said. "And more importantly, the attorney general's

Now the video is at the heart of a federal civil rights lawsuit against Reed, his two prosecutors Wall and Knight, the Bogalusa officers and Washington Parish Sheriff Randy "Country' Seal

The suit seeks unspecified damages for a host of alleged Constitutional violations: false arrest, false imprisonment, fabricated evidence, perjury, and abuse of due process.

WWL-TV reached out to the defendants for comment, but only Sheriff Seal responded with a statement. He said, "We are confident that all claims against all WPSO deputies will be rejected and dismissed by the court."

Goyeneche said the legal troubles for some of the witnesses may go beyond the federal lawsuit.

"It's a felony to falsify a police report. And this is a police report. And this police report was the basis of charging this individual with serious crimes." Goyeneche said.

Cressy, who in addition to working under Reed served as the Mandeville city attorney for 15 years, said the lawyers involved in the case may have additional problems with legal ethics and the bar association.

"It was totally wrong, a 180-degree lie" Cressy said. "So, yeah, they're going to have problems, certainly the lawyers."

**'An abuse of power'**

Meanwhile, Dendinger's attorney Philip Kaplan continues to dig into the case with depositions and new evidence.

In a deposition taken by Kaplan, one Bogalusa police officer, Lt. Patrick Lyons, said he witnessed a battery that knocked Cassard back several feet. But the video shows him far in the distance with his back turned.

Two of the officers stated that Dendinger ran from the scene, although he said his disability makes running impossible.

Kaplan also points out what he thinks should be obvious: "If this was truly a battery on a police officer with police officers all around him, why isn't something happening right there? Why aren't they arresting him on the spot? This case is an abuse of power."

While Dendinger has been cleared of all charges, he still lives in Washington Parish and worries about what could happen next as he presses a high-stakes lawsuit against people who tried to lock him up.

"I didn't do anything wrong and I know they know I didn't do anything wrong," he said. "So I'm faced with the reality that these people purposely lied about something that could put me in prison for the rest of my life."

Recently elected St. Tammany District Attorney Warren Montgomery said he has conducted an independent investigation of the case, but declined comment because a lawsuit is pending.

However, as of this week, Wall no longer works at the office, Montgomery said. Knight is still employed there, he said.

Read or Share this story: http://www.wwltv.com/story/news/local/investigations/mike-perlstein/2015/02/26/charges-crumble-after-cell-phone-video-uncovered/24039559/

ALL ARE PRESUMED INNOCENT UNTIL PROVEN GUILTY IN A COURT OF LAW. PUBLISHED MUGSHOTS AND/OR ARREST RECORDS ARE PREVIOUSLY PUBLISHED PUBLIC RECORDS OF: AN ARREST, A REGISTRATION, THE DEPRIVATION OF LIBERTY OR A DETENTION. THE MUGSHOTS AND/OR ARREST RECORDS PUBLISHED ON MUGSHOTS.COM ARE IN NO WAY AN INDICATION OF GUILT AND THEY ARE NOT EVIDENCE THAT AN ACTUAL CRIME HAS BEEN COMMITTED. EVERY EFFORT IS MADE TO ENSURE THE ACCURACY OF INFORMATION POSTED ON THIS WEBSITE. HOWEVER, MUGSHOTS.COM DOES NOT GUARANTEE THE ACCURACY OR TIMELINESS OF THE CONTENT OF THIS WEBSITE. IN ADDITION NAMES MAY BE SIMILAR OR IDENTICAL TO OTHER INDIVIDUALS. FOR LATEST CASE STATUS, CONTACT THE OFFICIAL LAW ENFORCEMENT AGENCY WHICH ORIGINALLY RELEASED THE INFORMATION.

IF YOU WERE FOUND GUILTY; YOU STILL MAY QUALIFY TO BE UNPUBLISHED.

or Call 1-800-

* L.A. POLICE SHOOTING

Video Evidence Shows LA Po

The Java plug-in needs your permission to run Run Now Always run on this site

MUGSHOTS.COM NEWS - OPINION - EDITORIAL

Tweet 0

## MUGSHOTS.COM NEWS - OPINION - EDITORIAL: LOUISIANA POLICE AND PROSECUTORS CONSPIRE TO SEND AN INNOCENT MAN TO PRISON FOR SERVING A SUMMONS ON A FELLOW POLICE OFFICER — 3/03/2015

*Can you trust our legal system to function the way it should when those charged with making sure it works act corrupt? On August 20, 2012, Douglas Dendinger served a court summons on Bogalusa Police officer Chad Cassard in connection with his nephew's police brutality lawsuit against Cassard. By the end of the day, Dendinger would end up being arrested on charges of simple battery, obstruction of justice, and intimidating a witness. Because of an earlier conviction on his record, Dendinger faced a long prison sentence as a repeat offender if convicted.*

*Two Washington Parish prosecutors at the scene alleged that Dendinger had assaulted Cassard while serving him with the summons. They claimed he "slapped him in the chest" forcefully while serving Cassard, who made that same allegation in a written statement regarding the incident. In addition, a staff attorney with the District Attorney's Office, Pamela Legendre, stated that she thought Dendinger had punched Cassard. Yet another alleged witness stated in a deposition that Dendinger used such force when serving the summons that Cassard flew back several feet. Bogalusa Police Chief Joe Culpepper summed up the incident by concluding Dendinger had used "violence" and "force" against Cassard.*

*With that many upstanding and respected members of the criminal justice system serving as witnesses to the incident, Dendinger seemed destined for an extended stay behind bars. After all, with that many credible witnesses all saying essentially the same thing, Dendinger had to be guilty. Right? What all those upstanding members of the law enforcement community didn't know was that Dendinger's wife and nephew recorded the serving of the summons on Cassard, and video showed him simply handing the summons to Cassard then both men walking away in opposite directions without incident— just like Dendinger had been saying all along.*

You May Like

What Happens To Your Body When You Take A Free Testost...

Nugenix Supplement

3 Veggies BOOST metabolism & fight fat (are you eating t...

The Fat Burning Kitchen

EXHIBIT L

*The local District Attorney's Office was forced to recuse itself, and the Louisiana Attorney General's Office took over the case. The charges were quickly dropped against Dendinger. The absolutely frightening thing is that without that video no one other than Dendinger's family would have believed him. No one would have believed that several sworn police officers and prosecutors would all intentionally conspire to send an innocent man to prison by repeating a blatant lie. Yet that's exactly what happened.*

*Even more chillingly, consider how many citizen-police interactions are not caught on video and how many of those citizens wind up under arrest or in jail afterwards. There's a lot of justified concern about the eroding of privacy as video cameras become ubiquitous in public spaces. But video cameras also help serve the public interest by holding authority figures and the powerful accountable. When it's their word against a member of the general public, John Q. Public doesn't stand a chance. That's precisely the reason video cameras have become indispensable in ferreting out the truth, especially when a person in a relative position of power who isn't above twisting the truth to suit his or her own interests is involved.*

Mugshots.com ID:

External Links:

What Happens To Your Body When You Take A Free Testosterone Supplement?

Khloe Kardashian's Waist Is So Small She Doesn't Look Real (PHOTO)

'Warren Buffett Indicator' Signals Collapse in Stock Market

The 11 Most Embarrassing Fashion Trends Ever

10 Hilarious Hidden Jokes in Disney Movies

16 Exercises You Must Do If You Want To Lose Weight

All [illegible] at [illegible] is subject to [illegible] ... believed to [illegible] ... mugshots.com is not an [illegible] by mugshots.com that the person has in fact engaged in any of the activities or crimes for which they [illegible]. All information published by mug[illegible] ... true and correct, and is not intended to [illegible] or [illegible] any [illegible]. Mugshots.com [illegible] effort to ensure the accuracy of [illegible] ... not [illegible] the accuracy [illegible] of the content of this [illegible] ... in comments [illegible] ...

mugshots.com [illegible]

Arrest or [illegible]: An arrest is the act of depriving a person of his or her liberty [illegible] to the pursuit and investigation or [illegible] of crime and [illegible] ... system. The term is An[illegible] and is [illegible] French [illegible] ...

The question whether the person is under arrest or not [illegible] not on the [illegible] of the arrest but on whether the [illegible] ... of the [illegible], including [illegible] ... investigation of an alleged crime.

[illegible] on [illegible] of a person or the [illegible] of a person's liberty.

The word "[illegible]" [illegible] by mugshots.com is identical in meaning to the word "[illegible]"

Mugshot: A photograph of usually a person's head and [illegible] ... photograph of a suspect's face or profile [illegible]

"[illegible]": A mugshot may [illegible] ... authorities.

"[illegible]" or "view": An [illegible] ... The [illegible] to [illegible] ... of [illegible] is [illegible]

The [illegible] questions [illegible] on the web site about a possible arrest of a person [illegible] of an actual arrest.

Owned and Operated by [illegible] West [illegible]

Hot Topics:
Rolling Stone
Iran
Indiana
2nd Amend
Campaign 2016
TheBlaze TV

Crime

# Seven Cops and Lawyers Apparently 'Lied' to Put This Man in Jail. He Was Only Saved by the Video You're About to See.

Mar. 2, 2015 12:14pm Zach Noble

7.6K
Shares
Share This
Tweet This

1.6M
350.4K
29.8K
9.5K

Email this story to a friend

Your Name | Your Email Address

Friend's Name | Friend's Email Address
Your Message
Send Email

Justice is supposed to be blind.

It's not supposed to see what it wants to see.

Douglas Dendinger is a 47-year-old disabled Army veteran who found himself the target of an apparent police conspiracy to put him away for life — all because he handed a court summons to a cop, WWL-TV reported.

He stepped up to act as process server in August 2012 for a brutality lawsuit filed by his nephew.

Handing a summons to Chad Cassard as the former police officer exited the courthouse in Washington Parish, Louisiana, Dendinger found himself verbally attacked by the swarm of cops and lawyers nearby.

"It was like sticking a stick in a bee's nest," Dendinger recalled. "They started cursing me. They threw the summons at me. Right at my face, but it fell short. Vulgarities. I just didn't know what to think. I was a little shocked."

That was only the beginning of Dendinger's "nightmare."

Douglas Dendinger. (Image via WWL-TV)

Later that night, police came to Dendinger's house and arrested him, charging him with simple battery and two felonies: obstruction of justice and intimidating a witness.

Due to his prior felony cocaine conviction, Dendinger estimated the new charges could land him behind bars for up to 80 years.

The night of his arrest, Dendinger said he was mocked by police in the Washington Parish Jail. He claimed Bogalusa Police Chief Joe Culpepper went so far as to whistle the ominous theme music from "The Good, the Bad and the Ugly," WWL reported.

EXHIBIT
M

Things got worse when seven witnesses — including two of Dendinger's prosecutors — signed statements that affirmed the cop's version of events: "[Dendinger] slapped me in the chest with a white envelope and stated, 'You been served brother.'"

Image via WWL-TV

Even Police Chief Culpepper said he'd witnessed Dendinger's "violence" — despite the fact that the chief also admitted he hadn't actually been outside the courthouse when the summons was served.

In the end, what saved Dendinger was the fact that his wife and nephew recorded the incident — and the videos contradicted what the police and attorneys were swearing had happened.

Image via WWL-TV

After a year-long fight, St. Tammany District Attorney Walter Reed was forced to recuse his office and the Louisiana Attorney General's Office dropped the case against Dendinger.

Now Dendinger is filing a federal civil rights lawsuit against Reed, his two prosecutors, the Bogalusa cops and Washington Parish Sheriff Randy "Country" Seal — and he said he's learned a frightened lesson about perversions of justice along the way.

"I didn't do anything wrong and I know they know I didn't do anything wrong," Dendinger said. "So I'm faced with the reality that these people purposely lied about something that could put me in prison for the rest of my life."

—

*Follow Zach Noble ([illegible]) on Twitter*

Tom Liberman

Tales of Corland

Home Novels About Books Biography Blog

# Police Contrived Conspiracy against Douglas Dendinger

Posted on March 1, 2015 by Tom Liberman

I read a lot of stories about abuse of power from law enforcement officials in the news these days but this one ranks near the top. A fellow named Douglas Dendinger served a summons concerning a police brutality case involving his nephew.

The police officer, two prosecutor, the police chief, and three other witnesses described the handing over of the summons as a physical assault. Written testimony from multiple witnesses stated clearly that Dendinger assaulted the officer in the course of serving the summons. Dendinger has a prior drug conviction.

I want you to imagine the comments you might have made with just that information. What you might have thought about the story right at that moment. The police chief and six other witnesses accused a convicted drug user of assaulting an officer. It's impossible they're all lying. The guy is a convicted felon. The case involved his nephew.

I wonder how many times this exact same scenario has occurred all across this great nation of ours? There's something new today. People have phones and can easily take video. I think you know where this is going.

The case finally got tossed out of court when the prosecutor's office was forced to recuse themselves and the state took over. With the case dismissed Dendinger is now free to discuss the events in public. There is video. The police chief lied. The officer lied. The lawyers from the prosecutor's office lied. Dendinger handed over the summons and walked away.

I want you to think about this case the next time you blindly support police officers against suspects. I'm not saying all police officers are bad. But when the bad officers are supported by the good officers we are all in trouble. The entire system may not be broken but it's not working properly anymore. It is my opinion that good police officers are being driven from the force because they won't go along with this sort of thing.

This antagonistic relationship between law enforcement and citizens is driven by the War on Drugs. The fact that municipalities increasingly rely on Seizure Laws to finance not only the police department but the entire city government. For all those great police officer out there; be aware that I'm not trying to attack you, I'm trying to save you!

This must stop. Police must return to Protecting and Serving, not intimidating, stealing, and using their position of power to attack anyone who dares question their authority.

When the citizens of this nation no longer trust the police force the entire country is in danger. We're not there yet but it's not good out there.

End the War on Drugs. Write the seizure laws off the books. City Hall finance your police department with what they need not the other way around. This is serious business.

Tom Liberman
Sword and Sorcery fantasy with a Libertarian Ideology

Search

Search ... Search

## Fantasy Novels

EXHIBIT N

Police Contrived Conspiracy against Douglas Dendinger | Tom Liberman Page 2 of 4

Current Release: The Black Sphere
Next Release: The Girl in Glass I: Apparition
Tom Liberman
Tales of Corland

Home Novels About Books Biography Blog

The Staff of Sakatha

The Sword of Water
Tom Liberman

Rate this (4 Votes)

This entry was posted in Law and tagged law. Bookmark the permalink.

‹ Dominik Walker Sentenced for Murder because he sold Heroin

Ferris Bueller's Day Off from a Libertarian Perspective ›

Tags

Ayn Rand Business Cardinals Chess Communication Critical Thinking Education Entertainment Environment Fallacy Humor Law Libertarian Misleading Headlines Objectivism Politics Rams Religion Science Scenic Social Media Sports Teaser Technology The Black Sphere The Broken Throne The Broken Throne The Hammer of Fire The Spear of the Hunt The Staff of Naught The Staff of Sakatha The Sword of Water Uncategorized Writing

## 5 thoughts on "Police Contrived Conspiracy against Douglas Dendinger"

*Donald Best* says:
March 4, 2015 at 2:39 am

It is fair to say that the public does not want to believe that a group of senior police, prosecutors and lawyers would work together to deliberately fabricate evidence and deceive the court, with the intent of putting an innocent person in jail.

The public accepts that two or three corrupt police officers might collude to present false evidence to the court, or that a lone rogue attorney might mislead the court by omission, but the idea that a mixed group of six or eight police officers and lawyers would work together to deliberately lie to the court is almost beyond belief. It shakes the very foundations of justice, so people are reluctant to accept that this could happen.

Yet, in both the Dendinger case and my case, there are secretly-made digital recordings and other evidence proving that groups of lawyers and police deliberately deceived the court, and worked together to do so.

Video and voice recording technologies are everywhere in today's society. No matter what is happening, there is always a cell phone in someone's hand, a dash camera driving by, or security camera pointing in the right direction.

Due to the public nature of police work, most of the 'hidden camera' incidents in the news involve police misconduct. Lawyers, however, perform most of their work in private offices and conference rooms away from the public eye, so incidents of serious misconduct by groups of lawyers are far more difficult to document and prove.

If there is one thing that can be gleaned from the Douglas Dendinger and Donald Best civil lawsuits, it is that police officers have no monopoly over lawyers when it comes to lying to the courts.

http://donaldbest.ca/lawsuits-allege-police-and-attorneys-jointly-fabricated-evidence-lied-to-court/

20
Rate this

*Reply*

*Tom Liberman* says:
March 4, 2015 at 12:59 pm

Hello Donald,

Thank you for the comment. I'm just up this morning but I'll peruse your link and situation after work today. I agree that what happened to Dendinger is difficult to fathom and if the same thing happened to you I'm terribly sorry.

I don't say "if" because I think you are lying or to be insulting. I simply say it because I have yet to look into the circumstances of your situation. I try to reserve judgment until I have a good

http://www.tomliberman.com/law-2/police-contrived-conspiracy-against-douglas-dendinger 4/28/2015

Police Contrived Conspiracy against Douglas Dendinger | Tom Liberman Page 3 of 4

understanding of events. I hope you aren't insulted and I'm very glad you stopped by and brought attention to your own situation.

Tom Liberman
Tales of Corland
Home Novels About Books Biography Blog

Thank you again and perhaps I'll be blogging about you soon!

Tom

20
Rate this

Reply

*Teresa Dendinger* says:
March 5, 2015 at 5:57 pm

This has truly been the most horrible thing that has ever happened to us.
The thing that is SO SAD, is that this is no where near all of the story,
I would like to thank so many people for the nice things beening said. And to please keep us in your prayers !
Sincerely, Mrs. Douglas Dendinger

10
Rate this

Reply

*Tom Liberman* says:
March 5, 2015 at 6:50 pm

Hello Teresa,

Thank you for your kind words. I'm blown away that you took the time from your certainly busy day to make a comment. Best of luck to you and your husband (and nephew)!

Tom

00
Rate this

Reply

*douglasdendinger* says:
March 5, 2015 at 6:43 pm

I will let you know what happens Tom.

10
Rate this

Reply

## Leave a Reply

Your email address will not be published.

Name

Email

Website

http://www.tomliberman.com/law-2/police-contrived-conspiracy-against-douglas-dendinger 4/28/2015

Police Contrived Conspiracy against Douglas Dendinger | Tom Liberman Page 4 of 4

Comment

Tom Liberman

Tales of Corland

Home Novels About Books Biography Blog

You may use these HTML tags and attributes: `<a href="" title=""> <abbr title=""> <acronym title=""> <b> <blockquote cite=""> <cite> <code> <del datetime=""> <em> <i> <q cite=""> <s> <strike> <strong>`

Post Comment

Proudly powered by WordPress | Theme: Superhero by WordPress.com.

## My Thoughts

Casino Refuses to Pay Grandma Misleading Headline

Cheating to Win – Kendall Schler at the St. Louis Marathon

Rachel Lehnardt – Mom has sex with 18 Year old – Who Cares?

Andrew Sadek – Another Victim of the War on Drugs

U.S. Seizes Kim Dotcom Assets

## Social

http://www.tomliberman.com/law-2/police-contrived-conspiracy-against-douglas-dendinger 4/28/2015



# But for the video...

By February 27

of cellphone video vindicating someone from false charges is a doozy. It comes from Washington Parish, La., and WWL TV.

> One of the worst days of Douglas Dendinger's life began with him handing an envelope to a police officer.
>
> In order to help out his family and earn a quick $50, Dendinger agreed to act as a process server, giving a brutality lawsuit filed by his nephew to Chad Cassard as the former Bogalusa police officer exited the Washington Parish Courthouse.
>
> The handoff went smoothly, but Dendinger said the reaction from Cassard, and a group of officers and attorneys clustered around him, turned his life upside down.
>
> "It was like sticking a stick in a bee's nest." Dendinger, 47, recalled. "They started cursing me. They threw the summons at me. Right at my face, but it fell short. Vulgarities. I just didn't know what to think. I was a little shocked."

EXHIBIT
O

> Not knowing what to make of the blow-up, a puzzled Dendinger drove home. That's where things went from bad to worse.
>
> "Within about 20 minutes, there were these bright lights shining through my windows. It was like, 'Oh my God.' I mean I knew immediately, a police car."
>
> "And that's when the nightmare started," he said. "I was arrested."

He was not only arrested, he was also charged with two felonies and a misdemeanor. A prior drug charge on his record meant he was potentially looking at decades in prison. Seven witnesses backed up the police account that Dendinger had assaulted Cassard.

But Dendinger had asked his wife and nephew to record him serving the papers. It was a last minute decision, but one that may have saved him his freedom.

> From what can be seen on the clips, Dendinger never touches Cassard, who calmly takes the envelope and walks back into the courthouse, handing [prosecutor Leigh Anne] Wall the envelope.
>
> "He'd still be in a world of trouble if he didn't have that film," said David Cressy, a friend of Dendinger who once served as a prosecutor under [former St. Tammany District Attorney Walter] Reed. "It was him against all of them. They took advantage of that and said all sorts of fictitious things happened. And it didn't happen. It would still be going like that had they not had the film."
>
> Dendinger spent nearly a year waiting for trial, racking up attorney's fees. As a disabled Army veteran on a fixed income, Dendinger said

the case stretched him financially, but in his eyes, he was fighting for his life.

After nearly a year passed, his attorneys forced Reed to recuse his office. The case was referred to the Louisiana Attorney General's Office, which promptly dropped the charges.

Rafael Goyeneche, president of the Metropolitan Crime Commission and himself a former prosecutor, studied the videos. He did not hesitate in his assessment.

"I didn't see a battery, certainly a battery committed that would warrant criminal charges," Goyeneche said. "And more importantly, the attorney general's office didn't see a battery."

That's all well and good. And Dendinger has since filed a federal civil rights lawsuit. I hope he collects.

But here's my question: Why aren't the seven witnesses to Dendinger's nonexistent assault on Cassard already facing felony charges? Why are all but one of the cops who filed false reports still wearing badges and collecting paychecks? Why aren't the attorneys who filed false reports facing disbarment? Dendinger's prosecutors both filed false reports, then prosecuted Dendinger based on the reports they knew were false. They should be looking for new careers — after they get out of jail.

If a group of regular citizens had pulled this on someone, they'd all likely be facing criminal conspiracy charges on top of the perjury and other charges. So why aren't these cops and prosecutors?

I could be wrong, but my guess is that they'll all be let off due to "professional courtesy" or some sort of exercise of prosecutorial discretion. And so the people who ought to be held to a higher standard than the rest of us will once again be held to a lower one.

Radley Balko blogs about criminal justice, the drug war and civil liberties for The Washington Post. He is the author of the book "Rise of the Warrior Cop: The Militarization of America's Police Forces."

Video Exonerates Man Set Up By Louisiana Cops And Prosecutors - Yahoo News    Page 1 of 8

News Home
U.S.
World
Politics
Tech
Science
Health
Odd News
Local
Dear Abby
Comics
ABC News
Yahoo Originals
Photos

Recommended Games

More games »

Coming up: Yahoo Special Report on Supreme Court gay marriag...

# Video Exonerates Man Set Up By Louisiana Cops And Prosecutors

DAILY CALLER

March 1, 2015 3:26 PM

*Video Exonerates Man Set Up By Louisiana Cops And Prosecutors [VIDEO]*

If not for cell phone video, 47-year-old disabled veteran Douglas Dendinger could be going to prison — because of an apparent co-ordinated effort by Washington Parish, La. cops and prosecutors who falsely accused him of battery and witness intimidation.

As New Orleans' WWL reports, Dendinger's two-year nightmare began on Aug. 20, 2012, when he was paid $50 to serve a court summons on behalf of his nephew against Bogalusa police officer Chad Cassard in a police brutality lawsuit.

Dendinger handed Cassard a white envelope containing the documents and says he went on his way. But 20 minutes later, police showed up to Dendinger's house and arrested him. He was put in jail on charges of simple battery, obstruction of justice and intimidating a witness.

Two of those charges are felonies, and a prior cocaine conviction on Dendinger's record threatened to land him in jail for a long time as a repeat offender.

But Dendinger was confident that a mistake had been made and that he would be released without cause since two prosecutors and several police officers had seen him hand over the summons peacefully.

But that's not what happened.

A year after the incident, then-District Attorney Walter Reed brought charges against Dendinger. His case was backed by two prosecutors who asserted that Dendinger had assaulted Cassard. Seven witness statements also supported the case.

SAMSUNG
phone
deals
from AT&T
For the latest deals, follow @ATTDeals

What to read next

The important thing everyone calling for non-violence in Baltimore fails to say
Vox.com

What China's "Assassin's Mace" Means for America
MONEY MORNING Sponsored

10 Things to Know for Today
Associated Press

National Guard called in to keep the peace in Baltimore
Associated Press

http://news.yahoo.com/video-exonerates-man-set-louisiana-cops-prosecutors-video-20263...    4/28/2015

EXHIBIT
P

Cassard made the same claim, writing in a voluntary statement that Dendinger "slapped him in the chest" when he served the summons.

Pamela Legendre, a staff attorney who witnessed the hand-off, said she thought Dendinger had punched Cassard.

Bogalusa police chief Joe Culpepper said that Dendinger had used "violence" and "force."

And another witness said in a deposition that Dendinger used such force when he served the summons that Cassard flew back several feet.

"It wasn't fun and games, they had a plan, the plan was really to go after him and put him away. That is scary," Philip Kaplan, the attorney representing Dendinger in his civil rights case, told WWL.

"I realized even more at that moment these people are trying to hurt me," Dendinger told the news station.

Luckily for Dendinger, his wife and nephew had filmed him that day in order to prove that the court papers had been served.

Grainy video of the exchange shows Dendinger handing Cassard the summons and the former police officer walking away in the opposite direction. Though the video aired by WWL does not show the entire encounter, what it does not show is Dendinger slapping anyone or acting aggressively during the crucial moment when he served the summons.

The video also shows that the witness who claimed that Denginger's force pushed Cassard back several feet had his back turned as the scene unfolded.

After Reed was forced to recuse his office from the case, it was referred to the Louisiana attorney general who quickly dropped the charges against Dendinger.

Rafael Goyeneche, president of the New Orleans Metropolitan Crime Commission, told WWL that after viewing the video he did not see Dendinger commit battery on Cassard and that the officers and prosecutors involved could be looking at serious ethics charges.

"I didn't see a battery, certainly a battery committed that would warrant criminal charges being preferred," Goyeneche said.

"It's a felony to falsify a police report," Goyeneche continued. "So this is a police report, and this police report was the basis for charging this individual."

Kaplan made the obvious point: "If this was truly a battery on a police officer, with police officers all around him, why isn't something happening right there?"

**WATCH:**

Image Shows the Moment Sea Lion Attacked
Good Morning America

Watch this language video (it's mind-blowing)
Pimsleur Approach Sponsored

Courteney Cox Says 'Friends' Cast Member Is Reason for Lack of Reunion
Good Morning America

Coffins arrive at Indonesian prison as executions near
Associated Press

Baltimore Riots: Mom Smacks Son for Taking Part in Violence
Good Morning America





APRIL 10, 2015 2:23PM

# Police Misconduct: The Worst Case in March

*By* TIM LYNCH

Over at Cato's Police Misconduct website, we have identified the worst case of the month for March: the conspiracy to frame an innocent man, Douglas Dendinger, in Bogalusa, LA.

Here's the story: Dendinger agreed to take on the task of a "process server." That is, he would hand-deliver legal papers to a person who has been sued, putting that person on notice about the legal action. In this instance, Dendinger was to serve papers on a former police officer, Chad Cassard, who was being sued for police brutality.

Dendinger found Cassard as he was leaving the local courthouse and made the delivery. At that moment, Cassard was in the company of several police officers and prosecutors. Those people became hostile and furious with Dendinger over what this lawsuit would mean for their friend/colleague.

The story then takes a bizarre and disturbing turn: Later that day, the police arrive at Dendinger's home and arrest him on several charges, including two felonies (1) obstruction of justice and (2) witness intimidation. Cassard and a few of his cohorts claimed that Dendinger had served the papers in a violent fashion.

EXHIBIT
Q

Because of those charges, Dendinger was in very serious legal trouble. He was looking at many years in prison.

Fortunately, a cell phone video of the "incident" emerged. Turns out, Dendinger did nothing wrong. All he did was peacefully hand-deliver an envelope to Cassard. Once the video surfaced, the charges were dropped.

We now know that local police and prosecutors leveled false accusations about what happened that day. Had the case proceeded to trial, and with no video evidence, it would have been Dendinger's word against several witnesses with law enforcement backgrounds. A jury would have been hard pressed to disbelieve several witnesses who claimed to see the same thing. A miscarriage of justice was narrowly averted.

The cell phone video exposed an outrageous criminal conspiracy by officials in Bogalusa. More here.

**Topics:** Law and Civil Liberties

(cc) BY-NC-SA

This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 3.0 Unported License.

# VOLUNTARY STATEMENT

(NOT UNDER ARREST)

I Chad Cassard, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO / Deputy S. Galloway. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 34 years of age, and I live at 60236 Greentree Dr. Bogalusa, La. 70427

On Monday August 20, 2012 I Chad Cassard just walked out of District Court in Franklinton, La. after a week long trial on Logan Mills where I was a victim and a police officer on the case. At approximately 7:30 pm a white male wearing short pants, pink colored long sleeve shirt and a ball cap slapped me in the chest with a white envelope and stated "You been served brother." The subject then walked down the steps of the court house and across the street and got into a green & tan Ford Bronco and drove off heading north on Main St. The subject was handed the papers by the mother of Logan Mills whom was ordered by Judge A.J. Hand earlie in the trial to not making any contact with any victims or witness involved in the case I Chad Cassard turned over the envelope that contained a civil suit in the name of Logan Mills Vs Chad Cassard to Deputy Steven Galloway.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at 8:25 P.M., this 20 day of August 20 12.

WITNESS: Deputy S. Galloway

WITNESS: ____________________

[signature]
Signature of person giving voluntary statement.

EXHIBIT R

# VOLUNTARY STATEMENT
(NOT UNDER ARREST)

I Scott Seals, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO / Deputy S. Galloway.
Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 35 years of age, and I live at 701 N. Columbia ST, Covington, LA 70433

I, Scott Seals, was walking out of the Courthouse in Franklinton, LA when I observed a white male dressed in shorts and what looked like a pink button up shirt hit Chad Cassard in the chest with a bundle of papers and State "you've been served brother". The white male walked accross the Street and entered a Green Ford Bronco bearing a LA Tag AR 8384. I was standing to the left of Chad Cassard when this incident occured.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at 1002 Main St Franklinton, LA 70438, this 20 day of August 2012.

WITNESS: Deputy S. Galloway

WITNESS: ______

[signature] Scott Seals
Signature of person giving voluntary statement.

EXHIBIT
S

# VOLUNTARY STATEMENT

(NOT UNDER ARREST)

I Julie Knight, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO / Deputy S. Galloway.
Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 42 years of age, and I live at Ofc - 701 North Columbia St, Covington

I on front of Washington Parish Courthouse On 8/20/12 after reading of verdict about 7:15 or after a man in a peach-colored shirt approached Ofc. Chad Cassard + hit him with his hand on or about his chest area. We could hear the slap as he hit Cassards chest with an envelope of papers. This occurred in front of us as we left the Court just after defendant was convicted. He was a white/male, short, pants, peach shirt and ball cap. He told him "Served Brother" as he slapped him. This was done in a manner to threaten and intimidate everyone involved.

On or about week of Aug 13-17, [illegible] possibly Wed after lunch outside Courtroom, Scott Seals was approached by defendants mother Melanie Mills who handed him an envelope while he was a State's witness. Leigh Anne Wall + I opened it up to find a copy of a law suit that had been already served. This was also done in a manner to intimidate and threaten the witness. Court ordered a protective order for State witness.

Trial was State v. Mills in Washington Parish Court in front of A.J. Hand.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at 8/20/12 August - 8:00pm, this 20th day of August 2012.

WITNESS: Deputy S. Galloway

WITNESS: ______

Julie Knight
Signature of person giving voluntary statement.

EXHIBIT

T

# VOLUNTARY STATEMENT
(NOT UNDER ARREST)

I Leigh Anne Wall, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO, Officer Steven Galloway. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 51 years of age, and I ~~live~~ work at 905 Pearl St., Franklinton LA 70438

During the trial of St. v. Logan Mills August 10-20, defendant's mother approached one of victims, Scott Seals, asked to speak to me + Ms. Knight. He said defendant's mother approached him, said his name, and handed him an envelope. When we opened the envelope we found a copy of defendant's civil lawsuit. Judge Hand told Ms. Mills and all other friends and family that no one was to have contact with witnesses. Off. Seals seemed upset and said he found it threatening.

When the trial finished and we were walking out, a man who had been in the courtroom all day was standing on the front porch of the Courthouse approached Officer Chad Cassard. This man was wearing a peach/salmon shirt. I saw him walk up to Officer Cassard but because of where I was standing I couldn't see what he did. Off. Cassard walked inside, very upset, and handed me an envelope that was identical to the one given to Off. Seals last week. I handed it back to him. I could see the man in the peach shirt walking off toward an older model truck, possibly a blazer, along with the members of defendant's family including his mother. The man screamed something from the middle of the road but I couldn't hear exactly, something about serving him. Officer Cassard was upset and said this man actually hit him.

I have read each page of this statement consisting of _______ page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at ~~[illegible]~~ WPSO office-Franklinton, this 20th day of August 20 12.

WITNESS: Deputy S. Galloway

WITNESS: ______________________

Leigh Anne Wall
Signature of person giving voluntary statement.

EXHIBIT
U

# VOLUNTARY STATEMENT

(NOT UNDER ARREST)

I Pamela Jean Legendre, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to Washington Parish S.O. Steve Galloway. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 57 years of age, and I live at Franklinton Courthouse, Div. B, Staff of August J. Hand, Judge

Upon exiting the courthouse after the trial, I was right behind Chad Cassard, Joe Culpepper and other officers, Patrick Lyons, Julie Kinsman Knight, Leigh Anne Wall, when a gentleman (not tall, stocky, pink shirt + cap) slapped a fat legal-sized envelope directly on Chad's sternum - it made such a noise I thought Chad had been punched - the fellow just as quickly turned + trotted down the steps - When the fellow slapped the papers against Chad he said "You served now brother" or something to that effect. It was clearly a battery - on a police officer (Chad is a reserve officer and had just testified in a trial due to his status as a former active Bogalusa P.O.). Also the Judge had placed the defendant's mother under a protective order to have no contact with any ~~officer~~ witness under subpoena - the criminal matter is not over - sentencing, post trial motions etc. remain. Logan's mother handed the paper to the guy in the pink shirt. It is also, to an observer, intimidation to a witness and to all gathered there.

I have read each page of this statement consisting of one page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at Franklinton, Louisiana this 20th day of August 20 12.

WITNESS: Lt Patrick Lyons

WITNESS: Deputy S. Galloway

[signature] Pamela Jean Legendre
Signature of person giving voluntary statement.

EXHIBIT V

# VOLUNTARY STATEMENT

(NOT UNDER ARREST)

I Joe Culpepper, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO / Deputy S. Galloway.

Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 50 years of age, and I live at 214 Arkanses ave Bogalusa

As I was walking down the steps of Washington Parish courthouse, I observed a w/m wearing a pink long sleeve shirt slap Chad Cassard in the chest w/ an envelope. Cassard was standing on the front steps of the courthouse just outside the front doors of the courthouse. The incident occurred @ approx 7:30 p on August 20, 2012.

Cassard resigned from BPD on Jan 1, 2012, but was put on the reserves of BPD.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at WPSO, this 20 day of Aug 2012.

WITNESS: Deputy S. Galloway

WITNESS: ______________________

[signature] Culpepper
Signature of person giving voluntary statement.

EXHIBIT
W

# VOLUNTARY STATEMENT
(NOT UNDER ARREST)

I Kendall Bullen, am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to WPSO / Deputy S. Galloway. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve.

I am 43 years of age, and I live at 214 Arkansas Ave Bogalusa, La.

On August 20, 2012 I was leaving outside the Parish Courtroom when I observed a white male wearing short pants with a peach colored long sleeve shirt and a ball cap. This subject hit officer Chad Cassard in the chest area with a packet of papers and stated you or served brother. This subject then walked across the street and got into a vehicle bearing Louisiana License number AA 8384 which comes back registered to Douglass Dellensen of Franklinton. The subject hit officer Cassard with force in the chest area with the packet of papers.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

Dated at WPSO, this 20th day of August 2012.

WITNESS: Deputy S. Galloway

WITNESS: ______

Kendall Bullen
Signature of person giving voluntary statement.

EXHIBIT
X

# WASHINGTON PARISH SHERIFF

## ARREST REPORT Incident: 2012080810

**Incident No.:** 2012080810 **Arrest Date/Time:** 8/20/2012 20:26

**Arrestee Name (Last, First, Middle, Suffix)** DENDINGER, DOUGLAS L

**Arrestee Address:** 16600 PELICAN ROAD MANDEVILLE LA 70448-0000

**Social Security No.:** 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 **Driver's Lic. (No., State, Type)** 7141105 LA F

| Race: | Sex: | Eyes: | Hair: | Height: | Weight: | DOB: | Age: | Marks: |
|---|---|---|---|---|---|---|---|---|
| W | M | | | | 0 | 07/13/1967 | 45 | |

**Arrestee No:** 2012080111 **Fingerprint Card No.:** **Arrest Type:** TAKEN INTO CUSTODY

**Arrest Location:** 16600 PELICAN ROAD

**Arresting Officer:** GALLOWAY, STEVEN

**Miranda (Date, Time, Place)** 08/20/2012 20:50 16600 PELICAN ROAD

**Miranda Officer:** GALLOWAY, STEVEN

**Type Weapon:** UNARMED

**Statute (LRS#):** 14:130.1 **Offense:** OBSTRUCTION OF JUSTICE **Location Type:** GOV
**Offense Date/Time, Location:** 08/20/2012 19:42 0 COURTHOUSE FRANKLINTON

**Statute (LRS#):** 14:129.1 **Offense:** INTIMIDATING OF A WITNESS **Location Type:** GOV
**Offense Date/Time, Location:** 08/20/2012 19:42 0 COURTHOUSE FRANKLINTON

**Statute (LRS#):** 14:34.2 **Offense:** BATTERY ON A POLICE OFFICER-SIMPLE **Location Type:** GOV
**Offense Date/Time, Location:** 08/20/2012 19:42 0 COURTHOUSE FRANKLINTON

**Property/Vehicle:** N

**Notes:**

On August 20, 2012 Deputy S. Galloway Arrested Douglas L. Dendinger (W/M DOB 7/13/67) after an altercation took place at the Courthouse. Deputy S. Galloway was advised by complainant, Officer Chad Cassard, Dendinger slapped him in the chest with an open hand containing a white envelope. Dendinger told Officer Cassard "you have been served brother". Deputy S. Galloway was made aware by the District Attorney's Office the Witnesses of the State was not to be Harassed.
Deputy S. Galloway was advised by numerous witness Dendinger committed the following acts.
Charges as followed : R.S. 14:130.1 Obstruction of Justice, R.S. 14:129.1 Intimidating of a witness, and R.S. 14:34.2 Battery of a Police Officer

Dendinger was turned over to the WPSO Jail for processing.

Nothing further.

**Report Made By:** Deputy S. Galloway 1016 **Date:** 8-20-12 **Time:** 2135

EXHIBIT Y

SURETY $2,500.00 Surety Bond

FELONY BILL OF INFORMATION

STATE OF LOUISIANA – PARISH OF WASHINGTON

TWENTY-SECOND JUDICIAL DISTRICT

---

TO THE HONORABLE, THE TWENTY-SECOND JUDICIAL DISTRICT COURT OF LOUISIANA, sitting in for the Parish of WASHINGTON, comes now into open Court the undersigned District Attorney of the Twenty-Second Judicial District of Louisiana, in the name and by the authority of said State, informs the said Honorable Court:

That the person(s) named and identified below, late of the Parish of WASHINGTON on or about the date below describe, in the Parish of WASHINGTON aforesaid and within the jurisdiction of the Twenty-Second Judicial District in and for the Parish of WASHINGTON, State of Louisiana and contrary to the form of the Statutes of the State of Louisiana in such cases made and provided, and against the peace and dignity of the same did violate:

---

DEFENDANTS NAME AND DATE OF BIRTH:

**DOUGLAS L. DENDINGER**
SSN: 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 SID#: 1687801
16600 PELICAN ROAD, MANDEVILLE, LA 70448

DOB: 07/13/67
Arrest Date: 08/20/2012

COUNT 1
R.S. 14:130.1 (A) (1) OBSTRUCTION OF JUSTICE
**DOUGLAS L. DENDINGER, on or about August 20, 2012,** by tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding.

COUNT 2
R.S. 14:35 SIMPLE BATTERY
**DOUGLAS L. DENDINGER, on or about August 20, 2012,** committed a battery upon Officer Chad Cassard, without the consent of the victim.

COUNT 3
R.S. 14:129.1A(2)(3) INTIMIDATING
**DOUGLAS L. DENDINGER, on or about August 20, 2012,** IMPEDING OR INJURING WITNESSES, by the intentional intimidation by threat of force or violence of Officer Chad Cassard with the intent to influence the testimony, the reporting of criminal conduct or an appearance at a judicial proceeding.

WALTER P. REED
DISTRICT ATTORNEY
22ND JUDICIAL DISTRICT
STATE OF LOUISIANA

BY: ______________________

EXHIBIT
Z